**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------- X
                             :

NEW YORK CITY TRANSIT AUTHORITY,

                             :      Civ. No.

                      Plaintiff,

                             :

          - against -            **COMPLAINT**

                             :

WESTFIELD FULTON CENTER LLC,     :

                     Defendant.     :
---------------------------------------------------------------- X

       Plaintiff New York City Transit Authority, by its attorneys Ingram LLP, for its

Complaint against defendant Westfield Fulton Center LLC, alleges as follows:

## OVERVIEW

       1.     This action arises out of a written lease agreement dated as of May 16, 2014 (the

"Lease") entered into between the Metropolitan Transportation Authority ("MTA"), as landlord,

and Westfield Fulton Center LLC, as tenant ("Westfield" or "Tenant").  The Lease, which has

since been assigned to MTA's affiliate, New York City Transit Authority ("NYCTA" or

"Landlord"), requires Westfield to manage and operate the transportation complex in lower

Manhattan known as the Fulton Center.

       2.     Westfield recently notified MTA, including by a letter from its counsel dated

February 12, 2024, that Westfield intends to cease its operations at the Fulton Center and

effectively terminate the Lease before the expiration of the Initial Term of the Lease.

       3.     Under Section 2.2 of the Lease, the Initial Term was to be at least 20 years

"unless terminated sooner in accordance with the provisions of this Lease."  More than 10 years

therefore remain on the Initial Term of the Lease.

4.      NYCTA has commenced this action for anticipatory repudiation, declaratory judgment, and injunctive relief based on Westfield's threat to engage in its stated course of action to cease operations and terminate the Lease, and thereby breach its various obligations under the Lease.  NYCTA will face irreparable injury if Westfield abandons the Fulton Center in derogation of its Lease obligations by advancing its own self-serving business interests over the interests of NYCTA, retail establishments in the Fulton Center, and members of the public.

5.      Westfield's unauthorized cessation of its operations and termination of the Lease would adversely affect not only the retail establishments in Fulton Center that Westfield subleased, but also members of the transit public who are customers of these retail outlets. Westfield's improper termination of the Lease also would adversely impact the goodwill that NYCTA has developed with the public by having made these retail establishments available to transit users.

6.      All capitalized terms not defined in this Complaint have the meaning ascribed to them in Section 1 or elsewhere in the Lease.  The Lease, without its exhibits, is annexed to this Complaint as **Exhibit A**.

## JURISDICTION

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a), as a civil action arising under this Court's diversity jurisdiction over matters involving a controversy exceeding the sum or value of in excess of $75,000.00, exclusive of interest and costs.

8.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(a) and (b) because Westfield is present in this district, a substantial part of the events or omissions giving rise to the claims occurred in this district, and the subject Lease was executed in this district.

## THE PARTIES

9.     NYCTA is a public benefit corporation organized under the laws of the State of New York with a principal place of business at 2 Broadway, New York, New York 10004.

10.     Upon information and belief, Westfield is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 2049 Century Park East, 41st Floor, Los Angeles, California 90067.

11.     Upon information and belief, based on NYCTA counsel's reasonable inquiry to determine the members of Westfield, the members of Westfield are all citizens of states other than New York.

12.     Upon information and belief, based on NYCTA counsel's reasonable inquiry to determine the members of Westfield, the managing member of Westfield is Westfield Property Management LLC ("Westfield Property Management"), a Delaware liability company.

13.     Upon information and belief, based on NYCTA counsel's reasonable inquiry to determine the members of Westfield Property Management, the parent corporations of Westfield Property Management are URW America, Inc. (69.93% interest), a foreign corporation organized under the laws of the State of Delaware and having a principal place of business at 2049 Century Park East, 41st Floor, Los Angeles, California 90067, and WHL USA Acquisitions Inc. (30.07% interest), a foreign corporation organized under the laws of the State of Delaware and having a principal place of business at 2049 Century Park East, 41st Floor, Los Angeles, California 90067.

## FACTUAL BACKGROUND

14.     The attacks of September 11, 2001 killed approximately 3,000 people and destroyed five major commercial office towers.  But those attacks also wiped out a huge array of

public transit infrastructure and put in question the future of  Lower Manhattan – New York City's historic business district.  The Fulton Transit Center was a centerpiece of the strategy developed and implemented by leaders of New York City, New York State, and the Lower Manhattan Development Corp., a special purpose entity formed to plan and oversee the rebuilding.  Those agencies determined that new and substantially improved public transit facilities were needed in order to attract back both workers and major employers who had fled downtown in the wake of 9/11.  Financed with federal funds, the Fulton Center was conceived as a major transit hub that would create connections between the eight subway lines originally developed by three separate subway companies, which before 9/11 had access only through a rabbit warren of entrances sprinkled over many blocks.  By contrast, the Fulton Transit Center was designed to create a more seamless transfer at a single convergence point.  At the same time, the MTA sought to fulfill the public demand for convenient customer retail amenities at this convergence.

15.     Today the Fulton Transit Center is the busiest subway complex in Lower Manhattan.  But Lower Manhattan is facing new challenges in the wake of the COVID-19 pandemic.  As transit ridership recovers (it has already reached roughly 80% of pre-pandemic levels), retail is key to making transit more appealing to the public.

16.     In 2013, the MTA selected Westfield to operate the Fulton Center after a year-long competitive request for proposals process.  MTA's selection of Westfield was due, in part, to its representation of financial stability and a stated commitment to Lower Manhattan, where Westfield also invested heavily in the World Trade Center retail.

17.     On or about May 16, 2014, Westfield entered into the Lease with MTA during the redevelopment of Fulton Center located in lower Manhattan.  The leased premises encompasses

portions of the interior spaces as well as exterior and structural elements of the Fulton Center, consisting of: (a) the Fulton Building, located at the intersection of Broadway and Fulton Street; (b) the Corbin Building, located at the intersection of Broadway and John Street; (c) the Dey Street Headhouse, located at the intersection of Broadway and Dey Street; (d) the Dey Street Concourse, comprising subsurface improvements located under Dey Street between Broadway and Church Street; (e) the R Line Underpass, comprising subsurface improvements located under Church Street at the western end of the Dey Street Concourse; and (f) the 4/5 Line Underpass, comprising subsurface improvements located under Broadway at the eastern end of the Dey Street concourse (collectively, the Premises).

18.     At the time that the Lease was entered into, MTA was the fee owner of the Premises.  Portions of Fulton Center that were not owned by MTA are not a part of the leased Premises.

19.     Under a deed dated June 17, 2015, MTA transferred its interest in the Premises to NYCTA.  As a result, NYCTA acquired the interests of MTA as the Landlord under the Lease.

A.    **Westfield's Obligations To Manage And Operate The Fulton Center**

20.     The Lease requires Westfield, as Tenant, to manage and operate the Fulton Center and oversee certain revenue-raising activities on Landlord's behalf.  The following paragraphs identify some of Westfield's material obligations under the Lease.

21.     Section 9.1 of the Lease requires Westfield to undertake to enter into Subleases with qualified Subtenants in areas of the Premises intended for commercial use (the Commercial Usage Areas) in accordance with Westfield's sound business practices and business judgment to foster the success of the Premises as a retail center in accordance with the Retail Standard.

22.     The term "Retail Standard," as defined in Section 5.1 of the Lease, refers to the quality commensurate with the standards of the retail portions of other high quality transportation-oriented retail facilities in Manhattan, such as the retail portions of Rockefeller Center, Grand Central Terminal, and JFK International Airport Terminal 8, taking into account the differing characteristics and operations appropriate for the Premises.  Section 5.1 further specifies the type of Subtenants that Westfield was to attract for "Permitted Retail Use" – i.e., "high quality, lawful retail stores, food service establishments and/or restaurants (selling food and beverages for on and/or off Premises consumption) and for no other purpose."

23.     Section 4 of the Lease, which sets forth Tenant's Participation Rent obligations, provides for three types of Participation Rent to be paid to NYCTA: (a) Signage Participation Rent arising from Signage Revenues; (b) Sponsorship Participation Rent arising from Sponsorship Revenues; and (c) Commercial Participation Rent arising from Commercial Revenues.

24.     Pursuant to a formula in Section 4.2 of the Lease, Westfield is required to pay NYCTA Participation Rent derived from Commercial Revenues, which are "all revenues of Tenant (or any Affiliate of Tenant) derived from Commercial Usage Areas" (see Lease, page 6). Section 4.9 of the Lease also requires Westfield to pay as Additional Rent "certain other charges, as herein elsewhere provided."

25.     As to Signage Participation Rent, the Premises includes multimedia signage where commercial advertising material is displayed for a fee.  Signage is controlled either by Landlord (Landlord Controlled Signage) or Tenant (Tenant Controlled Signage).  All Tenant Controlled Signage, which consists of (a) Base Tenant Controlled Signage, and (b) Additional Tenant Controlled Signage, is under the control of Westfield and is to be operated by Westfield.

26.     The Lease also requires Westfield to pay for Ongoing Capital Expenditures incurred in connection with Westfield's performance of Tenant's obligations and exercising its rights under the Lease at Fulton Center, including (with certain exclusions): (a) leasing commissions; (b) allowances paid to Subtenants for Subtenant Improvements or expended by Westfield itself in constructing such Improvements; and (c) expenditures for capital repairs or replacements of Base Building Equipment or other elements of the Premises.

27.     Section 7.1 of the Lease requires Westfield to repair and maintain certain aspects of the Fulton Center and Tenant Controlled Signage, and to keep, repair and maintain, or cause Subtenants to keep, repair and maintain the Subtenant Improvements and Tenant/Subtenant Equipment in good order and condition in accordance with, among other things, applicable Laws, the Lease's Concept of Operations (i.e., the manual outlining specifications for the maintenance and operations of the Premises), and the Retail Standard.

28.     Section 7.1.1 clarifies that, unless otherwise provided, the obligation to repair includes the making of capital replacements as required in accordance with good industry practice at Westfield's cost, subject to any deductions or credits expressly provided in the Lease.

29.     Section 7.1.2 of the Lease also requires Westfield to clean and maintain the Premises in accordance with the Concept of Operations, the Retail Standard, and as required by applicable Law, or to cause its Subtenants to do so.

30.     Finally, under Section 27.3 of the Lease, Westfield agreed, except as expressly provided in the Lease, to "pay any and all expenses, costs, obligations and charges whatsoever which shall arise, be incurred or become due during the Term with respect to or in connection with the improvement, operation, management, maintenance and repair of the Premises."

**B.**     <u>**Westfield Announces Its Plan To Leave Fulton Center**</u>

31.     In early January of 2024, a Westfield representative, Diana Grasso, had a telephone conversation with David Florio, MTA's Chief of Real Estate Transactions and Operations Officer who also oversees real estate transactions involving NYCTA.  Ms. Grasso informed Mr. Florio that Westfield wanted out of the Lease because the Fulton Center did not "work for" Westfield any longer.  In that telephone conversation, Mr. Florio told Ms. Grasso that he would get back to her after discussing the situation with MTA senior management.

32.     After a series of internal discussions amongst MTA and NYCTA personnel, Mr. Florio advised Ms. Grasso on February 7, 2024 that NYCTA would not agree to a termination of the Lease but that NYCTA would work with Westfield to address Westfield's operational concerns.  Mr. Florio also offered altered terms of the Lease, and the prospect of working with Westfield to foster greater control of the environment to improve the retail center.  Ms. Grasso responded that she would get back to him in a week or two.

33.     Ms. Grasso, instead, asked for a call the following day.  That telephone conversation occurred on February 9, 2024, when Ms. Grasso reiterated that Westfield wanted out of the Lease.  In that conversation, Ms. Grasso also stated that Westfield planned to stop operating Fulton Center, and that there was no circumstance under which Westfield would remain as Tenant for the remainder of the Initial Term because Westfield did not want to operate Fulton Center for another 13 years.

34.     Westfield  confirmed its intention to cease its operations and surrender the Premises at Fulton Center in its February 12, 2024 letter from Westfield's counsel, Hyura Choi, to Paige Graves, MTA's General Counsel.  A copy of the February 12, 2024 letter is annexed to this Complaint as **Exhibit B**.  In that letter, Ms. Choi stated that "the current situation [at Fulton

Center] is financially unsustainable, and Westfield is no longer in a position to be able to operate its Premises at Fulton Center."

35.     Contrary to a statement in that February 12, 2024 letter from Ms. Choi (who was not a party to Mr. Florio's call with Ms. Grasso), MTA did not assure Westfield in January that "a proposal regarding a surrender would be promptly conveyed" from MTA.  Mr. Florio instead told Ms. Grasso that he would get back to her after discussing the situation with MTA senior management.  After a series of internal discussions amongst MTA and NYCTA personnel, Mr. Florio advised Ms. Grasso on February 7, 2024 that NYCTA would not agree to a termination of the Lease but would work with Westfield to address its operational concerns, as stated above.

36.     The February 12, 2024 letter from Ms. Choi also states that, based on the conversation between Mr. Florio and Ms. Grasso on February 9, 2024, Westfield is "expecting a termination proposal from MTA this week."  Contrary to that statement, Mr. Florio advised Ms. Grasso only that he would advise MTA management of her comments, and he did not represent in any way that Westfield should expect a termination proposal from MTA.

37.     In short, Ms. Grasso and Ms. Choi have announced Westfield's intent to cease its operations at Fulton Center, to surrender the Premises, and to terminate the Lease many years before the end of the Initial Term.

**C.     The Lease Does Not Expressly Provide A Basis For Westfield To Terminate The Lease, And Westfield Has Expressly Acknowledged That Damages Will Be Inadequate For Westfield's Nonmonetary Default**

38.     Section 15.9 of the Lease, titled "Continuation of Lease," provides:

> Except as this Lease expressly provides, this Lease shall not terminate, be forfeited, or be affected in any other manner, and Tenant waives any right to quit or surrender the Premises or any part of the Premises, because of any Loss or any resulting untenantability.  Unless and until this Lease has been validly terminated, Tenant's obligations

under this Lease, including the obligation to pay Rent, shall
continue unabated.

39.     Westfield therefore may terminate the Lease only "as this Lease expressly

provides," but Westfield has not identified – and cannot identify – any Lease provision that

would allow Westfield to prematurely terminate its Lease obligations.

40.     The Lease contains three provisions that permit Westfield to terminate the Lease,

none of which applies to Westfield's circumstances.

41.     The first termination provision (Section 7.1.4(d)(2)) provides Westfield the right

to terminate the Lease upon notice as specified in Section 7.1.4(d)(2) if the aggregate Available

Rent Offset exceeds the Rent for the remainder of the Term.  But the condition required to

trigger the right of termination has not occurred.  Nor does Westfield's February 12, 2024 letter

reference Section 7.1.4(d)(2) as a basis for termination.

42.     The second termination provision (Section 7.2.1) concerns the allocation of

responsibility to repair, restore, or remediate a Material Structural Failure of any Structural

Component of the Premises, which is to be treated as a Casualty unless otherwise provided in the

Lease or agreed upon by the Parties.  This section provides that either Landlord or Westfield has

the right to terminate the Lease if the magnitude of the Casualty results in the Casualty being a

Substantial Casualty under Section 15.2, discussed below.

43.     The third termination provision (Section 15.2) concerns the occurrence of a

Casualty event.  This provision provides that (a) either Landlord or Westfield has the right to

terminate the Lease upon 90 days' notice if the Casualty is a Substantial Casualty; and (b)

Westfield has the right to terminate the Lease upon 90 days' notice if such Casualty occurs

during the two years prior to the then Scheduled Expiration Date, defined as the last day of the

Lease Term.  But there has been no Substantial Casualty event, and the Lease is not currently in

the last two years of its Initial Term, so the conditions required to trigger the right of termination

have not occurred.  Nor does Westfield's February 12, 2024 letter reference either Section 7.2.1

or Section 15.2 as a basis for termination.

44.     The Lease defines "Nonmonetary Default" to include Tenant's "failure to comply

with any affirmative or negative covenant or obligation of this Lease, except a Monetary

Default."  Because Westfield is not seeking to cease its operations and terminate the Lease on

any ground that "this Lease expressly provides," Westfield's threatened cessation of operations

and termination of the Lease therefore would constitute a Nonmonetary Default.

45.     Section 22.1.14 of the Lease, titled "Injunction of Breaches," provides:

> Whether or not an Event of Default has occurred, Landlord
> may obtain a court order enjoining Tenant from continuing
> any Default or from committing any threatened breach or
> Default. Tenant specifically and expressly acknowledges
> that damages would not constitute an adequate remedy for
> any Nonmonetary Default.

46.     Section 22.1.14 thus reinforces NYCTA's position that this Court should enter an

injunction against Westfield because NYCTA has no adequate remedy at law for Westfield's

threatened cessation of operations and termination of the Lease.

### AS AND FOR A FIRST CAUSE OF ACTION
#### (Anticipatory Repudiation Of The Lease)

47.     NYCTA repeats and realleges the preceding paragraphs of this Complaint as if

fully set forth herein.

48.     Westfield, through its statements and acts, including the February 12, 2024 letter

from its counsel to MTA's counsel, positively and unequivocally expressed its intent to cease its

operations at Fulton Center and thereby breach and terminate the Lease and no longer perform its

obligations for the remainder of the Initial Term of the Lease.

49.     The Lease does not permit Westfield to terminate the Lease on the grounds stated in its February 12, 2024 letter.  To the contrary, Section 15.9 of the Lease expressly provides in relevant part that, "Except as this Lease expressly provides, this Lease shall not terminate, be forfeited, or be affected in any other manner."

50.     Westfield's stated intention to cease it operations at Fulton Center and terminate the Lease without a basis that the Lease "expressly provides" constitutes an anticipatory repudiation by Westfield of its obligations and a Nonmonetary Default under the Lease.

51.     NYCTA has no adequate remedy at law, as Westfield expressly recognized in Lease Section 22.1.14, which provides that "Tenant specifically and expressly acknowledges that damages would not constitute an adequate remedy for any Nonmonetary Default."

52.     As a result of Westfield's anticipatory repudiation of the Lease, NYCTA will suffer harm that cannot be remedied by an award of damages.

53.     By reason of the foregoing, NYCTA is entitled to preliminary and permanent injunctions against Westfield's threatened cessation of operations at Fulton Center and termination of the Lease.

### AS AND FOR A SECOND CAUSE OF ACTION
#### (Declaratory Judgment)

54.     NYCTA repeats and realleges the preceding paragraphs of this Complaint as if fully set forth herein.

55.     No provision of the Lease provides Westfield the right to cease its operations at Fulton Center and to terminate the Lease at the current time.

56.     There is an actual, justiciable controversy between NYCTA and Westfield concerning whether Westfield has the right to cease its operations at Fulton Center and to terminate the Lease.

57.     This controversy is ripe for adjudication.

58.     By reason of the foregoing, NYCTA requests a declaration that the Lease is in full force and effect, that Westfield is not entitled to cease its operations at Fulton Center and to terminate the Lease, and that Westfield's ceasing of its operations at the Fulton Center would constitute a breach of the Lease.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Injunctive Relief)

59.     NYCTA repeats and realleges the preceding paragraphs of this Complaint as if fully set forth herein.

60.     Westfield has no valid basis under the Lease to cease its operations at Fulton Center and to terminate the Lease.

61.     If Westfield ceases operations at Fulton Center and improperly terminates the Lease, NYCTA will suffer irreparable harm and an unquantifiable loss of goodwill that NYCTA has developed with members of the transit public through operations at the Fulton Center.

62.     Westfield's cessation of operations at Fulton Center and termination of the Lease will also adversely affect Subtenants at Fulton Center, as well as members of the public who use the Fulton Center.

63.     NYCTA has no adequate remedy at law because, as Westfield recognized in Section 22.1.14 of the Lease, "damages would not constitute an adequate remedy for any Nonmonetary Default."

64.     Westfield would incur no harm from preservation of the *status quo* by being required to perform its contractual obligations under the Lease.

65.     By reason of the foregoing, the balance of equities tips decidedly in favor of NYCTA.

66.      By reason of the foregoing, NYCTA is entitled to a preliminary and permanent injunction barring Westfield from ceasing its operations at Fulton Center and terminating the Lease.

### AS AND FOR A FOURTH CAUSE OF ACTION
#### (Attorneys' Fees)

67.      NYCTA repeats and realleges the preceding paragraphs of this Complaint as if fully set forth herein.

68.      Section 28.1 of the Lease provides that, in the event of any litigation arising under the Lease, the prevailing party is entitled to "reimbursement of its Legal Costs with Default Interest and all other reasonable costs and expenses incurred in enforcing this Lease or curing the other Party's default."  The Lease defines Legal Costs to include reasonable attorneys' fees and court costs.

69.      In accordance with Section 28.1 of the Lease, if NYCTA prevails in any litigation or dispute with Westfield, Westfield is obligated to pay NYCTA's expenses, including reasonable attorneys' fees, incurred in connection with the enforcement of NYCTA's rights under the Lease or upon Westfield's default.

70.      As a result, Westfield is liable to NYCTA for the expenses and attorneys' fees incurred by NYCTA in prosecuting this action, in an amount to be determined upon the trial of this action.

**WHEREFORE**, NYCTA demands the following relief against Westfield as follows:

(a)      Pursuant to Fed. R. Civ. P. 65, a preliminary and permanent injunction enjoining Westfield from ceasing its operations at Fulton Center and terminating the Lease before the end of Initial Term of the Lease;

(b)  Pursuant to 28 U.S.C. § 2201, a declaratory judgment that the Lease is in full force and effect, that Westfield is not entitled to cease its operations at Fulton Center or to terminate the Lease, and that Westfield's ceasing of operations at Fulton Center would constitute a breach of the Lease and a Nonmonetary Default under the Lease;

(c)  A judgment for any damages that may arise and can be calculated as a result of Westfield's repudiation of the Lease;

(d)  A judgment for attorneys' fees pursuant to Section 28.1 of the Lease;

(e)  The costs and disbursements of the action; and

(f)  For such other and further relief as this Court may deem just and proper.

Dated:  New York, New York
         February 15, 2024

**INGRAM LLP**
*Attorneys for Plaintiff*
*New York City Transit Authority*


By:___*/s/John Nicolich*_____
        John G. Nicolich
        Daniel L. Carroll
        Mioko C. Tajika
    150 East 42nd Street, 19th Floor
    New York, NY  10017
    Tel: (212) 907-9600
    jnicolich@ingramllp.com
    dcarroll@ingramllp.com
    mtajika@ingramllp.com