# EXHIBIT A

EXECUTION VERSION

# LEASE

BETWEEN

**METROPOLITAN TRANSPORTATION AUTHORITY, AS LANDLORD**

AND

**WESTFIELD FULTON CENTER LLC, AS TENANT**

**FULTON CENTER**

# TABLE OF CONTENTS


PAGE

1. Definitions. ..... 2

2. Term. ..... 29
   - 2.1 *Stabilization Period.* ..... 29
   - 2.2 *Initial Term.* ..... 29
   - 2.3 *Renewal Options.* ..... 29

3. Landlord's Work; Delivery of Premises; Tenant Controlled Signage. ..... 29
   - 3.1 *Landlord's Work.* ..... 29
   - 3.2 *Delivery of Commercial Usage Areas in Tenant-Ready Condition.* ..... 30
   - 3.3 *Entry by Tenant Prior to Interim Delivery Date.* ..... 31
   - 3.4 *Entry by Tenant Between Applicable Delivery Date and Opening Date.* ..... 31
   - 3.5 *Material Physical Impairment.* ..... 31
   - 3.6 *Opening Date.* ..... 31
   - 3.7 *Tenant Controlled Signage.* ..... 31

4. Rent. ..... 32
   - 4.1 *Rent Derived from Signage Revenues.* ..... 32
   - 4.2 *Participation Rent Derived from Commercial Revenues.* ..... 34
   - 4.3 *Rent Derived From Sponsorship Revenues.* ..... 34
   - 4.4 *Guaranteed Minimum Rent During the Renewal Terms.* ..... 35
   - 4.5 *Offset.* ..... 36
   - 4.6 *Payment.* ..... 36
   - 4.7 *Monthly Statements; Annual Statements; Reconciliation.* ..... 36
   - 4.8 *Contracts with Affiliates.* ..... 40
   - 4.9 *Additional Rent.* ..... 40

5. Use. ..... 40
   - 5.1 *Retail Standard.* ..... 40
   - 5.2 *Signage.* ..... 42
   - 5.3 *Arts Programming.* ..... 44
   - 5.4 *Use of NYCT Retained Areas.* ..... 44
   - 5.5 *Storage Areas/Deliveries.* ..... 45
   - 5.6 *Trade Name.* ..... 45
   - 5.7 *Operating Hours.* ..... 45
   - 5.8 *Tenant's Manner of Operation: No Unauthorized Use of Public Areas.* ..... 45
   - 5.9 *Pest Control; Trash Disposal.* ..... 46
   - 5.10 *Grease Traps.* ..... 46
   - 5.11 *Con Ed Equipment and Facilities.* ..... 46
   - 5.12 *MWBE.* ..... 47
   - 5.13 *Compliance with Labor Laws.* ..... 47
   - 5.14 *Commencement of Tenant's Responsibilities.* ..... 47

6. Compliance. 47
6.1 *Generally.* 47
6.2 *Landlord as Government Agency.* 47
6.3 *Copies of Notices.* 48
6.4 *FTA Requirements.* 48
6.5 *Prohibited Persons.* 49

7. Maintenance, Repairs and Services. 49
7.1 Maintenance and Repairs; Cleaning. 49
7.2 *Maintenance and Repair of Structural Components.* 56
7.3 *Utilities.* 57
7.4 *Center Security.* 57
7.5 *Sprinkler System.* 59
7.6 *Fire Alarm System.* 59
7.7 *Compliance with FTA Requirements.* 60
7.8 *No Other Services.* 60

8. Construction. 60
8.1 *Construction.* 60
8.2 *Plans and Specifications; Code Compliance.* 61
8.3 *Corbin Building.* 63
8.4 *Security for Tenant's Work.* 63
8.5 *Labor Harmony.* 63

9. Subleasing. 63
9.1 *Subleases.* 63
9.2 *Recognition of Subtenants.* 64
9.3 *Assignment of Commercial Revenues.* 65
9.4 *Required Provisions.* 65
9.5 *Assignment of Reading Room Agreement.* 66

10. Communications Protocols. 67

11. Prohibited Liens. 67
11.1 *Tenant's Covenant.* 67
11.2 *Protection of Landlord.* 67

12. Hazardous Substances. 68
12.1 *Restrictions.* 68
12.2 *Compliance; Clean-Up.* 68
12.3 *Pre-Existing Conditions.* 68

13. Indemnification; Liability of Landlord. 69
13.1 *Indemnity by Tenant.* 69
13.2 *Indemnity by Landlord.* 69
13.3 *Relationship of Indemnities to Commercial General Liability Insurance* 69
13.4 *Enforcement of Indemnification Obligations of Subtenants.* 70
13.5 *Enforcement of Indemnification Obligations of Service Contractors and*

*Construction Contractors.* ... 70
13.6 *Management of Third-Party Liability Claims; Landlord's Right to Contest.* ... 70
13.7 *Liability of Landlord.* ... 71
13.8 *Indemnification Procedures.* ... 71

14. Insurance Requirements. ... 71
14.1 *Landlord and Tenant – Property Insurance.* ... 71
14.2 *Tenant's Liability and Other Insurance.* ... 73
14.3 *Insurance for Construction.* ... 74
14.4 *Subtenant's and Service Contractor's Insurance.* ... 77
14.5 *General Insurance Requirements.* ... 78
14.6 *Insurance Submission Requirements.* ... 79
14.7 *No Limit on Tenant's Liability.* ... 80
14.8 *Right to Request Additional Insurance and Limits.* ... 80
14.9 *Waiver of Subrogation.* ... 80
14.10 *Blanket and/or Master Policies.* ... 80
14.11 *Suspension of Work / Event of Default.* ... 80

15. Losses and Loss Proceeds. ... 81
15.1 *Prompt Notice.* ... 81
15.2 *Casualty.* ... 81
15.3 *Disposition of Insurance Proceeds.* ... 82
15.4 *Substantial Condemnation.* ... 82
15.5 *Insubstantial Condemnation.* ... 83
15.6 *Temporary Condemnation.* ... 83
15.7 *Condemnation Affecting Tenant Controlled Signage.* ... 83
15.8 *Disbursement of Loss Proceeds.* ... 83
15.9 *Continuation of Lease.* ... 83
15.10 *Disputes.* ... 83

16. Representations and Warranties. ... 83
16.1 *Due Authorization and Execution.* ... 83
16.2 *No Litigation.* ... 84
16.3 *FIRPTA.* ... 85
16.4 *Office of Foreign Assets Control.* ... 85
16.5 *Special Purpose Entity.* ... 85

17. Landlord Controlled Equipment. ... 85

18. NYCT Retained Areas. ... 85

19. Transfers. ... 85
19.1 *Transfer of Lease.* ... 85
19.2 *Transfers of Equity Interests.* ... 86
19.3 *Replacement Guarantor.* ... 86

20. Self Help Rights. 86
*20.1 Landlord's Right to Cure.* 86
*20.2 Tenant's Right to Cure.* 87

21. Quiet Enjoyment; Title to Certain Premises; Certain Agreements. 87
*21.1 Quiet Enjoyment.* 87
*21.2 Access and Inspection.* 87
*21.3 Title.* 88

22. Events of Default; Remedies. 88
*22.1 Definition of "Event of Default".* 88
*22.2 Remedies.* 89
*22.3 Proceeds of Reletting.* 91
*22.4 Tenant's Late Payments; Default Interest.* 92
*22.5 Holding Over.* 92
*22.6 Waivers.* 92
*22.7 Accord and Satisfaction; Partial Payments.* 93
*22.8 Miscellaneous.* 93

23. Arbitration. 93
*23.1 Third-Party Arbitration.* 93
*23.2 Specific Provisions.* 94
*23.3 Binding Effect.* 95
*23.4 Other Rights and Obligations Not Affected.* 95

24. End of Term. 95

25. Notices. 96

26. Brokers. 96

27. Additional Deliveries; Third Parties. 96
*27.1 Estoppel Certificates.* 96
*27.2 Further Assurances.* 97
*27.3 Net Lease.* 97
*27.4 Modification.* 97
*27.5 Successors and Assigns.* 97

28. Miscellaneous. 97
*28.1 Costs and Expenses; Legal Costs.* 97
*28.2 No Consequential Damages.* 98
*28.3 No Waiver by Silence.* 98
*28.4 Performance Under Protest.* 98
*28.5 Survival.* 98
*28.6 Unavoidable Delay.* 98
*28.7 Financial Statements.* 98
*28.8 Development Rights.* 98

29. Interpretation, Execution, and Application of Lease. ........ 100
*29.1 Captions.* ........ 100
*29.2 Counterparts.* ........ 100
*29.3 Delivery of Drafts.* ........ 100
*29.4 Entire Agreement.* ........ 100
*29.5 Governing Law.* ........ 100
*29.6 Partial Invalidity* ........ 100
*29.7 Principles of Interpretation.* ........ 100
*29.8 Lobby Law Certification.* ........ 101

***Attachments:***

**Exhibit A** = Lease Demarcation Plans
**Exhibit B** = Usage Plans
**Exhibit C** = Location of Tenant Controlled Signage and Landlord Controlled Signage
**Exhibit C-1**= Specifications for Base Tenant Controlled Signage
**Exhibit D** = Comparison Stores
**Exhibit E** = Form of Guaranty
**Exhibit F** = Notice Addresses (Including Required Copy Recipients)
**Exhibit G** = Form of Estoppel Certificate
**Exhibit H** = Special Purpose Entity Covenants
**Exhibit I** = Named and Additional Insureds
**Exhibit J** = Landlord's Forms of Required Certificates of Insurance
**Exhibit K** = Concept of Operations
**Exhibit L** = Design Guidelines
**Exhibit M** = List of Prohibited Uses
**Exhibit N** = MWBE Programs and Requirements
**Exhibit O** = FTA Grant Management Requirements
**Exhibit P** = Core and Shell/Base Building Plans and Specifications
**Exhibit Q** = Substantial Completion and Final Completion
**Exhibit R** = Utility Allocation
**Exhibit S** = Prohibited Person Vetting Process
**Exhibit T** = Close-Out Items
**Exhibit U** = Risk Management Procedure
**Exhibit V** = Items to be included in Monthly Statements and Annual Statements
**Exhibit W** = Hypothetical Illustration of the Calculation of Guaranteed Minimum Rent
**Exhibit X** = Lobbying Law Certification

# LEASE

This **LEASE** (this "Lease") is made and entered into as of the 16th day of May, 2014 (the "Lease Execution Date"), between Metropolitan Transportation Authority, a public benefit corporation of the State of New York ("Landlord"), and Westfield Fulton Center LLC, a Delaware limited liability company ("Tenant").

## ***WITNESSETH:***

**WHEREAS**, Landlord is currently completing the redevelopment of the transportation complex known as the Fulton Center located in Lower Manhattan (the "Fulton Center"), which encompasses the following improvements, all of which are identified by the following names on the plans attached hereto as **Exhibit A** (the "Lease Demarcation Plans"): (a) the Fulton Building, located at the intersection of Broadway and Fulton Street (the "Fulton Building"); (b) the Corbin Building, located at the intersection of Broadway and John Street (the "Corbin Building"); (c) the Dey Street Headhouse, located at the intersection of Broadway and Dey Street (the "Dey Street Headhouse"); (d) the Dey Street Concourse, comprising subsurface improvements located under Dey Street between Broadway and Church Street (the "Dey Street Concourse"); (e) the R Line Underpass, comprising subsurface improvements located under Church Street at the western end of the Dey Street Concourse (the "R Line Underpass"); (f) the 4/5 Line Underpass, comprising subsurface improvements located under Broadway at the eastern end of the Dey Street Concourse (the "4/5 Line Underpass"); (g) the subsurface improvements identified on the Lease Demarcation Plans and referred to herein as (i) "A/C Mezzanine West" and "A/C Mezzanine East"; (ii) "2/3 Line Platform" and "2/3 Line Mezzanine"; (ii) "J/Z Line Northbound Platform" and "J/Z Line Southbound Platform"; (iii) "R Line Platform"; and (iv) "4/5 Line Platform" and (h) the entrances and stairs to and from the street level to the subway lines identified on the Lease Demarcation Plans (collectively, the "Subway Street Level Entrances," which term, for the avoidance of doubt, does not include the entrances to the Dey Street Headhouse, or any entrances to or within the Corbin Building or the Fulton Building);

**WHEREAS**, Landlord is the fee owner of the portions of the Fulton Center depicted in yellow and identified on the Lease Demarcation Plans as the "Master Lease Premises" (referred to in this Lease as the "Premises"), and Landlord's affiliate the New York City Transit Authority ("NYCTA") controls the balance of the Fulton Center pursuant to a long-term master lease between the City of New York and NYCTA;

**WHEREAS**, Landlord desires to lease the Premises to Tenant and Tenant desires to lease the Premises from Landlord, subject to and in accordance with the terms and conditions contained herein;

**WHEREAS**, it is anticipated that on or about the commencement of the term of this Lease, Landlord will assign to NYCTA Landlord's fee interest in the Premises and interest as landlord under this Lease;

**WHEREAS**, the Premises include not only interior spaces within the Fulton Building, Corbin Building, Dey Street Headhouse, Dey Street Concourse, R Line Underpass and 4/5 Line Underpass but also the exterior and structural elements thereof;

**WHEREAS,** the interior spaces within the Premises comprise four different types of areas, which are identified on the plans attached hereto as **Exhibit B** (the "Usage Plans") as (i) "Unpaid Public Circulation," (ii) "Paid Public Circulation," (iii) "Commercial Usage Areas," a portion of which is exclusively for retail use, and (iv) "Back of House," which areas are further described and defined in this Lease;

**WHEREAS,** the Premises do not include the areas depicted in blue and green and identified on the Lease Demarcation Plans as (i) "NYCT" and (ii) "Third Party," which areas are further described and defined, and referred to, in this Lease as "NYCT Retained Areas" and "Third Party Areas," respectively;

**WHEREAS**, the NYCT Retained Areas consist primarily, but not exclusively, of the A/C Mezzanine West and A/C Mezzanine East; the 2/3 Line Platform and 2/3 Line Mezzanine; the J/Z Line Northbound Platform and J/Z Line Southbound Platform; the R Line Platform; the 4/5 Line Platform; and the Subway Street Level Entrances;

**WHEREAS,** the Premises will include the multimedia displays described under the heading "Tenant Controlled Signage" on **Exhibits C** and **C-1** (each such individual display, and any replacement thereof, a "Tenant Controlled Sign" and collectively, together with the associated equipment, the "Tenant Controlled Signage") at the locations shown on **Exhibit C** ("Signage Locations"), which include certain locations within the A/C Mezzanine East and the A/C Mezzanine West, which Tenant shall operate for profit, subject to and in accordance with the terms and conditions contained in this Lease;

**WHEREAS**, as set forth on **Exhibits C** and **C-1**, the Tenant Controlled Signage is divided into two groups for purposes of this Lease, designated as the "Base Tenant Controlled Signage" and the "Additional Tenant Controlled Signage";

**WHEREAS**, the Parties desire to enter into this Lease to set forth their rights and obligations to each other relating to the Premises, NYCT Retained Areas and Third Party Areas; and

**WHEREAS**, concurrently with the execution and delivery of this Lease, Westfield America Limited Partnership, a Delaware limited partnership ("Guarantor"), is executing and delivering to Landlord a payment and performance guaranty in the form of **Exhibit E** (the "Guaranty");

**NOW, THEREFORE,** for good and valuable consideration, Landlord leases and demises the Premises to Tenant, and Tenant takes and hires the Premises from Landlord, for the Term, upon the terms and conditions of this Lease.

*1.* *Definitions*. The following definitions apply in this Lease.

"1st Level Initial Threshold" has the meaning set forth in Section 4.2.1.

"1st Level Participation Rent" has the meaning set forth in Section 4.2.1.

"1st Level Participation Rent Cap" has the meaning set forth in Section 4.2.1.

"2nd Level Initial Threshold" has the meaning set forth in Section 4.2.2.

"2nd Level Participation Rent" has the meaning set forth in Section 4.2.2.

"2/3 Line Mezzanine" has the meaning set forth in the Recitals.

"2/3 Line Platform" has the meaning set forth in the Recitals.

"4/5 Line Underpass" has the meaning set forth in the Recitals.

"AAA" means the American Arbitration Association.

"A/C Mezzanine East" has the meaning set forth in the Recitals.

"A/C Mezzanine West" has the meaning set forth in the Recitals.

"A/C Mezzanine" means the A/C Mezzanine East and the A/C Mezzanine West.

"Actual Life Span" has the meaning set forth in Section 7.1.3.

"Actual Life Span Cost" has the meaning set forth in Section 7.1.3.

"Additional Rent" means all sums that this Lease requires Tenant to pay Landlord, excluding Participation Rent and Guaranteed Minimum Rent payments, whether or not expressly called Additional Rent.

"Additional Retail Signage" has the meaning set forth in Section 5.2.2.

"Additional Signage Participation Rent" has the meaning set forth in Section 4.1.2(c).

"Additional Tenant Controlled Signage" has the meaning set forth in the Recitals and **Exhibits C** and **C-1**.

"Affiliate" of any specified Person means any other Person Controlling or Controlled by or under common Control with such specified Person. "Affiliated" shall have the correlative meaning.

"Annual Escalation" means, with respect to any amount that is subject to Annual Escalation, that such amount is increased by 3%, compounded annually, as of the beginning of each Lease Year other than the first Lease Year.

"Annual Statement" has the meaning set forth in Section 4.7(b) and **Exhibit V**.

"Anti-Money Laundering and Anti-Terrorism Laws" means (a) the USA PATRIOT Act of 2001 and the regulations administered by the United States Treasury Department's Office of Foreign Assets Control ("OFAC"), (b) orders issued by OFAC, (c) Executive Order 13224 issued by the President of the United States on September 23, 2001 and

made effective as of September 24, 2001, and (d) similar laws or orders hereafter in effect from time to time.

"Applicable Delivery Date" means (a) the Lease Execution Date, for the Corbin Building and the Retail Usage Areas within (i) the Dey Street Headhouse, (ii) the Dey Street Concourse, (iii) the R Line Underpass and (iv) the 4/5 Line Underpass, (b) the Interim Delivery Date, for the Retail Usage Areas (excluding the RMUs) in the Fulton Building, or (c) the date of Substantial Completion of Landlord's Work, for the balance of the Premises.

"Applicable Lease Year" has the meaning set forth in Section 4.4.1.

"Applicable Month" has the meaning set forth in Section 4.4.1.

"Application" means any agreement or application with respect to any Approval.

"Approvals" means, subject to the terms and conditions of Section 6.2, any and all licenses, permits (including building, demolition, alteration, use, and special permits), approvals, consents, certificates (including certificate(s) of occupancy), rulings, variances, authorizations, or amendments to any of the foregoing, as shall be required under any Law for the commencement, performance or completion of any Construction, or the use, occupancy, maintenance, or operation of the Premises.

"Arbitration" means the procedure for binding alternative dispute resolution set forth in Article 23.

"Arbitration Notice" has the meaning set forth in Section 23.1.

"Arbitrator" has the meaning set forth in Section 23.1.

"Architect" means, for any Construction, the architect or engineer of record for such Construction, which architect or engineer shall be (a) selected by Tenant or a Subtenant; (b) not an Affiliate of Tenant; (c) licensed in the State; (d) reasonably qualified and experienced in overseeing projects similar to the Construction for which such architect or engineer is engaged; and (e) in connection with any Major Construction, subject to approval by Landlord, which approval shall not be unreasonably withheld or delayed.

"Arrearage Exception" has the meaning set forth in Section 4.7(a).

"Audit Period" has the meaning set forth in Section 4.7.2.

"Available Rent Offset" means, as of the end of any month, the sum of (a) the amount of the Stabilization Period Operating Deficit Net Accrual, if any, as of the end of such month, *plus* (b) the amount of the Tenant Commercial Liability Expenses Net Accrual, if any, as of the end of such month, *plus* (c) the amount of any Capital Expenditure Offset Amount, determined in accordance with Section 7.1.3, 7.1.4, 7.2.1 or 15.2, as applicable, to the extent such Capital Expenditure Offset Amount has not theretofore or concurrently therewith been credited against Rent.

"Back of House Areas" means the areas of the Premises identified on the Usage Plans as "Back of House."

"Bankruptcy Law" means Title 11, United States Code, and any other or successor state or federal statute relating to assignment for the benefit of creditors, appointment of a receiver or trustee, bankruptcy, composition, insolvency, moratorium, reorganization, or similar matters.

"Bankruptcy Proceeding" means any proceeding, whether voluntary or involuntary, under any Bankruptcy Law.

"Base Building Equipment" means the mechanical equipment and systems, the electrical equipment and systems and vertical circulation equipment and other base building equipment incorporated in the Premises (including any replacement thereof), exclusive of Tenant/Subtenant Equipment, Tenant Controlled Signs and Landlord Controlled Property.

"Base Signage Participation Rent" has the meaning set forth in Section 4.1.1(c).

"Base Tenant Controlled Signage" has the meaning set forth in the Recitals and **Exhibits C** and **C-1**.

"BID" means any business improvement district or similar district or program, proposed or actual, that includes, may include, or affects the Premises.

"Break-Even Date" means a date to be designated by Tenant, prospectively or retrospectively, by written notice to Landlord given during or within a reasonable time after the end of the Stabilization Period, which date shall be the last day of a calendar month and shall occur prior to or at the end of the Stabilization Period, and which date is intended, but is not required, to be the approximate beginning of the period during the remainder of the Stabilization Period in which Commercial Revenues for such remainder period exceed Tenant O & M Expenses for such remainder period.

"Business Day" means any weekday on which New York State-chartered banks are open to conduct regular banking business with bank personnel.

"Capital Expenditures" means expenditures that should be capitalized under GAAP.

"Capital Expenditure Offset Amount" has the meaning set forth in Section 7.1.4.

"Capital Expenditure Offset Reimbursement" has the meaning set forth in Section 7.1.4.

"Casualty" means any damage or destruction affecting the Premises arising from (i) a risk of loss covered by an "All Risk" property damage insurance policy described in Section 14.1.1(a) or Section 14.1.2(a), regardless of whether such insurance has in fact been maintained, other than any individual loss if the resulting damage or destruction costs less than $5,000 (subject to Annual Escalation) to repair and less than $40,000 (subject to Annual Escalation) in

the aggregate for all individual losses sustained in any Lease Year, or (ii) a Material Structural Failure.

"Casualty Termination" means a termination of this Lease because of a Casualty, when and as this Lease expressly allows such a termination.

"Chronic Default" has the meaning set forth in Section 22.1.5.

"Close-Out Items" means the items listed on **Exhibit T**.

"Code Compliance" means, with respect to any Construction, compliance with all building and fire codes applicable thereto.

"Code Compliance Review Process" means the process for determining Code Compliance required by Landlord in its capacity as the Government with authority with respect thereto.

"Commercial Participation Rent" means, collectively, 1st Level Participation Rent and 2nd Level Participation Rent.

"Commercial Revenues" means all revenues of Tenant (or any Affiliate of Tenant) derived from the Commercial Usage Areas, including any and all fixed rent, percentage rent, "key money" paid by a Subtenant, proceeds of business interruption insurance, proceeds of any Condemnation Award relating to a temporary taking of any Commercial Usage Area, contributions for common area or operating expenses and utility charges and other fees and charges however denominated, but excluding (a) security or construction deposits, until and unless applied, and (b) any state or city sales, excise, gross receipt or similar taxes now or hereafter collected and paid by Tenant (or such Affiliate) on account of such revenues. Commercial Revenues shall include revenues from RMUs and exclude Signage Revenues and Sponsorship Revenues. The accounting treatment of "key money" paid by a Subtenant and base rent under a Sublease that has a Free Rent Period is addressed in Section 4.7(a).

"Commercial Net Revenues" means, for any period, the Commercial Revenues for such period, *less* the sum of (a) the Tenant O & M Expenses for such period, and (b) the amount, if any, by which the Ongoing Capital Expenditures for such period exceed $250,000 per Lease Year ($20,833.33 per month) (such $250,000 and $20,833.33 amounts being subject to Annual Escalation).

"Commercial Usage Areas" means the areas of the Premises identified on the Usage Plans as "Commercial Usage Areas," which include the Retail Usage Areas as well as areas that may be used for non-retail purposes.

"Communications Protocols" has the meaning set forth in Section 10.

"Comparable Facilities" has the meaning set forth in Section 5.1.

"Comparison Stores" means retail stores, food service establishments and restaurants set forth on **Exhibit D**. Such list of Comparison Stores is subject to change from time to time in accordance with Section 5.1.

"Comparison Years" has the meaning set forth in Section 4.4.1.

"Concept of Operations" means the manual outlining specifications for the maintenance and operation of the Premises attached hereto as **Exhibit K**, as it shall be supplemented in due course by O&M Manuals. In the event of any conflict between this Lease (excluding **Exhibit K**) and the Concept of Operations, this Lease shall control.

"Condemnation" means (a) any temporary or permanent taking of the Premises or any portion thereof, or of the right to use or occupy the Premises or any portion thereof, by condemnation, eminent domain, or any similar proceeding; or (b) any action by any Government not resulting in an actual transfer of an interest in, or of the right to use or occupy, the Premises but creating a right to compensation, such as a change in grade of any street upon which the Premises abut.

"Condemnation Award" means any award paid or payable (whether or not in a separate award) to either Party after the Lease Execution Date because of, or as compensation for, any Condemnation, including (a) any award made for any improvements that are the subject of the Condemnation; (b) the full amount paid or payable by the condemning authority for the estate that is the subject of the Condemnation, as determined in the applicable Condemnation proceedings; (c) any interest on such award; and (d) any other sums payable on account of such Condemnation.

"Condemnation Effective Date" means, for any Condemnation, the first date when the condemning authority has acquired title to or possession of any Premises subject to the Condemnation.

"Con Ed" means Consolidated Edison, Inc.

"Construction" means any alteration, construction, demolition, reconstruction or Restoration done in the Premises by or on behalf of Tenant or any Person claiming by or through Tenant, including construction of any Subtenant Improvements. Construction includes Minor Construction and Major Construction. Repair and maintenance in the ordinary course shall not be deemed to constitute Construction. Mere decoration of Commercial Usage Areas shall not be deemed to constitute Construction, but shall nonetheless be consistent with the Retail Standard and, to the extent applicable, be consistent with the Design Guidelines and comply with the requirements of Section 8.3.

"Construction Warranty" means a manufacturer's or contractor's warranty referenced in Section 4.7 of the Concept of Operations.

"Construction Documents" means, with respect to any Major Construction, the following documents, as such documents may be modified by the parties thereto from time to time: (a) a contract between Tenant or any Subtenant, as applicable, as owner, and the Architect

for such Major Construction, relating to the Architect's preparation of the Plans and Specifications for such Major Construction; (b) a contract between Tenant or any Subtenant, as applicable, as owner, and such Person's general contractor or construction manager; and (c) any Major Subcontracts.

"Contractor-Related Liability Claims" has the meaning set forth in Section 13.5.

"Control" means the possession, directly or indirectly, of (a) at least 20% of the direct or indirect ownership of the Equity Interests of a Person (provided that, as applied to the term Affiliate as used in clause (a) of the definition of Prohibited Person, "at least 20%" shall be replaced by "more than 50%"); or (b) the power to direct or cause the direction of the management and policies of such Person, whether by ownership of Equity Interests, by contract, or otherwise.

"Corbin Building" has the meaning set forth in the Recitals.

"Core and Shell/Base Building Improvements" means the Improvements to be made to the Premises by Landlord in accordance with the Core and Shell/Base Building Plans and Specifications, including those of such Improvements that are required for the Premises to be in Tenant-Ready Condition, as such Improvements may be modified and/or replaced from time to time in accordance with this Lease. Core and Shell/Base Building Improvements includes Base Building Equipment, but not Landlord Controlled Property.

"Core and Shell/Base Building Plans and Specifications" means the plans and specifications for the Core and Shell/Base Building Improvements, as such plans and specifications may be modified from time to time in accordance with the terms of this Lease. As of the date hereof, the plans and specifications for the Core and Shell/Base Building Improvements are referenced on **Exhibit P**.

"County" means New York County.

"CPI" means the United States Department of Labor, Bureau of Labor Statistics "Consumer Price Index" for Urban Wage Earners and Clerical Workers (CPI-W) published for New York - Northern New Jersey - Long Island, NY-NJ-CT-PA, with a base of 1982-1984 = 100. If the CPI ceases to be published, with no successor index, then the Parties shall reasonably agree upon a reasonable substitute index. The CPI for any date means the CPI last published before the calendar month that includes such date.

"CPI Adjustment Factor" means, as of any date, the greater of (a) 1.00 or (b) the CPI for such date divided by the CPI as of the Lease Execution Date.

"C/S Contractor" means the contractor hired by Landlord to construct the Core and Shell/Base Building Improvements.

"Default" means Tenant's uncured default or breach under this Lease.

"Default Interest" means interest at an annual rate equal to the lesser of (a) the Prime Rate plus 4% per annum; or (b) the Usury Limit.

"Default Notice" means a notice of a Default under this Lease, describing the Default in reasonable detail.

"Design Guidelines" means the guidelines set forth on **Exhibit L**.

"Design Review Process" means the process for review and approval of Plans and Specifications by Landlord, in its capacity as landlord, for the purpose of confirming compliance with the Design Guidelines.

"Dey Street Concourse" has the meaning set forth in the Recitals.

"Dey Street Headhouse" has the meaning set forth in the Recitals.

"E&O Policy" means the $10 million project-specific insurance policy that Landlord has heretofore obtained with respect to errors and omissions of the designers of the Core and Shell/Base Building Improvements.

"Emergency" has the meaning set forth in Section 20(a).

"Environmental Law" means any Law concerning: (a) air, ground water, soil or other environmental conditions at, in, under or above the Premises; or (b) clean-up, control, disposal, generation, storage, release, transportation, or use of, or liability or standards of conduct concerning, Hazardous Substances at, in, under, above the Premises.

"Equipment Lien" means any security interest, financing lease, personal property lien, conditional sales agreement, chattel mortgage, security agreement, title retention arrangement or similar arrangement (including any related financing statement) for Tenant's or any Subtenant's acquisition or leasing of any Tenant/Subtenant FF&E used in the Premises that is leased, purchased under conditional sale or installment sale arrangements, or used under a license, provided that each Equipment Lien encumbers or otherwise relates only to the Financed Tenant/Subtenant FF&E for which such secured party provides bona fide purchase-money financing or a bona fide equipment lease after the Lease Execution Date and provided that such secured party is not an Affiliate of Tenant or the applicable Subtenant.

"Equity Interest" means, with respect to any Person, all or any part of any direct or indirect equity or ownership interests, whether stock, partnership interest, beneficial interest in a trust, membership interest, or other interest of an ownership or equity nature, in such Person at any tier of ownership.

"Estoppel Certificate" means a statement by one Party, addressed to the designee of the requesting Party, in substantially the form of **Exhibit G** and containing such other assurances as the requesting Party may reasonably request.

"Event of Default" has the meaning set forth in Section 22.1.

"Excluded Commercial Liability Expenses" has the meaning set forth in the definition of Tenant Commercial Liability Expenses.

"Expiration Date" means the date when this Lease terminates or expires in accordance with its terms, whether on the Scheduled Expiration Date, by Landlord's exercise of remedies for an Event of Default, or otherwise.

"FCSS" has the meaning set forth in Section 7.4(b).

"FDNY" means the Fire Department of the City of New York.

"Fee Estate" means Landlord's fee estate in the Premises, including Landlord's reversionary interest in the Premises after the Expiration Date.

"Final Completion" or "Finally Complete" has the meaning provided on **Exhibit Q**.

"Financed Tenant/Subtenant FF&E" means any Tenant/Subtenant FF&E subject to an Equipment Lien. Tenant shall deliver, or cause to be delivered, to Landlord a copy of any document evidencing an Equipment Lien, upon request by Landlord.

"Free Rent Period" means, with respect to any Sublease, any period after the earlier of the date upon which the applicable Subtenant opens for business or the day such Subtenant is required under its Sublease to open for business during which period such Subtenant is not required to pay base rent; provided that, if a Subtenant of office space in the Commercial Usage Areas completes construction of its Subtenant Improvements prior to completion of the reasonably allotted time therefor set forth in its Sublease, the remainder of such allotted time shall not be considered a Free Rent Period. The Free Rent Period shall be considered part of the term of the applicable Sublease for purposes of the calculation under Section 4.7(a).

"FTA" means the United States Department of Transportation, Federal Transit Administration.

"Fulton Building" has the meaning set forth in the Recitals.

"Fulton Center" has the meaning set forth in the Recitals.

"Fulton Center Security System" has the meaning set forth in Section 7.4(b).

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time.

"Government" means each and every governmental agency, authority, bureau, department, quasi-governmental body or other public entity or instrumentality having jurisdiction over the Premises.

"Grant Management Requirements" means the pertinent FTA requirements set forth in Circular FTA C 5010.1D dated November 1, 2008, which pertinent FTA requirements are those provisions from such circular that are attached hereto as part of **Exhibit O**.

"Guaranteed Minimum Rent" has the meaning set forth in Section 4.4.1.

"Guarantor" has the meaning set forth in the Recitals.

"Guaranty" has the meaning set forth in the Recitals.

"Hazardous Substances" includes flammable substances, explosives, radioactive materials, asbestos, asbestos-containing materials, polychlorinated biphenyls, chemicals known to cause cancer or reproductive toxicity, pollutants, contaminants, hazardous wastes, medical wastes, toxic substances or related materials, explosives, petroleum and petroleum products, and any "hazardous" or "toxic" material, substance or waste that is defined by those or similar terms or is regulated as such under any Law, including any material, substance or waste that is (a) defined as a "hazardous substance" under Section 311 of the Water Pollution Control Act (33 U.S.C. § 1317), as amended; (b) defined as a "hazardous waste" under Section 1004 of The Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901, et seq., as amended; (c) defined as a "hazardous substance" or "hazardous waste" under Section 101 of The Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Reauthorization Act of 1986, 42 U.S.C. § 9601 et seq. or any so-called "superfund" or "superlien" law, including the judicial interpretations thereof; (d) defined as a "pollutant" or "contaminant" under 42 U.S.C.A. § 9601(33); (e) defined as "hazardous waste" under 40 C.F.R. Part 260; (f) defined as a "hazardous chemical" under 29 C.F.R. Part 1910; or (g) subject to any other Law regulating, relating to or imposing obligations, liability or standards of conduct concerning protection of human health, plant life, animal life, natural resources, property or the enjoyment of life or property free from the presence in the environment of any solid, liquid, gas, odor or any form of energy from whatever source.

"Hazardous Substances Discharge" means any deposit, discharge, generation, release, or spill of Hazardous Substances that occurs at or from the Premises, or into the land underlying the Premises, or that arises at any time from the use, occupancy or operation of the Premises or any activities conducted therein or any adjacent or nearby real property, or resulting from seepage, leakage, or other transmission of Hazardous Substances from other real property to such land, whether or not caused by a Party and whether occurring before or after the Lease Execution Date.

"Immaterial Loss" means a Casualty or Condemnation that is not a Substantial Casualty or Substantial Condemnation, respectively.

"Impositions" means (a) all taxes, assessments including all assessments for public improvements or benefits, whether or not commenced or completed prior to the date hereof and whether or not to be completed within the Term (including all interest and penalties thereon), water and sewer rents and charges, charges for public utilities, excises, levies, license fees, permit fees, inspection fees and other authorization fees and other charges of every nature and kind whatsoever together with all expenses incident to the installation, repair, replacement and/or reading of water meters (including all interest and penalties thereon), and legal fees associated with any reduction proceedings relative to such taxes, not in excess of such reduction, in each case, whether general or special, (b) business improvement district charges, special district charges, and (c) all other governmental, administrative and/or quasi-governmental levies, impositions or charges, ordinary, extraordinary, foreseen or unforeseen, of every type and nature whatsoever, in each case, which at any time during or in respect of the Term may be assessed,

levied, charged, confirmed or imposed on Tenant, this Lease, any Subtenant or any Sublease, or in respect of, or be (i) a lien upon the Premises or any Sublet Premises, (ii) any rent therefrom or any estate, right or interest therein, (iii) any occupancy, use or possession of or activity conducted on the Premises or any part thereof including any Sublet Premises (including any taxes and/or assessments levied in lieu of, the foregoing due to a change in the method of taxation), and (d) all taxes and assessments that may, during the Term, be levied or assessed against any personal property located in, or upon the Premises, or any portion thereof including any Sublet Premises, and either owned by Tenant or any Subtenant or used by Tenant or any Subtenant in connection with the operation of the Premises or any portion thereof including any Sublet Premises, to the extent that such taxes and assessments, if unpaid, would result in a lien against the Premises or any portion thereof, including any Sublet Premises; provided, however, that, notwithstanding anything to the contrary contained in this Lease, in no event shall Tenant be obligated to pay any Real Property Tax in connection with the Fulton Center, the Premises, or any portion thereof, it being agreed and understood that any such Real Property Tax is specifically excluded from this definition of Impositions, nor shall Impositions include any income taxes assessed against Landlord, franchise, estate, inheritance or transfer taxes of Landlord unless such taxes, or any one or more of them, shall hereafter be implemented by the taxing authority in lieu of, or in replacement or substitution of any existing Imposition.

"Improvements" means buildings, structures, fixtures and other improvements, including components thereof.

"Indemnitees" shall mean the Landlord Indemnitees or the Tenant Indemnitees, as the context requires.

"Initial Capital Expenditures" means Capital Expenditures incurred by Tenant prior to the Break-Even Date, including: (a) costs of responding to Landlord's request for proposals and negotiating and entering into this Lease, (b) costs of conducting due diligence with respect to the Premises, and participating in the initial inspection, commissioning and acceptance of the Core and Shell/Base Building Improvements, (c) costs of hiring and training initial staff and entering into initial service contracts relating to the maintenance and operation of the Premises (as distinct from recurring payroll expenses and service contract obligations following the Opening Date), (d) leasing commissions for the initial Subleases for all Sublet Premises and other costs of marketing and promoting the Commercial Usage Areas for initial lease-up or opening, including attorneys' fees; (e) with respect to the Subtenant Improvements for initial Subleases (including initial Subleases of RMUs), the amounts expended by Tenant as allowances paid to Subtenants for such Improvements or expended by Tenant in itself constructing such Improvements; (f) costs of constructing and equipping the tool shop at the Premises to prepare the tool shop for initial operation; (g) costs of constructing and equipping the management office at the Premises to prepare the management office for initial operation; and (h) the amount, if any, paid to the Reading Room for the surrender of the Reading Room Lease.

"Initial Term" has the meaning set forth in Section 2.2.

"Insubstantial Condemnation" means any Condemnation except a Substantial Condemnation or a Temporary Condemnation.

"Insurance Requirements" means the requirements of any insurer to the extent such requirements apply to the Premises, to the use or manner of use of the Premises or to Tenant in its capacity as lessee of the Premises.

"Interim Delivery Date" has the meaning set forth in Section 3.2.

"J/Z Line Northbound Platform" has the meaning set forth in the Recitals.

"J/Z Line Southbound Platform" has the meaning set forth in the Recitals.

"Landlord" means the owner from time to time of fee title to the Premises, which owner is initially the MTA and will at all times during the Term be either the MTA or NYCTA or a successor thereto, and if fee title to the Premises is transferred between the MTA and NYCTA then the Landlord shall be the grantee in any such transfer unless and until fee title to the Premises is so transferred again, in which event the transferee shall thereupon become the Landlord.

"Landlord Controlled Equipment" means the fare control equipment, fare vending equipment, telecommunications equipment, fire/life safety equipment, sprinkler system, security cameras and other security equipment, in each case to the extent installed by Landlord, as such equipment shall be altered from time to time.

"Landlord Controlled Property" means Landlord Controlled Equipment, Landlord Controlled Signage and/or Landlord FF&E.

"Landlord Controlled Signage" means the digital signage that is specified under the heading "Landlord Controlled Signage" on **Exhibit C**, and the other, conventional signage shown on the MTA Signage Drawings, all of which has been or will be installed by Landlord in the Public Circulation Areas for the benefit of NYCTA and its customers, as such signage shall be altered and/or supplemented from time to time in accordance with this Lease (excluding, however, the following two signs shown on such drawings—sign T.S.B3.2302 on drawing 4F-BG-T-S-202 located on the street level and sign T.C.B.4.2412 on drawing 4F-BG-T-C-202 located on the concourse level, which signs, Landlord agrees, shall not be installed).

"Landlord FF&E" means furniture, furnishings, equipment and other personal property of Landlord or its Affiliates or contractors that shall be located in but not attached to the NYCT Retained Areas.

"Landlord Indemnitees" means Landlord, the Government of the United States and the Additional Insureds as defined on **Exhibit I** and any and all Affiliates of any of the foregoing, and their respective agents, directors, officers and employees.

"Landlord's Code Compliance Officer" means a duly designated representative of Landlord or any of its Affiliates, who shall be responsible for monitoring and determining Code Compliance matters hereunder from time to time.

"Landlord's Construction Records" means the following materials with respect to Landlord's Work to the extent existing: (i) inspection and test results, governmental sign-offs

and certifications of engineers, the architect of record and the C/S Contractor, (ii) a report from the architect of record and the C/S Contractor listing the punch-list items and specifying what work remains incomplete in order for the Premises to achieve Final Completion, which report from such C/S Contractor will include a plan and schedule for completion of such work, (iii) reports with respect to the commissioning of equipment and the mechanical, electrical, fire-safety, security and plumbing systems within the Premises, (iv) the final or temporary certificates of occupancy issued for Premises, and (v) the Close-Out Items.

"Landlord's Forms of Required Certificates of Insurance" has the meaning set forth on **Exhibit J**.

"Landlord's Representative" means an agent or employee of Landlord responsible for (a) determining on behalf of Landlord whether Landlord's contractors shall have achieved Substantial Completion and Final Completion of Landlord's Work, and (b) monitoring Tenant's compliance with the Concept of Operations and the Design Guidelines.

"Landlord's Work" means construction by Landlord (at its sole cost) of the Core and Shell/Base Building Improvements in accordance with the Core and Shell/Base Building Plans and Specifications.

"Laws" means all laws, ordinances, requirements, orders, proclamations, directives, rules, and regulations of any Government affecting the Premises, this Lease, or any Construction in any way, including any use, maintenance, taxation, operation, or occupancy of, or environmental conditions affecting, the Premises, or relating to any Impositions, or otherwise relating to this Lease or any Party's rights and remedies under this Lease, or any Transfer, whether in force at the Lease Execution Date or passed, enacted, or imposed at some later time, subject in all cases, however, to any applicable waiver, variance, or exemption.

"Lease Demarcation Plans" has the meaning set forth in the Recitals.

"Lease Execution Date" has the meaning set forth in the Preamble.

"Lease Related Documents" has the meaning set forth in Section 16.1(a).

"Lease Termination Notice" means a notice stating this Lease is being terminated by reason of any Event of Default, and describing such Event of Default in reasonable detail.

"Lease Year" means (a) the period commencing on the Opening Date and ending on December 31 of the same year in which the Opening Date occurs, and (b) each calendar year thereafter during the Initial Term (and, if applicable, each Renewal Term), up to and including the Expiration Date.

"Leasehold Estate" means Tenant's leasehold estate, and all of Tenant's rights and privileges, under this Lease, upon and subject to all the terms and conditions of this Lease.

"Legal Costs" of any Person means all reasonable costs and expenses (including reasonable attorneys' fees and court costs) such Person incurs in any legal proceeding, including

any Bankruptcy Proceeding or in taking any other action for which such Person is entitled hereunder to be reimbursed for its Legal Costs.

"Loss" means any Casualty or Condemnation.

"Loss Proceeds" means Condemnation Awards and/or Property Insurance Proceeds.

"Major Construction" means any Construction that (a) affects the Structure, or (b) adversely (or potentially adversely) affects any utilities or systems of the Fulton Center. For purposes of the preceding clause (b), the installation of Tenant/Subtenant Equipment, the installation of any electrical components, plumbing fixtures or other equipment or components within the Sublet Premises, and the connection thereof to utility lines and equipment serving the Fulton Center in order to provide utility and other services to the Sublet Premises, shall not be Major Construction so long as such installation and connection complies with applicable building and fire codes and is consistent with applicable load limitations and other applicable specifications set forth in the Design Guidelines.

"Major Liability Claims" means the incidents or claims listed as items 1 through 8 on **Exhibit U** under the heading "Incidents/Claims Requiring Immediate Reporting to the NYCTA."

"Major Subcontracts" means any structural, electrical, plumbing or HVAC subcontracts entered into for any Major Construction.

"Manufacturer Specifications" means, with respect to (a) any major Base Building Equipment, the O&M Manual therefor, and (b) any other Non-Structural Components, the manufacturer's or vendor's conditions or requirements for honoring the Construction Warranty therefor as specified in such Construction Warranty, or if no such conditions or requirements apply, reasonable requirements as recommended by Tenant's service contractors.

"Material Physical Impairment" means a change in or deviation from the Core and Shell/Base Building Improvements Plans and Specifications that results in a material reduction in ceiling heights in any portion of the Premises or any other material intrusion by shafts, pipes, ducts, conduits, wires, risers and other fixtures, equipment or appurtenant facilities into any portion of the Premises, it being agreed that such materiality standard will vary depending on the location of the portion of the Premises that is so affected. Compliance with such plans and specifications will be strictest in the Commercial Usage Areas compared to the Public Circulation Areas or Back of House Areas, and, accordingly, a lesser deviation from such plans and specifications may constitute a Material Physical Impairment in the Commercial Usage Areas whereas the same deviation in the Public Circulation Areas or Back of House Areas may not necessarily constitute a Material Physical Impairment.

"Material Structural Failure" has the meaning set forth in Section 7.2.1.

"Minor Construction" means any Construction that Tenant or any Subtenant undertakes from time to time, except Major Construction.

"Modification" means any abandonment, amendment, cancellation, discharge, extension, modification, rejection, renewal, replacement, restatement, substitution, supplement, surrender, termination, or waiver of a specified agreement or document, or of any of its terms or provisions, or the acceptance of any cancellation, rejection, surrender, or termination of such agreement, document, or terms.

"Modify" means agree to, cause, make, or permit any Modification.

"Monetary Default" means Tenant's failure to pay any Rent as and when this Lease requires.

"Monthly Statement" has the meaning set forth in Section 4.7(a) and **Exhibit V**.

"MTA Police Department" means the police department of the Metropolitan Transportation Authority, as constituted from time to time.

"MTA Signage Drawings" means the set of drawings designated "Contract A-36125 Transit Center Enclosure, Contract Drawings, Revised Drawings, 8th November 2013."

"Multi-Property Package Deals" has the meaning set forth in Section 4.1.5.

"MWBE Programs and Requirements" has the meaning set forth on **Exhibit N**.

"Nonmonetary Default" means Tenant's (a) failure to comply with any affirmative or negative covenant or obligation in this Lease, except a Monetary Default; or (b) breach of any representation or warranty as of the date made or deemed made.

"Non-Structural Components" means elements of the Premises other than Structural Components, Subtenant Improvements, Tenant Controlled Signage and Landlord Controlled Property.

"Notice of Default" or "Default Notice" means any notice alleging a Default.

"NYCTA" has the meaning set forth in the Recitals.

"NYCT Retained Areas" has the meaning set forth in the recitals.

"NYPD" means the New York City Police Department.

"NYPD Security System" has the meaning set forth in Section 7.4(b).

"O&M Manual" means, with respect to any Base Building Equipment, the manufacturer's operating and maintenance manual therefor, if any.

"Offset Eligible Replacement" has the meaning set forth in Section 7.1.4.

"Ongoing Capital Expenditures" means, for any period following the Break-Even Date, all Capital Expenditures made in respect of such period by Tenant in performing Tenant's

obligations and exercising its rights under this Lease, including (a) leasing commissions for Subleases and other costs of entering into Subleases, including attorneys' fees; (b) amounts expended by Tenant as allowances paid to Subtenants for Subtenant Improvements or expended by Tenant in itself constructing such Improvements; and (c) expenditures for capital repairs or replacements of Base Building Equipment or other elements of the Premises; provided, however, that Ongoing Capital Expenditures shall exclude (in addition to Initial Capital Expenditures and amounts expended by Subtenants), amounts described in clauses (a) and (b) with respect to initial Subleases, Signage Capital Expenditures, Capital Expenditure Offset Amounts, and any Capital Expenditures funded by Landlord or using insurance proceeds or attributable to Tenant's gross (as distinguished from ordinary) negligence or willful misconduct (or, as applicable to Section 7.1.4, Tenant Recklessness).

"Opening Date" means the date when the entirety of the Public Circulation Areas shall be open to the public.

"Operating Hours" means the hours for the operation of the Retail Usage Area as set forth in Section 5.7.

"Paid Public Circulation Areas" means the areas of the Premises identified on the Usage Plans as "Paid Public Circulation."

"Participation Rent" means, collectively, Signage Participation Rent, Sponsorship Participation Rent and Commercial Participation Rent.

"Party" means Landlord or Tenant, as the context requires; and "Parties" means, collectively, Landlord and Tenant.

"Performance Records" has the meaning set forth in Section 4.7.2.

"Performance Records Default" has the meaning set forth in Section 4.7.3.

"Periodic Service" has the meaning set forth in Section 7.1.3.

"Permitted Equity Interest Transfer" means:

(a) any Transfer of Equity Interests, in Tenant, provided that Guarantor shall continue to own, directly or indirectly, 100% of the Equity Interests in Tenant, or

(b) any Transfer of Equity Interests in Guarantor, or other corporate reorganization, consolidation or merger of Guarantor or of any holder of Equity Interests in Guarantor, provided that:

(1) Except in the case of a Transfer of Publicly-Traded Equity Interests, if the transferee, together with its Affiliates, will own 20% or more of the Equity Interests in Guarantor (and therefore, indirectly, 20% or more of the Equity Interests in Tenant) following such Transfer (and, prior to such transfer, held less than 20% of such Equity Interests), Tenant shall, not less than 5 Business Days after the date of such Transfer, certify to Landlord that it has performed background checks for such transferee using the Prohibited Person Vetting

Process and, subject to the Prohibited Person Determination Standards, has determined that such transferee is not a Prohibited Person; and

(2) Guarantor, or a replacement guarantor, shall thereupon have a net worth of not less than $500,000,000, subject to Annual Escalation.

(c) a Transfer of Equity Interests in Guarantor or Tenant in order to effect the sale or other transfer of all or substantially all of the shopping centers owned, directly or indirectly by Guarantor, provided that Guarantor, or a replacement guarantor, shall thereupon have a net worth of not less than $500,000,000, subject to Annual Escalation.

"Permitted Retail Use" has the meaning set forth in Section 5.1.

"Person" means any association, corporation, government, individual, joint venture, joint-stock company, limited liability company, partnership (of any type), trust, unincorporated organization, or other entity of any kind.

"Pertinent Grant Management Requirements" means the FTA requirements, set forth in Chapter IV of the Circular FTA C 5010.1D dated November 1, 2008, that are not crossed-out on **Exhibit O** attached hereto, it being understood and agreed that, as between Landlord and Tenant, Tenant shall have no obligation to take any actions or otherwise comply with the provisions of Chapter IV of such circular that are crossed-out on **Exhibit O**.

"Plans and Specifications" means, for any Construction, the plans and specifications therefor as they may be modified from time to time, which plans and specifications shall, to the extent required by this Lease and/or by applicable Law in order to obtain any required Approval, be prepared by an Architect and submitted to Landlord in such machine-readable format as is then customary in the architectural profession.

"Pre-Existing Environmental Conditions" has the meaning set forth in Section 12.3.

"Premises" has the meaning set forth in the Recitals.

"Prime Rate" means the prime rate or equivalent "base" or "reference" rate for corporate loans that is from time to time (a) published in the Wall Street Journal; or (b) if such rate is no longer so published, such rate as announced by any large United States "money center" commercial bank Tenant designates; or (c) if such rate is no longer so announced, then a reasonably equivalent rate published by an authoritative third party that Landlord reasonably designates.

"Prohibited Lien" means any mechanic's, vendor's, laborer's, or material supplier's statutory lien or other similar lien that (a) arises from work, labor, services, equipment, or materials supplied, or claimed to have been supplied, to Tenant or any Subtenant (or anyone claiming through either) and (b) attaches (or may attach upon termination of this Lease) to any portion of the Fulton Center. An Equipment Lien on Tenant/Subtenant Equipment or Tenant/Subtenant FF&E shall not be deemed to constitute a Prohibited Lien.

"Prohibited Person" shall mean any Vettable Person for which any matter described in paragraphs (a) – (f) below applies and (i) Tenant's general manager of the Premises, assistant general manager of the Premises or leasing director of the Premises has actual knowledge at the time of such vetting that such Vettable Person is a Prohibited Person, (ii) any Senior Officer of Tenant, based upon actual knowledge of the Vettable Transaction and such Vettable Person, knows, or ought to know, that such Vettable Person is a Prohibited Person in the context of such transaction and this Lease, or (iii) such matter is disclosed to Tenant at the time Tenant performs background checks for such Vettable Person using the Prohibited Person Vetting Process for such Person in accordance with this Lease and subject to the Prohibited Person Determination Standards:

(a) such Vettable Person or any Affiliate thereof is in monetary default or in breach of any non-monetary obligation under any written agreement with the State (including Landlord) or the City of New York after notice and beyond any applicable cure periods, unless, in each instance, such monetary default or breach either (i) has been waived in writing by the State or City of New York, (ii) is being disputed in a court of law, administrative proceeding, arbitration or other similar forum, (iii) is cured within 30 days after a determination and notice to Tenant from Landlord that such Vettable Person is a Prohibited Person as a result of such default or breach, or (iv) is in connection with a payment default under a mortgage loan that is either recourse or non-recourse to a single purpose entity borrower and issued by an agency or authority for the State or City of New York other than Landlord or its subsidiaries;

(b) such Vettable Person (i) is an organized crime figure or is reputed to have substantial business or other affiliations with an organized crime figure, or (ii) has had in the 10 years preceding the date of the proposed Vettable Transaction a contract terminated by any government agency for breach of contract or for any cause directly or indirectly related to an indictment or conviction;

(c) such Vettable Person (i) has been convicted in the 10 years preceding the date of the proposed Vettable Transaction of a felony in which such Vettable Person committed a violent crime, fraud or tax evasion, or (ii) is a registered sex offender;

(d) such Vettable Person (i) has been convicted of a felony under any Anti-Money Laundering and Anti-Terrorism Laws; (ii) is in violation of any Anti-Money Laundering and Anti-Terrorism Laws; or (iii) is on a list maintained by OFAC;

(e) such Vettable Person is a government, or is an entity owned by a government, that the United States has finally determined to be in violation of the Export Administration Act of 1979, as amended, or any successor statute, or the regulations issued pursuant thereto, or subject to the regulations or controls thereof; or

(f) such Vettable Person is a government, or is an entity owned by a government, that is subject to the Trading with the Enemy Act of 1917, as amended, or the regulations of the United States Treasury Department or executive orders of the President of the United States of America issued pursuant thereto.

As of the Lease Execution Date, clause (e) refers only to the governments listed by the United States Treasury Department as participating in the Arab League boycott of Israel, which are the governments of Iraq, Kuwait, Lebanon, Libya, Qatar, Saudi Arabia, Syria, the United Arab Emirates and Yemen, and their government-owned companies. As of the Lease Execution Date, clause (f) refers to the government of Cuba only, and Cuba's government-owned companies.

"Prohibited Person Determination Standards" has the meaning set forth in Section 6.5.

"Prohibited Person Vetting Process" has the meaning set forth in Section 6.5 and **Exhibit S**.

"Prohibited Uses" has the meaning set forth in **Exhibit M.**

"Property Insurance" means any and all property insurance required by Section 14.1.

"Property Insurance Proceeds" means net proceeds (after reasonable costs of adjustment and collection, including Legal Costs) of Property Insurance, when and as received by Landlord or Tenant, excluding proceeds of business interruption insurance. If Landlord self-insures all or any portion of its Property Insurance requirements, then Property Insurance Proceeds shall include the deductible under, and any other amount that Landlord would have received from, its Property Insurance had it satisfied such requirements through the purchase of insurance policies rather than by self-insurance.

"Public Circulation Areas" means, collectively, the Paid Public Circulation Areas and the Unpaid Public Circulation Areas.

"Publicly-Traded Equity Interest" means an Equity Interest that is traded on a public, government-regulated exchange.

"Public Person" means any Person some or all of the Equity Interests in which are Publicly-Traded Equity Interests.

"R Line Platform" has the meaning set forth in the Recitals.

"R Line Underpass" has the meaning set forth in the Recitals.

"Reading Room" means the Christian Science Reading Room Tri-State Committee, Inc.

"Reading Room Agreement" means that certain agreement by and between Metropolitan Transportation Authority and Reading Room, dated as of April 27, 2005, whereby the Reading Room has been afforded the opportunity to lease a portion of the ground floor of the Corbin Building, as more particularly described therein, which Reading Room Agreement shall be assigned to Tenant as of the Lease Execution Date, as hereinafter provided.

"Real Property Tax" means New York City imposed ad valorem real property tax payable pursuant to the Real Property Tax Law or any successor thereto.

"Recalculated Participation Rent" has the meaning set forth in Section 4.7.

"Recalculated 1st Level Participation Rent" has the meaning set forth in **Exhibit V**.

"Recalculated 2nd Level Participation Rent" has the meaning set forth in **Exhibit V**.

"Recalculated Signage Participation Rent" has the meaning set forth in **Exhibit V**.

"Records Request" has the meaning set forth in Section 4.7.3.

"Remaining Useful Life Cost" has the meaning set forth in Section 7.1.3.

"Renewal Option" has the meaning set forth in Section 2.3.

"Renewal Term" has the meaning set forth in Section 2.3.

"Renewal Exercise Notice" has the meaning set forth in Section 2.3.

"Rent" means Participation Rent and Additional Rent and, during any Renewal Term, Guaranteed Minimum Rent, all of which will be payable as hereinafter provided.

"Required Bond Improvement" has the meaning set forth in Section 8.4.1.

"Restoration" means restoring and/or repairing Improvements after a Loss.

"Restoration Funds" means any Loss Proceeds to be applied to Restoration.

"Restore" means undertake a Restoration.

"Retail Standard" has the meaning set forth in Section 5.1.

"Retail Usage Area" means that portion of the Commercial Usage Areas that may be used for the Permitted Retail Use only. The Retail Usage Areas encompass the entirety of the Commercial Usage Areas excluding all floors in the Corbin Building above the ground floor. RMUs, but not areas around RMUs, shall be deemed to be part of the Retail Usage Area, notwithstanding that they are located within Public Circulation Areas. The area around each RMU shall be deemed to be part of the Public Circulation Areas.

"RMU" means a mobile cart, kiosk, retail merchandising unit or other similar mobile retail outlet.

"Scheduled Expiration Date" means, as of any point in time, the last day of the Term as it may theretofore have been extended in accordance with this Lease.

"Senior Officer" means, in the case of (a) a Transaction Party, the president, chief executive officer, executive vice president, chief financial officer, chief operating officer, general counsel or equivalent titles or a Principal of such Transaction Party, and (b) Tenant, the president, chief executive officer, executive vice president, chief financial officer, chief operating officer, general counsel or equivalent titles of Guarantor or a parent company of Guarantor.

"Signage Capital Expenditures" means, at any time, aggregate gross Capital Expenditures theretofore made by Tenant for the acquisition, repair, replacement or installation of Tenant Controlled Signage. For purposes of calculating Signage Participation Rent, Signage Capital Expenditures shall not be capitalized over the useful life of the improvements thereby funded but shall be treated as expenses when made.

"Signage Locations" has the meaning set forth in the Recitals.

"Signage Participation Rent" has the meaning set forth in Section 4.1.2(c).

"Signage Revenues" means all revenues of Tenant (or any Affiliate of Tenant) attributable to the Tenant Controlled Signage, including any proceeds of business interruption insurance or any Condemnation Award relating to the Tenant Controlled Signage, but excluding (a) any such revenues refunded by Tenant (or such Affiliate) to a party paying for the use of the Tenant Controlled Signage, and (b) any state or city sales, excise, gross receipt or similar taxes now or hereafter collected and paid by Tenant (or such Affiliate) on account of such revenues.

"Special Purpose Entity Covenants" has the meaning set forth in **Exhibit H**.

"Sponsorship Net Revenues" means, for any period, the Sponsorship Revenues attributable to Sponsorship Events during such period, *less* all expenses incurred by Tenant in connection with such Sponsorship Events, without duplication of any Tenant O & M Expenses.

"Sponsorship Participation Rent" has the meaning set forth in Section 4.3.

"Sponsorship Events" means any marketing or other sponsorship events, (including live broadcasts, webcasts and/or film shoots) that may be authorized by Landlord and Tenant to take place in the Public Circulation Areas.

"Sponsorship Revenues" means all revenues of Tenant (or any Affiliate of Tenant) attributable to Sponsorship Events, excluding Signage Revenues, and excluding (a) any such revenues refunded by Tenant (or such Affiliate) to a party paying for a Sponsorship Event, and (b) any state or city sales, excise, gross receipt or similar taxes now or hereafter collected and paid by Tenant (or such Affiliate) on account of such revenues.

"Stabilization Conditions" has the meaning set forth in **Exhibit Q.**

"Stabilization Period" has the meaning set forth in Section 2.1.

"Stabilization Period Operating Deficit" means the amount, if any, by which (a) the Tenant O & M Expenses for the period commencing on the Opening Date and ending on the

Break-Even Date exceed (b) the Commercial Revenues for such period. The Stabilization Period Operating Deficit shall not be subject to adjustment by reason of the Commercial Revenues for the remainder of the Stabilization Period exceeding the Tenant O & M Expenses for such remainder period. Notwithstanding the foregoing, if the Opening Date occurs after August 1, 2014, then the Stabilization Period Operating Deficit shall also include any Tenant O & M Expenses for operating the Corbin Building from August 1, 2014 to the Opening Date.

"Stabilization Period Operating Deficit Net Accrual" means, at any time, the aggregate Stabilization Period Operating Deficit accrued at such time, together with interest on the un-recouped balance thereof accruing at 10% per annum, compounded annually, *less* the amount theretofore or concurrently therewith credited against Rent on account thereof.

"State" means New York State.

"Structural Components" means the following elements of the Core and Shell/Base Building Improvements: (a) footings, foundations, floors and roof slabs, load-bearing walls, structural steel and other structural support systems of the Fulton Building, Corbin Building, Dey Street Headhouse, Dey Street Concourse, R line Underpass and 4/5 Line Underpass, (b) the structural (as opposed to architectural or mechanical) elements of stairways and escalators and (c) the extraordinary glass elements of the exterior shell and atrium of the Fulton Building (including the roof but excluding storefronts, doors and street-level windows). Windows, roofing materials and exterior cladding and finishes shall not be deemed to be "Structural Components" except as expressly provided in the preceding sentence.

"Sublease" means any sublease, license or other occupancy agreement pursuant to which Tenant permits a Person to use and occupy a portion of the Premises.

"Sublet Premises" means any portion of the Premises sublet by Tenant to any Subtenant pursuant to any Sublease made and entered into in accordance with Article 9.

"Submission Period" has the meaning set forth in Section 4.7.3.

"Substantial Casualty" means a Casualty (a) that damages or destroys 50% or more of the Retail Usage Area; (b) that causes such material damage to major Structural Components, and/or to the historic fabric of the Corbin Building, that Landlord reasonably determines it to be impracticable to rebuild the Premises substantially as they were prior to such Casualty and/or elects to close the Dey Street Concourse permanently or on an indefinite, long-term basis and/or to demolish substantially all of the Corbin Building or the exterior "cube" and/or the interior "donut" comprising the principal above-ground portions of the Fulton Building; (c) for which Restoration of the Premises to the same use as existed prior to such Casualty is prohibited by Law; or (d) for which Restoration of the Core and Shell/Base Building Improvements will require not less than two years from the date of such Casualty, as reasonably estimated by an architect selected by Landlord and subject to Tenant's approval, not to be unreasonably withheld.

"Substantial Completion" or "Substantially Complete" has the meaning provided on **Exhibit Q**.

"Substantial Condemnation" means any Condemnation that (a) takes the entire Premises, (b) in Tenant's reasonable determination renders the remaining Premises economically unviable or (c) occurs during the last two years of the Term.

"Subtenant" means any Person entitled to occupy, use and possess any portion of the Premises under a Sublease, including any Person operating an RMU.

"Subtenant Improvements" means, for any Sublet Premises, the Improvements to such premises, other than Core and Shell/Base Building Improvements, that shall be necessary for the Subtenant thereof to open such premises to the general public for the conduct of its business, and any other Improvements that may thereafter be made by such Subtenant.

"Subtenant-Related Liability Claim" has the meaning set forth in Section 13.4.

"Subway Street Level Entrances" has the meaning set forth in the Recitals.

"Target Opening Date" means June 26, 2014.

"Temporary Condemnation" means a Condemnation of the temporary right to use or occupy all or part of the Premises.

"Tenant" has the meaning set forth in the Preamble.

"Tenant Commercial Liability Expenses" means, as of the date of determination, the aggregate amount paid by Tenant from the Opening Date to the date of determination for (a) 85% of the premiums charged to Tenant for its (but not to Subtenants or contractors for their) commercial general liability insurance policies for the Premises (the remaining 15% of such premiums being "Tenant's GCL Premium Share"), *plus* (b) the deductibles/self-insured retention under such policies to the extent Tenant (or a third-party claims administrator retained to handle third party claims on behalf of Tenant and its liability insurer) has made payments to third-party claimants or incurred Legal Costs (which Legal Costs, under the commercial general liability policy described in Section 14.2(b) are applied against such deductibles/self-insured retention), excluding, however, any deductibles/self-insured retention to the extent paid or used for any claim in which Tenant or any of its Affiliates or their respective employees or agents is found by a court of competent jurisdiction or by an arbitrator in accordance with the procedures set forth in Article 23 to have committed gross negligence or willful misconduct (such excluded payments being referred to as "Excluded Commercial Liability Expenses"), *plus* (c) for each third-party claim under such policies, the administrative fee charged by such third-party claims administrator, *less* (d) the sum of (i) any amounts recovered by Tenant from a contractor hired by Tenant or its liability insurer on account of the possible liability of such party, which recovery itself shall be net of any unreimbursed Legal Costs incurred by Tenant in obtaining such recovery and (ii) any amounts recoverable by Tenant from a Subtenant or its liability insurer (given the indemnification obligations of such Subtenant as described in Section 13.4) or attributable solely to the performance by Tenant of work in the Commercial Usage Areas.

"Tenant Commercial Liability Expense Net Accrual" means, as of the date of determination, the Tenant Commercial Liability Expenses *less* the amount of Tenant Commercial Liability Expenses theretofore or concurrently therewith credited against Rent.

"Tenant Controlled Signage" has the meaning set forth in the Recitals and **Exhibits C** and **C-1**.

"Tenant Curable Material Structural Failure" has the meaning set forth in Section 7.2.1.

"Tenant Gross Negligence" means the gross negligence or willful misconduct of Tenant or any of its Affiliates or their respective employees or agents in connection with the use, occupancy, control, management, operations or possession of the Premises.

"Tenant Indemnitees" means Tenant, Subtenants, their respective Affiliates and their respective directors, officers and employees.

"Tenant O & M Expenses" means, for any period, the expenses (but not Initial Capital Expenditures or Ongoing Capital Expenditures) incurred by Tenant in respect of its operation and maintenance of the Premises, excluding (i) expenses relating to the Tenant-Controlled Signage and/or Sponsorship Events, (ii) expenses attributable to Tenant's gross (as distinguished from ordinary) negligence or willful misconduct, (iii) except as provided in clause (o) below, any off-site costs of services performed for the Premises at home or regional offices of Tenant's Affiliates, (iv) any corporate "overhead" expenses incurred by or on behalf of Tenant, including overhead expenses for maintaining, staffing and operating any office of Tenant's Affiliates located in office space within the Corbin Building, (v) Tenant Commercial Liability Expenses, and (vi) Excluded Commercial Liability Expenses. Subject to such limitations, Tenant O & M Expenses shall include the following:

(a) Impositions;

(b) sales taxes paid with respect to goods or services benefiting the Premises, exclusive of sales taxes collected from third parties;

(c) charges for gas, electricity and other utilities supplied to the Premises (except to the extent such charges are paid for by Landlord without reimbursement by Tenant or directly by Subtenants to the applicable utility providers), and the disposal of all garbage and refuse from the Premises (except to the extent such charges are paid for directly by Subtenants to the applicable service providers);

(d) expenses of operating, leasing, maintaining, repairing, replacing and cleaning all areas of the Premises (except to the extent such charges are paid for directly by Subtenants to the applicable service providers), including the salaries, wages, benefits and other costs of all on-site employees at the Premises employed by Tenant or its Affiliates;

(e) expenses of operating, maintaining and repairing the Non-Structural Components (except to the extent borne directly by Subtenants);

(f) a management fee equal to 2 1/2 % of Commercial Revenues;

(g) fees and charges incurred in connection with the opening, maintenance and operation of any bank accounts for the Premises or Tenant;

(h) advertising, marketing and promotional expenses relating to the Premises;

(i) the fees of attorneys and other consultants engaged in connection with operation and maintenance of the Premises;

(j) Tenant's GCL Premium Share;

(k) expenses incurred in connection with equipment needed for purposes of the operation and maintenance of the Premises, including any financing, leasing or other charges reasonably incurred in respect of such equipment and any legal or other expenses associated with the arranging thereof;

(l) charitable donations made by Tenant from time to time after the Break-Even Date in furtherance of its operations at the Premises;

(m) third party audit and accountancy fees incurred in connection with the preparation of any accounts or financial statements relating to the Premises and prepared by or on behalf of Tenant for the purpose of providing required financial information to Landlord;

(n) expenses incurred in (x) complying with Law and Insurance Requirements applicable to the Premises, Tenant or Subtenants; and (y) enforcing compliance with Law and Insurance Requirements binding on Subtenants, contractors or consultants; and

(o) subject to Landlord's approval, which shall not be unreasonably withheld or delayed, an allocable portion of those personnel employed by Tenant or its Affiliates who are dedicated to working solely on Westfield World Trade Center and the Premises and whose services related to the Premises is work that is customarily performed by on-site personnel, which allocable portion shall reflect the approximate percentage of time each employee spends performing services specifically related to the Premises.

"Tenant-Ready Condition" means, with respect to the Commercial Usage Areas, excluding the RMUs, that the requirements set forth in Appendix A to **Exhibit L** (the Design Guidelines) have been satisfied in all material respects.

"Tenant Recklessness" means (a) a deliberate act by Tenant the purpose of which is to damage the Premises, (b) a deliberate act by Tenant, without justification and in reckless disregard of knowledge that such action would be likely to cause significant damage to the Premises, or (c) a persistent and deliberate failure of Tenant to comply with maintenance guidelines for particular Core and Shell/Base Building Improvements with knowledge that such persistent failure creates a significant risk of resulting material damage to such Core and Shell/Base Building Improvements.

"Tenant's GCL Premium Share" has the meaning set forth in the definition of Tenant Commercial Liability Expenses.

"Tenant/Subtenant Equipment" means any and all fixtures or equipment incorporated in any Sublet Premises by Tenant or any Subtenant, at Tenant's or such Subtenant's cost, and used, useful or necessary to operate such Sublet Premises. Tenant/Subtenant Equipment shall exclude Tenant/Subtenant FF&E and shall, subject to Section 24, become the property of Landlord upon the expiration or earlier termination of this Lease.

"Tenant/Subtenant FF&E" means all movable furniture, furnishings, equipment, and personal property of Tenant or any Subtenant that may be removed without material damage to the Premises and without adversely affecting: (a) the Structural Components; (b) the Base Building Equipment or any Tenant/Subtenant Equipment or the present or future operation thereof; or (c) the present or future provision of any utility service to the Premises. Tenant/Subtenant FF&E shall include items such as merchandise, signs, goods, trade fixtures, factory equipment, furniture, movable equipment, telephone, telecommunications and facsimile transmission equipment, point of sale equipment, televisions, radios, network racks, and computer systems and peripherals.

"Term" means the Initial Term, as such term may be extended by Tenant's valid exercise of the First Renewal Option and the Second Renewal Option.

"Third Party Areas" has the meaning set forth in the Recitals.

"Third-Party Liability Claims" has the meaning set forth in Section 13.1.

"Trade Name" means the trade name of the Commercial Usage Areas.

"Transfer" means, (a) with respect to this Lease and the Leasehold Estate, any assignment, conveyance, mortgage, hypothecation, sale or other transfer of this Lease, the Leasehold Estate, or any portion thereof, including the grant of any mortgage, easement, lien, or other encumbrance on this Lease or the Leasehold Estate, whether by operation of law or otherwise, whether voluntary or involuntary; and (b) with respect to Equity Interests in Tenant or Guarantor, any conversion, exchange, issuance, sale, or other transfer of such Equity Interests. For the avoidance of doubt, a Sublease (other than a master sublease) shall not be deemed to be a Transfer.

"Unavoidable Delay" means delay in performing any obligation under this Lease, except payment of money, arising from or on account of any cause whatsoever beyond the performing Party's reasonable control, despite such Party's reasonably diligent efforts, including strikes, labor troubles or other union activities, such Party's inability to obtain required labor or materials after commercially reasonable efforts to do so, Loss, accidents, changes in Laws, governmental preemption, war, riots, terrorism, threats of terrorism, NYPD or MTA Police Department activity or other acts of a Government authority, extreme weather conditions, or a delay in issuing a necessary permit beyond the normal period for processing such permit. Unavoidable Delay shall exclude delay caused by such Party's financial condition, illiquidity, or insolvency. A Party claiming Unavoidable Delay shall notify the other Party (a) within 30 days

after such Party knows of any such Unavoidable Delay; and (b) within 10 days after such Unavoidable Delay ceases to exist. To be effective, any such notice must describe the Unavoidable Delay in reasonable detail. The performance of a nonmonetary obligation that is affected by Unavoidable Delay shall extend the time for such performance only by the number of days by which such Unavoidable Delay actually delayed such performance.

"Unpaid Public Circulation Areas" means the areas of the Premises identified on the Usage Plans as "Unpaid Public Circulation."

"Unrecovered Signage Capital Expenditures" means, at any time, the aggregate Signage Capital Expenditures theretofore made *less* Signage Revenues applied pursuant to Sections 4.1.1(a) or 4.1.2(a).

"Usage Plans" has the meaning set forth in the Recitals and **Exhibit B**.

"Useful Life" has the meaning set forth in Section 7.1.3.

"Usury Limit" means the highest rate of interest, if any, that Law allows under the circumstances.

"Vettable Person" means (a) (i) any prospective Subtenant, (ii) any prospective vendor under consideration by Tenant to provide services to Tenant at the Premises on a regular basis pursuant to a contract with Tenant or its Affiliates valued at more than $100,000 per annum (subject to Annual Escalation) or pursuant to a renewal of any such contract, (iii) any prospective construction contractor under consideration to construct improvements or alterations at the Premises pursuant to a contract with Tenant or its Affiliates valued at more than $100,000 (subject to Annual Escalation), or (iv) any prospective transferee of Equity Interests in Tenant or Guarantor under clause (b) of the definition of Permitted Equity Interest Transfer, and (b) for each non-Public Person in the preceding clause (a) that is not a government-owned company, the controlling owner(s) of such Person as disclosed by such Person to Tenant.

"Vettable Transaction" means (a) a Sublease, (b) a contract with Tenant or any Affiliate of Tenant valued at more than $100,000 per annum (subject to Annual Escalation) to provide services to Tenant at the Premises on a regular basis pursuant to a contract with Tenant or its Affiliates, or a renewal of any such contract, (c) a contract with Tenant or any Affiliate of Tenant valued at more than $100,000 (subject to Annual Escalation) to construct improvements or alterations at the Premises, or (d) an agreement to Transfer Equity Interests in Tenant or Guarantor pursuant to clause (b) of the definition of Permitted Equity Interest Transfer.

"Warranty" means either a Construction Warranty or the E&O Policy, as applicable.

2. *Term.*

2.1 *Stabilization Period.* The "Stabilization Period" is the portion of the Term ending on the 24th full calendar month after the latest of (a) the Opening Date, (b) the date on which all of the Stabilization Conditions have been satisfied and (c) the Interim Delivery Date.

2.2 *Initial Term.* The initial term of this Lease (the "Initial Term") shall (a) commence upon the Substantial Completion of Landlord's Work; and (b) end on the 20th anniversary of the later of (x) the date on which all of the Stabilization Conditions have been satisfied, and (y) the earlier of (i) the last day of the Stabilization Period, and (ii) the day Subtenants occupying not less than 80% of the Commercial Usage Areas are open to the public for the conduct of their respective businesses (such 20th anniversary date being the "Scheduled Expiration Date"), unless terminated sooner in accordance with the provisions of this Lease.

2.3 *Renewal Options.* Provided that Tenant is in full compliance with all the material terms and conditions of this Lease at the time Tenant gives a Renewal Exercise Notice, Tenant shall have the right and option (each, a "Renewal Option," the first of which being the "First Renewal Option" and the second of which being the "Second Renewal Option") to extend and renew this Lease upon all the same terms and conditions, except as this Lease otherwise expressly states, for two additional successive periods of 10 years each (each, a "Renewal Term," the first of which being the "First Renewal Term" and the second of which being the "Second Renewal Term") after the Initial Term expires. Tenant shall exercise each Renewal Option, if at all, by giving Landlord notice of such exercise (a "Renewal Exercise Notice") not less than 24 months before the first day of the corresponding Renewal Term. Within 10 days after Landlord acknowledges in writing that Tenant has satisfied all conditions to the effectiveness of Tenant's exercise of a Renewal Option, Tenant shall pay Landlord the applicable Capital Expenditure Offset Reimbursement determined pursuant to Section 7.1.4, if any. After the Second Renewal Term, Tenant shall have no further right to renew or extend the Term. If Tenant exercises the First Renewal Option, then the Scheduled Expiration Date will be extended by 10 years, and if Tenant exercises the Second Renewal Option, then the Scheduled Expiration Date will be extended by an additional 10 years. If Tenant fails to validly and timely exercise the First Renewal Option, then the Second Renewal Option shall terminate.

3. *Landlord's Work; Delivery of Premises; Tenant Controlled Signage.*

3.1 *Landlord's Work.* To the extent not yet completed as of the Lease Execution Date, Landlord shall diligently and in good faith pursue Substantial Completion and thereafter Final Completion of Landlord's Work. Landlord shall give Tenant reasonable advance notice of key milestones with respect to such work (including testing and acceptance of Base Building Equipment, and determinations with respect to Substantial Completion and punchlist items), and Landlord and Tenant shall conduct joint inspections of such work. Landlord shall arrange for Tenant to participate, and Tenant shall participate, in the commissioning of the Core and Shell/Base Building Improvements so that Tenant's personnel are appropriately trained in the proper maintenance and operation thereof. Not less than seven days prior to the commissioning of any Base Building Equipment and in any event not less than seven days prior to the Applicable Delivery Date for the portion of the Premises in which any Base Building Equipment is located, Landlord shall deliver to Tenant the O&M Manual for such equipment.

Within seven days after the commissioning of any Base Building Equipment, Landlord shall deliver to Tenant test results from such commissioning. Landlord shall notify Tenant when it believes that it has achieved Substantial Completion and Tenant shall thereafter have five Business Days to inspect the Premises to confirm that Substantial Completion has been achieved and to confirm the punchlist with respect thereto based on a joint inspection. The punchlist items shall have no material adverse effect upon Tenant's use of the Premises or the construction of Subtenant Improvements hereunder, and, in any event, shall be reasonably promptly completed by, or on behalf of, Landlord. If Tenant fails to timely inspect and notify Landlord of any dispute as to the Substantial Completion or the punchlist with respect thereto, then Tenant shall be deemed to have waived same, and Substantial Completion shall be deemed to occur on the date designated by Landlord by notice to Tenant. Upon completion of the punchlist items and satisfaction of the other conditions to Final Completion of Landlord's Work, Landlord shall notify Tenant and Tenant shall have five Business Days after the date of such notice to inspect the balance of the Premises to confirm that Final Completion, including completion of the punchlist items, has been achieved. In the event of any dispute between Landlord and Tenant as to whether Substantial Completion or Final Completion has occurred, such dispute shall be resolved by Arbitration, in a manner that shall be coordinated as well as reasonably possible with any related dispute resolution under the design and construction contracts for Landlord's Work. At Tenant's request, Landlord shall make any or all of Landlord's Construction Records available to Tenant.

*3.2 Delivery of Commercial Usage Areas in Tenant-Ready Condition.* Landlord hereby delivers to Tenant, and Tenant hereby accepts, possession of the Corbin Building and the Retail Usage Areas within the Dey Street Headhouse, which Tenant acknowledges to be Substantially Complete and in Tenant-Ready Condition, subject to a punch list agreed to by Landlord and Tenant, and possession of the Retail Usage Areas within the Dey Street Concourse and the 4/5 Line Underpass, which Tenant acknowledges to be Substantially Complete, subject to a punch list agreed to by Landlord and Tenant. The Dey Street Concourse and the 4/5 Line Underpass shall not be open to the public until the Opening Date, and notwithstanding the delivery of possession of the Retail Usage Areas within the Dey Street Concourse and the 4/5 Line Underpass to Tenant on the Lease Execution Date, Tenant shall not have any operational responsibility for these areas until the Opening Date, as set forth in Sections 5.14. Landlord shall use commercially reasonable efforts to deliver to Tenant possession of the Retail Usage Areas (except for the RMUs) in the Fulton Building Substantially Complete and in Tenant-Ready Condition as soon as reasonably possible after the Lease Execution Date, and in any event Landlord shall deliver such areas to Tenant Substantially Complete and in Tenant-Ready Condition by the Opening Date (the actual date of such delivery being the "Interim Delivery Date"). Landlord shall complete the finishes in the lobby areas on the second and third levels of the Fulton Building on or prior to September 30, 2014. From and after the Lease Execution Date, Landlord shall keep Tenant regularly apprised of the status of construction of the Core and Shell/Base Building Improvements. When Landlord believes the Tenant-Ready Condition for such Retail Usage Areas has been achieved Landlord shall give written notice to Tenant to that effect and concurrently therewith deliver to Tenant, for review, inspection and copying, Landlord's Construction Records for such areas to the extent then available. Following receipt of such notice, Tenant shall have five Business Days to inspect the Retail Usage Areas to confirm that Tenant-Ready Condition has been achieved (excluding any RMU locations, with

respect to which "Tenant-Ready Condition" does not apply) based on a joint inspection. If any work remains incomplete in order for such areas to achieve Tenant-Ready Condition, Landlord shall promptly complete such work and notify Tenant thereof. The provisions of the two preceding sentences shall reapply until Tenant agrees that such areas have achieved Tenant-Ready Condition.

3.3 *Entry by Tenant Prior to Interim Delivery Date.* Prior to the Interim Delivery Date, Landlord shall permit Tenant, prospective Subtenants, and Subtenants and their respective architects, consultants and contractors to enter the Commercial Usage Areas outside of the Corbin Building, solely for the purposes of inspecting and taking measurements and photographs of such areas. Any such entry shall be in accordance with Landlord's standard procedures and an agreed-upon access agreement.

3.4 *Entry by Tenant Between Applicable Delivery Date and Opening Date.* After the Lease Execution Date, Tenant and Subtenants shall have the right to construct Subtenant Improvements in the Corbin Building and in the Retail Usage Areas within the Dey Street Headhouse, the Dey Street Concourse and the 4/5 Line Underpass, and after the Interim Delivery Date, Tenant and Subtenants shall have the right to construct Subtenant Improvements in the Retail Usage Areas (except the RMUs) in the Fulton Building, subject to compliance with the requirements applicable to Construction as set forth in Article 8. Tenant shall pay for all utilities furnished to Tenant and Subtenants in connection with such Construction. With respect to electric power and natural gas, consumption by Tenant and Subtenants shall be measured by meters serving exclusively the Commercial Usage Areas. With respect to water consumption, for which there is no separate meter serving exclusively the Commercial Usage Areas, the Parties shall split the cost thereof based on the relative size of the affected areas compared to the balance of the Premises.

3.5 *Material Physical Impairment.* Landlord has not heretofore authorized or permitted, and shall not authorize or permit, any Material Physical Impairment without the prior written consent of Tenant, not to be unreasonably withheld.

3.6 *Opening Date.* Landlord shall endeavor in good faith to achieve Substantial Completion on or before the Target Opening Date. Prior to the Opening Date, in accordance with a timetable to be approved by Landlord and Tenant, which approval shall not be unreasonably withheld or delayed, Landlord and Tenant shall commence the transition process whereby the responsibility for operation and maintenance of the Base Building Equipment and other aspects of the Premises is shifted from Landlord to Tenant so that on the Opening Date such responsibility will have shifted entirely from Landlord to Tenant. Notwithstanding the foregoing, if the parties so agree, the opening of the Dey Street Concourse shall be delayed until the connection between the Dey Street Concourse and the World Trade Center transportation hub is open to the public.

3.7 *Tenant Controlled Signage.* **Exhibit C** sets forth, for each Tenant Controlled Sign, the location within the Premises (or the A/C Mezzanine West or A/C Mezzanine East) of such Tenant Controlled Sign, and **Exhibit C-1** sets forth the model and model number for the media player and other hardware comprising each Base Tenant Controlled Sign. Tenant shall have the right, in the exercise of its own discretion, to select the

manufacturer, model and model number of the Additional Tenant Controlled Signage so long as Tenant complies with the Design Guidelines applicable to such signage.

3.7.1 As part of Landlord's Work, Landlord shall cause the Base Tenant Controlled Signs to be installed in accordance with **Exhibit C** and the applicable Core and Shell/Base Building Plans and Specifications with the objective of having such signs being fully operational prior to the Opening Date. Landlord shall be solely responsible for the cost of purchasing and installing the Base Tenant Controlled Signs, including the hardware and media player for each such sign, together with an industry-standard 7-year warranty from a third-party service provider or the manufacturer for each such sign.

3.7.2 As part of Landlord's Work, Landlord shall complete the structural preparation for the Additional Tenant Controlled Signs in the Fulton Building at the locations set forth in **Exhibit C** by May 30, 2014 except for the "Super C" signs. So long as such structural preparation is completed by May 30, 2014, then prior to the Opening Date, Tenant shall install such Additional Tenant Controlled Signage, but if Tenant fails, for any reason, to complete such installation prior to the Opening Date, Tenant shall have the right to install such signage after the Opening Date, subject to coordinating such work with Landlord's Representative. With respect to the "Super C" signs, Tenant shall give Landlord four weeks' advance notice of their scheduled delivery date at the Premises, and Landlord shall complete the structural preparation for such signs within five days following the delivery of such signs at the Premises. Tenant shall perform all work (including any structural work) required to install the Additional Tenant Controlled Signage in the Dey Street Headhouse that is described in such exhibit. Insofar as such Additional Tenant Controlled Signage in the Fulton Building is concerned, the design and construction costs of such structural preparation shall be evenly split between Landlord and Tenant, and Tenant shall be solely responsible for the cost of such installation. Insofar as the Additional Tenant Controlled Signage in the Dey Street Headhouse is concerned, all costs shall be borne by Tenant. In each case, Tenant shall solely bear the cost of purchasing and installing the Additional Tenant Controlled Signs, including the hardware and media player for such signs, together with an industry-standard 7-year warranty from a third-party service provider or the manufacturer. Any amounts expended by Tenant on the acquisition and installation of, and/or structural preparation for, the Additional Tenant Controlled Signs (including the purchase of such product warranties) shall constitute Signage Capital Expenditures.

*4.* *<u>Rent</u>.*

*4.1 Rent Derived from Signage Revenues.*

4.1.1 During the Term, subject to Section 4.5, Signage Revenues derived from Base Tenant Controlled Signage shall be applied on a monthly basis in the following order:

(a) *First*, to Tenant until Tenant has received an amount equal to the Unrecovered Signage Capital Expenditures;

(b) *Second*, to Tenant, until Tenant has received a 10% per annum return (compounded annually) on the balance from time to time of the Unrecovered Signage Capital Expenditures; and

(c) *Third*, 70% of the balance of the Signage Revenues derived from Base Tenant Controlled Signage remaining after Sections 4.1.1(a) and (b) shall be paid to Landlord as Rent ("Base Signage Participation Rent").

4.1.2 During the Term, subject to Section 4.5, Signage Revenues derived from Additional Tenant Controlled Signage shall be applied on a monthly basis in the following order:

(a) *First*, to Tenant until Tenant has received an amount equal to the Unrecovered Signage Capital Expenditures after taking into account any recovery by Tenant under Section 4.1.1(a);

(b) *Second*, to Tenant, until Tenant has received a 10% per annum return (compounded annually) on the balance from time to time of the Unrecovered Signage Capital Expenditures after taking into account any recovery by Tenant under Section 4.1.1(b); and

(c) *Third*, 65% of the balance of the Signage Revenues derived from the Additional Tenant Controlled Signage remaining after Sections 4.1.2(a) and (b) shall be paid to Landlord as Rent ("Additional Signage Participation Rent"; and together with Base Signage Participation Rent, "Signage Participation Rent").

4.1.3 *Payment Date.* Signage Participation Rent shall be paid monthly on or before the 30th day of the month with respect to the Signage Revenues collected by Tenant during the preceding month.

4.1.4 *Allocation of Signage Revenues.* To the extent Signage Revenues are derived from "package deals" that include both Additional Tenant Controlled Signage and Base Tenant Controlled Signage, Tenant shall reasonably allocate such Signage Revenues between Additional Tenant Controlled Signage and Base Tenant Controlled Signage, taking into account non-packaged deals, for purposes of determining whether such revenues flow through Section 4.1.1 or 4.1.2.

4.1.5 *Signage Deals Involving Multiple Assets.* Tenant shall not enter into signage "package deals" involving Tenant Controlled Signage and signage at other properties owned or managed by any Tenant Affiliate ("Multi-Property Package Deals") in which advertisers or sponsors are given a greater discount off of regular rates for Tenant Controlled Signage than for any such other properties unless Tenant holds Landlord harmless against the resulting reduction in Signage Revenues.

4.1.6 *Signage Deals with Tenants.* Tenant shall not sell ad space on Tenant Controlled Signage to Subtenants, or to tenants of any Tenant Affiliate at the World Trade Center or elsewhere at rates for Tenant Controlled Signage that are more favorable to the advertiser or sponsor than would be in the absence of the advertiser's or sponsor's relationship with Tenant or its Affiliate unless Tenant holds Landlord harmless against the resulting reduction in Signage Revenues.

4.1.7 *Signage Deals in Connection With Sponsorship Events.* In any case where ad space on Tenant Controlled Signage is sold in connection with any Sponsorship Event, the allocation of the resulting aggregate revenues between Signage Revenues and Sponsorship Revenues shall be in proportion to how such revenues would be allocated if use of the Tenant Controlled Signage and the Sponsorship Event had been sold separately to the applicable advertiser or sponsor.

*4.2 Participation Rent Derived from Commercial Revenues.* During the Term, Tenant shall pay Rent derived from Commercial Revenues in accordance with this Section 4.2.

4.2.1 *1st Level Participation Rent.* On or before the January 31 following the end of each Lease Year, Tenant shall pay Landlord the following amount (the "1st Level Participation Rent") in respect of such Lease Year: 50% of the amount, if any, by which (a) Commercial Net Revenues for such Lease Year exceed (b) \$3,500,000 (\$3,500,000 being the "1st Level Initial Threshold"). Each annual payment of 1st Level Participation Rent shall be subject to a cap of \$625,000 (the "1st Level Participation Rent Cap"). The 1st Level Initial Threshold and the 1st Level Participation Rent Cap are subject to Annual Escalation and shall be appropriately pro-rated in the case of any Lease Year of less than 12 months. The 1st Level Participation Rent payment due January 31 shall be subject to adjustment and reconciliation based on the annual financial statements prepared and submitted by Tenant pursuant to Section 4.7. Such 1st Level Participation Rent shall be subject to offset as provided in Section 4.5.

4.2.2 *2nd Level Participation Rent.* In addition to paying the 1st Level Participation Rent, on or before the January 31 following the end of each Lease Year, Tenant shall pay Landlord the following amount (the "2nd Level Participation Rent") in respect of such Lease Year: 60% of the amount, if any, by which (a) Commercial Net Revenues for such Lease Year exceed (b) \$4,750,000 (\$4,750,000 being the "2nd Level Initial Threshold"). The 2nd Level Initial Threshold is subject to Annual Escalation and shall be appropriately pro-rated in the case of any Lease Year of less than 12 months. The 2nd Level Participation Rent payment due January 31 shall be subject to adjustment and reconciliation based on the annual financial statements prepared and submitted by Tenant pursuant to Section 4.7. Such 2nd Level Participation Rent shall be subject to offset as provided in Section 4.5.

*4.3 Rent Derived From Sponsorship Revenues.* During the Term, Tenant shall pay to Landlord 50% of Sponsorship Net Revenues ("Sponsorship Participation Rent"). Sponsorship Participation Rent shall be paid monthly on or before the 30th day of the month with

respect to the Sponsorship Net Revenues collected by Tenant during the preceding month. Sponsorship Participation Rent shall be subject to offset as provided in Section 4.5.

*4.4 Guaranteed Minimum Rent During the Renewal Terms.* As of the end of each month of each Lease Year of a Renewal Term, the Rent payable by Tenant for the elapsed portion of such Lease Year shall be the greater of (a) the Guaranteed Minimum Rent for the entire elapsed portion of such Lease Year as of the end of such month, as calculated below (referred to below as the "cumulative Guaranteed Minimum Rent"), and (b) the aggregate actual Participation Rent for the entire elapsed portion of such Lease Year as of the end of such month, as calculated pursuant to Sections 4.1 to 4.3 (referred to below as the "cumulative aggregate actual Participation Rent"). In determining whether the cumulative Guaranteed Minimum Rent at the end of any month is greater or less than the cumulative aggregate actual Participation Rent at the end of such month, the offset provided in Section 4.5 shall be disregarded. If the cumulative aggregate actual Participation Rent at the end of any month exceeds the cumulative Guaranteed Minimum Rent at the end of such month, then Landlord shall be entitled to no further payment pursuant to this Section 4.4 at the end of such month. If the cumulative Guaranteed Minimum Rent at the end of any month exceeds the cumulative aggregate actual Participation Rent at the end of such month, then Landlord shall be entitled to a payment for such month equal to the amount of such excess net of any prior Guaranteed Minimum Rent payments made for the same Lease Year. The Guaranteed Minimum Rent Payment shall be calculated each month of each Lease Year of a Renewal Term as follows:

4.4.1 For each month (the "Applicable Month") of each Lease Year of a Renewal Term ("Applicable Lease Year"), the "Guaranteed Minimum Rent" shall be the sum of the following amounts: (i) 80% of (A) the sum of the 1st Level Participation Rents, the 2nd Level Participation Rents and the Sponsorship Participation Rents, in each case determined without applying any Available Rent Offset, for the last two Lease Years prior to the commencement of such Renewal Term (such last two Lease Years being the "Comparison Years"), (B) divided by 24, *plus* (ii) the amount of Signage Participation Rent that would be payable for the Applicable Month if (A) the Signage Revenues derived from the Base Tenant Controlled Signage for such Applicable Month equaled 80% of (I) the Signage Revenues derived from the Base Tenant Controlled Signage for the two Comparison Years, (II) divided by 24, and (B) the Signage Revenues derived from the Additional Tenant Controlled Signage for such Applicable Month equaled 80% of (I) the Signage Revenues derived from the Additional Tenant Controlled Signage for the two Comparison Years, (II) divided by 24, in each case determined without taking into account any Available Rent Offset in such Comparison Years or any application of such revenues in such Comparison Years on account of any Unrecovered Signage Capital Expenditures or interest thereon as contemplated by Sections 4.1.1 or Section 4.2.1, *less* (iii) any Unrecovered Signage Capital Expenditures as of the Applicable Month and the requisite 10% return thereon.

4.4.2 For each month of each Lease Year of a Renewal Term, the Monthly Statement for such Lease Year submitted to Landlord pursuant to Section 4.7(a) shall include the cumulative Guaranteed Minimum Rent through the end of such month and the determination of whether such cumulative Guaranteed Minimum Rent

is greater or less than the cumulative aggregate actual Participation Rent through the end of such month.

4.4.3 For each Lease Year of a Renewal Term, the Annual Statement for such Lease Year submitted to Landlord pursuant to Section 4.7(b) shall include the Guaranteed Minimum Rent for such Lease Year and the determination of whether such Guaranteed Minimum Rent is greater or less than the aggregate actual Participation Rent for such Lease Year, which comparison will be based on the Recalculated Participation Rent.

4.4.4 Concurrently with the submission of the Annual Statement for each Lease Year of a Renewal Term, the Guaranteed Minimum Rent payments for such year shall be reconciled with the excess, if any, of the Guaranteed Minimum Rent for such year over the aggregate actual Participation Rents for such year. If the Guaranteed Minimum Rent payments for such year are greater than such excess, then Tenant shall be entitled to a credit to be applied against the next installment of monthly Participation Rent. If the Guaranteed Minimum Rent payments for such year are less than such excess, then Tenant shall pay the deficiency within 30 days following submission of the Annual Statement.

4.4.5 A hypothetical illustration of the calculation of the Guaranteed Minimum Rent on an annual basis is set forth on **Exhibit W**.

*4.5* *Offset.* Tenant shall be entitled to a credit against the Participation Rent payable for any month equal to the Available Rent Offset as of the end of such month. For the avoidance of doubt, the amount of the credit for any month under this Section 4.5 will not exceed the Rent payable for such month, so if the Available Rent Offset exceeds the Rent that would otherwise be payable for such month, then the amount of Rent payable to Landlord for such month would be $0 and such excess Available Rent Offset will carry over and be available for credit against Rent after such month. The Available Rent Offset shall not be applied against any Guaranteed Minimum Rent payment.

*4.6* *Payment.* Tenant shall pay Landlord the Rent without notice or demand, deduction, credit or set-off, except as specifically provided in this Lease, in lawful money of the United States of America, by wire transfer, pursuant, initially, to the following wire instructions:

JPMorgan Chase Bank
ABA # 021000021
Account Name: MTA REAL ESTATE AND ADVERTISING REVENUE
Account # 182532661
Attn: Tim Noble

Landlord shall have the right to change such wire instructions from time to time upon reasonable prior notice to Tenant.

*4.7* *Monthly Statements; Annual Statements; Reconciliation.*

(a) *Monthly Statements.* Not later than the 30th day of each month during the Term after the Opening Date (including the 30th day of the month subsequent to the month during which the Expiration Date occurs), Tenant shall deliver, or cause to be delivered, to Landlord a true, correct and complete statement (each such statement, a "Monthly Statement") prepared, subject to the Arrearage Exception, on an accrual basis of accounting in accordance with GAAP and in a form from time to time reasonably acceptable to the Parties, showing each of the amounts set forth on **Exhibit V** for (a) the immediately preceding calendar month, and (b) the entire elapsed portion of the Lease Year, including the immediately preceding month. In accordance with the accrual basis of accounting, (i) Tenant shall treat rents and revenues owed by third-parties under Subleases or under agreements for use of Tenant Controlled Signage or from Sponsorship Events as having been paid during the month in which such rents and revenues are due and payable, even if such rents and revenues are not so paid, provided that if such rents and revenues remain unpaid for 90 days after the due date, then such unpaid rents and revenues will be written off as losses and the treatment of the corresponding rents and revenues, which were theretofore treated as having been paid, will be retroactively reversed; if such rents or revenues are thereafter paid, then they will be treated as having been paid in the month in which they are actually paid (this clause (i) is referred to as the "Arrearage Exception"); (ii) if the Subtenant under any Sublease pays "key money," then such key money shall be amortized on a straight-line basis over the initial term of such Subtenant's Sublease (so that, for each month during such term, the Commercial Revenues attributable to such Sublease shall be deemed to include the amount obtained by dividing the amount of the "key money" by the number of months in the term of such Sublease); and (iii) with respect to any Sublease with a Free Rent Period, the "free rent" afforded the applicable Subtenant shall be amortized on a straight-line basis over the initial term of such Subtenant's occupancy (so that, for each month between the first day of such Free Rent Period and the end of such initial term, the Commercial Revenues attributable to such Sublease shall be deemed to include the amount obtained by dividing the aggregate base rent payable by such Subtenant for the entirety of such term by the number of months in such term). Each Monthly Statement shall include a certification that Tenant has complied with Sections 4.1.5 to 4.1.7, identify any ad sales covered by such Monthly Statement to which such Sections apply, and specify how revenues were allocated in accordance with such Sections.

(b) *Annual Statements.* Not later than 120 days after the close of each Lease Year (including any Lease Year ending on the Expiration Date), Tenant shall deliver, or cause to be delivered, to Landlord a true, correct and complete statement (each such statement, an "Annual Statement") in a form from time to time reasonably acceptable to the Parties showing each of the amounts set forth on **Exhibit V** for the entire preceding Lease Year. Each Annual Statement shall be certified by an independent certified public accountant and prepared on an accrual basis of accounting in accordance with GAAP, subject to the Arrearage Exception.

(c) *Reconciliation.* If the aggregate amount paid by Tenant as Rent for a Lease Year is less than the aggregate Recalculated Signage Participation Rent, Recalculated Sponsorship Participation Rent and Recalculated Commercial Participation Rent (as each such term is defined on **Exhibit V** and collectively "Recalculated Participation Rent") for such Lease Year, then, simultaneously with the rendition of such statement, Tenant shall pay to Landlord the amount of such deficiency, and if such deficiency is 3% or more of the aggregate Rent for the

applicable Lease Year, then Tenant shall pay Default Interest on such deficiency from the midpoint of the applicable Lease Year until the date of payment of such deficiency. If the aggregate amount paid by Tenant as Rent for such Lease Year is greater than the Recalculated Participation Rent for such Lease Year, then Landlord shall credit the amount of such overpayment against the next monthly installments of Rent due. Any payment theretofore timely made by Tenant and any credit given by Landlord pursuant to this clause shall be without interest thereon except as provided in the first sentence of this paragraph. The acceptance by Landlord of payments of Rent or the acceptance by Landlord of Monthly Statements and Annual Statements shall be without prejudice to Landlord and shall in no event constitute a waiver of Landlord's right to claim a deficiency or to audit Tenant's books and records as provided herein. In addition, if Tenant selects the Break-Even Date retrospectively, then within 30 days after the Break-Even Date is selected, Tenant shall recalculate the Stabilization Period Operating Deficit and the Stabilization Period Operating Deficit Net Accrual based on the Break-Even Date, and Tenant shall further recalculate any Participation Rent for any prior periods based on the Stabilization Period Operating Deficit and the Stabilization Period Operating Deficit Net Accrual as recalculated. If Tenant owes any Participation Rent for any prior period on account of such recalculation, Tenant shall pay the deficiency with the next payment of Participation Rent, and if Tenant has overpaid any Participation Rent for any prior period, Tenant shall be entitled to a credit against future payments of Participation Rent.

4.7.1 Tenant shall pay, prior to delinquency, any and all Impositions and all federal, state and local sales, use, payroll and other similar taxes relating to its operations. Within 30 days following request by Landlord, Tenant shall deliver to Landlord a monthly statement itemizing such Impositions and payments made, and photocopies of the related tax returns filed by Tenant with the appropriate governmental authority.

4.7.2 Tenant shall prepare, keep and maintain at the Premises or at Tenant's principal office within the United States for a period of three years following the end of each Lease Year, complete and accurate books of account and records on an accrual basis in accordance with GAAP, subject to the Arrearage Exception (collectively, the "Performance Records"), in form and substance reasonably satisfactory to Landlord, of all Commercial Net Revenues, Sponsorship Net Revenues, Signage Revenues, Tenant O & M Expenses, Signage Capital Expenditures and other Capital Expenditures. Tenant shall have controls in place that are satisfactory to Landlord, in its reasonable judgment, to prevent the alteration or manipulation of such Performance Records. Supplementing the foregoing, the Performance Records for any particular period occurring during the Term (each, an "Audit Period") shall include all information recorded by Tenant that Landlord, in its reasonable judgment, deems pertinent to the determination of Signage Participation Rent, Sponsorship Participation Rent or Commercial Participation Rent for such Audit Period, including reasonably detailed records with respect to Multi-Property Package Deals. Landlord's right to review and audit the Performance Records under this Section 4.7.2 and Section 4.7.3 shall survive for three years after Tenant submits to Landlord the Annual Statements for such Lease Year and shall survive the Expiration Date for a period of three years with respect to the final Lease Year, two years with

respect to the penultimate Lease Year and one year with respect to the antepenultimate Lease Year, in each case the survival period running from the date of submission by Tenant to Landlord of the Annual Statements for the applicable Lease Year.

4.7.3 Subject to the time limitations contained in Section 4.7.2, Landlord (and its representatives) shall have the right, from time to time, to examine and/or cause a complete audit (and to make copies) of any or all Monthly Statements and Annual Statements and the Performance Records and Tenant's procedures for keeping such statements and records. In connection with any such examination and/or audit, Landlord (or its representatives) shall have the right, from time to time, to request, in a written notice given to Tenant (each, a "Records Request"), that Tenant make, or cause to be made, available to Landlord (or its representatives), at a location in New York City designated by Landlord, the Performance Records relating to any Audit Period. Tenant, within 30 days after Tenant's receipt of any Records Request (each such 30-day period, a "Submission Period"), shall make, or cause to be made, available to Landlord (or its representatives) the Performance Records requested by Landlord in such Records Request. If, with respect to any Records Request, Tenant fails to make, or cause to be made, available the Performance Records requested by such Records Request at the location designated by Landlord within the applicable Submission Period, then such failure (a "Performance Records Default") shall constitute a material Nonmonetary Default hereunder (with respect to which Tenant shall be entitled to a notice and cure period pursuant to Section 22.1.4). If the Performance Records made available by Tenant in response to such Records Request are insufficient to permit an accurate determination of the pertinent revenues and/or expenditures for the applicable Audit Period, then (a) Landlord shall identify the changes necessary to remedy such insufficiency, and (b) Tenant shall, within a reasonable period of time after such changes are identified, implement such changes and thereafter resubmit the applicable Performance Records to Landlord. For purposes of this Section 4.7.3, the phrase "make available" or other words of similar import shall be deemed to require that Tenant make, or cause to be made, the Performance Records requested by any Records Request available to Landlord (or its representatives) either at the Premises or at Tenant's principal office within New York City.

4.7.4 Tenant shall pay, within 30 days following demand from Landlord, any additional Rent due Landlord as determined pursuant to any examination and/or audit of the Monthly Statements and Annual Statements, Performance Records and/or Tenant's procedures for keeping the same (together with Default Interest thereon from the midpoint of the calendar year that was examined or audited). In addition, if any such audit discloses that the actual amount of Rent differs from the amount reported by more than 5%, then Tenant shall also pay the reasonable costs of such examination and/or audit as Additional Rent to Landlord within 30 days following rendition of a bill therefor.

4.7.5 Any dispute between the Parties about the calculation or determination of any component of Rent shall be subject to Arbitration, including any dispute arising from a year-end reconciliation or audit.

*4.8 Contracts with Affiliates.* Notwithstanding any other provision of this Lease, Tenant shall not enter into a contract with an Affiliate of Tenant for the provision of materials or services if the payments thereunder are included in Capital Expenditures or Tenant O & M Expenses unless such contract is disclosed to Landlord and the economic terms thereof are not less favorable to Tenant than would be an arms' length contract between Tenant and a non-Affiliated third-party for the same materials or services. Any such contract shall require the prior written consent of Landlord (not to be unreasonably withheld) to the extent, if any, that Tenant proposes to count payments thereunder for purposes of any Available Rent Offset against Signage Participation Rent.

*4.9 Additional Rent.* In addition to Rent, Tenant shall pay Landlord (or the appropriate third party, as applicable) certain other charges, as herein elsewhere provided. Except where this Lease provides otherwise, Tenant shall pay all Additional Rent within 30 days after receipt of an invoice and reasonable supporting documentation.

*5. Use.*

*5.1 Retail Standard.* Tenant shall permit the use by Subtenants of the Retail Usage Area (including the RMUs) for high quality, lawful retail stores, food service establishments and/or restaurants (selling food and beverages for on and/or off Premises consumption) and for no other purpose (the "Permitted Retail Use"). Such use shall be of a quality commensurate with the standards of the retail portions of other high quality transportation-oriented retail facilities in Manhattan such as, by way of example only, the retail portions of Rockefeller Center and Grand Central Terminal and the retail facilities at JFK International Airport Terminal 8 (the "Comparable Facilities"), taking into account the differing characteristics and operations appropriate to the below grade, street level and above street level portions of the Premises, and the operational and merchandising differences between RMUs and enclosed retail spaces (the "Retail Standard"), it being agreed also that the Retail Standard specifically excludes, on the street level of the Fulton Center and above, any so-called "chain" or "formula" restaurants having 10 or more other locations in the New York metropolitan area and that are required, by contract or otherwise, to maintain any of the following: standardized services, decor, uniforms, architecture, furniture, signage, or similar features (determined as of the time the applicable Sublease is entered into). The use of the Retail Usage Area (including the RMUs) by Tenant and any Subtenants shall at all times comply with the Permitted Retail Use and shall (i) comply with the Design Guidelines, (ii) with respect to quality of products and operations of retail stores at each level within the Retail Usage Area, be commensurate with or better than the quality of products and operations of the retail stores included in the Comparison Stores for such level, (iii) with respect to the quality of food and service of food service establishments or restaurants at each level, be commensurate with or better than the quality of food and service of the food service establishments and restaurants included in the Comparison Stores for such level, and (iv) exclude uses on the list of "Prohibited Uses" attached hereto as **Exhibit M**, except as and to the extent Landlord's Director of Real Estate may otherwise permit in his or her sole and absolute discretion. The list of retail stores, food service establishments

and restaurants comprising the Comparison Stores is only intended to be indicative of the anticipated quality of products and operations of retail stores and food and service of restaurants and food service establishments and is not intended to be an exclusive list of qualified Subtenants. Furthermore, the absence of local brands and the preponderance of national brands on the list of Comparison Stores is not intended to reflect a preference for national brands over local brands or to exclude local brands from being Subtenants. The Parties intend that the list of Comparison Stores will be updated from time to time to add new brands and to remove brands that have ceased to exist or whose quality has diminished over time, and the Parties agree to cooperate to update the list at the request of either Party. Notwithstanding anything to the contrary herein, any vacant space in the Retail Usage Area may be used, on a temporary basis, as a so-called "pop-up" store so long as the products sold therein are seasonal in nature, high quality and not prohibited by **Exhibit M**.

5.1.1 *Commercial Usage Areas.* With respect to those portions of the Commercial Usage Areas that are outside of the Retail Usage Area, Tenant may use, or permit the use by Subtenants of, such areas for back of house, office or other commercial purposes in a manner that is consistent with the high quality standard applicable to the Retail Usage Area. No uses set forth on **Exhibit M** shall be permitted in such portions of the Commercial Usage Areas.

5.1.2 *Public Circulation Areas.* Except as expressly authorized herein, the Public Circulation Areas shall be used solely as circulation space available to the general public and for no other purpose. Landlord shall have the right, with respect to the Public Circulation Areas, to review and adjust passenger circulation flows and address issues related thereto on an as needed basis throughout the Term, subject, however, to Section 5.1.4 for any such issues arising with respect to RMUs. Without limitation of the foregoing, Landlord will be entitled to designate the directions in which the Public Circulation Area's escalators run at various times of day, and to vary such instructions from time to time during the Term in accordance with the Concept of Operations.

5.1.3 *Sponsorship Events.* Tenant shall have the right to use portions of the Unpaid Public Circulation Areas as venues for Sponsorship Events, provided that Tenant complies with procedures to be developed by Landlord, with Tenant's input, for the submission to Landlord of proposed Sponsorship Events and the review and approval by Landlord of the location and timing of such events, for compliance of such events with applicable building and fire codes, and for maintenance of adequate levels of service for pedestrians throughout such events.

5.1.4 *RMUs.* Tenant may install up to 16 RMUs at the locations within the Fulton Building, Dey Street Concourse and 4/5 Line Underpass shown on **Exhibit B,** each of which may have the size shown on Appendix C (Area Narrative Tables) to **Exhibit K**, provided that the placement and width of the RMUs in the Dey Street Concourse must allow for an unobstructed width at all times of not less than 22 feet. In addition, if from time to time pedestrian use of the Dey Street Concourse or other areas within the Premises in which the RMUs are located substantially exceeds current expectations for foot traffic in these areas, thereby

resulting in a deterioration of levels of service to unacceptable levels, then Landlord and Tenant shall jointly review the location of the RMUs and Tenant shall comply with Landlord's reasonable adjustments to the number and location of the RMUs, provided that (i) Landlord shall endeavor to identify suitable replacement locations that are reasonably comparable to the original locations in terms of exposure to foot traffic and ability to generate revenues for the RMU operators; provided, however, that if during the Term more than four RMUs are removed entirely or are relocated to areas that are not reasonably comparable to the original locations, then Landlord shall provide Tenant with reasonable compensation for the lost Commercial Revenues resulting from removal or relocation of each RMU after removal or relocation of four RMUs, and (ii) Tenant shall have the right to offset against Rent any costs of relocating the RMUs, including the cost of relocating electrical outlets.

5.1.5 *ATMs, Etc.* Tenant may install, or permit the installation of, ATMs, vending machines, digital interactive kiosks and telephone charging stations within the Public Circulation Areas, so long as the locations of such installations are approved by Landlord in advance. Any such approval will be conditioned on Landlord being satisfied that the level of service will not be adversely affected by any such installation in any material respect, and will be subject to revocation if that proves not to be the case. Any such installation approved by Landlord will be subject to the provisions of this Lease that are applicable to the Retail Usage Areas.

5.1.6 *Foot Traffic Counters.* Tenant shall have the right to install foot traffic counters at locations within the Premises selected by Tenant, subject to Landlord's approval, which approval shall not be unreasonably withheld.

5.1.7 *Exclusivity.* Neither Landlord nor NYCTA shall permit, or suffer to exist, any retail operations or Sponsorship Events conducted by any Person other than Tenant and its Subtenants in the Premises or in the A/C Mezzanine.

5.1.8 *Subordination.* This Lease is subject and subordinate to: (i) the NYCT Wicom Network License Agreement between New York City Transit Authority and Transit Wireless, LLC dated as of September 26, 2007, Amended, Conformed and Restated on October 1, 2011 and further Amended, Conformed and Restated on August 1, 2012; and (ii) the right of Con Ed to have access to Con Ed's facilities and transformer rooms on the 6th floor of the Fulton Building, provided that such access does not impair the use by Tenant or its Subtenants of the Corbin Building in any material respect. Tenant shall execute, acknowledge and deliver any instrument requested by Landlord to evidence such subordination, but no such instrument shall be necessary to make such subordination effective.

*5.2 Signage.*

5.2.1 *Tenant Controlled Signage.* With respect to the Tenant Controlled Signage that is located within the Premises, the grant of the Leasehold Estate to Tenant includes such Tenant Controlled Signage, together with the right and

obligation of Tenant to operate, control, utilize, maintain, repair and replace such Tenant Controlled Signage; and with respect to the Tenant Controlled Signage that is located within the A/C Mezzanine, Landlord hereby grants to Tenant an exclusive license to operate, control, utilize, maintain, repair and replace, such Tenant Controlled Signage, subject to all the applicable terms and conditions of this Lease, including the Retail Standard, the Concept of Operations and the Design Guidelines. Tenant's leasehold interest and license with respect to the Tenant Controlled Signage shall commence on the Opening Date and end on the Expiration Date and shall constitute exclusive rights granted to Tenant for signage and displays for commercial purposes in, at and on the Premises. Each replacement of a Tenant Controlled Sign shall comply with the Design Guidelines. Screens visible from the streets adjoining the Premises shall be operated at brightness levels that do not unduly disturb the public and shall display video and/or animation only to such extent as Landlord may approve from time to time. Tenant shall accept for display on Tenant Controlled Signs only programming that promotes commerce, and shall not accept programming that, in the Tenant's judgment, although promoting commerce, prominently or predominately expresses non-commercial messages, including viewpoints regarding political, moral, or religious issues or related mattes, or support for or opposition to a candidate, issue, cause or belief. Except as provided in the last two sentences of this Section 5.2.1, Tenant shall bear the cost of purchasing and installing any replacement Tenant Controlled Signs, and such cost shall constitute Signage Capital Expenditures. Notwithstanding anything to the contrary herein, Landlord shall provide the programming for the one Base Tenant Controlled Sign indicated on **Exhibit C** with a blue "C1" and the two Base Tenant Controlled Signs indicated on **Exhibit C** with a blue "C3", and Landlord and Tenant shall share the programming for the one Base Tenant Controlled Sign indicated on **Exhibit C** with a purple "C1" and the one Base Tenant Controlled Sign indicated on **Exhibit C** with a purple "C3". Such sharing shall be as follows: for the one purple "C1" sign, which will have two screens, Landlord and Tenant will each program one screen; for the one purple "C3" sign, which will have four screens, Landlord and Tenant will each program two screens on such sign. Landlord's programming on such Base Tenant Controlled Signs shall exclude any commercial or revenue-generating activity. Tenant shall be responsible for maintaining the blue and purple "C1" and "C3" signs, but Landlord shall be solely responsible for, at Landlord's cost, purchasing any replacement signs for the blue "C1" and "C3" signs and for installing such signs. With respect to the purple "C1" and "C3" signs, each party shall be responsible for, at such party's cost, replacing its screens, and for paying 50% of any other replacement costs or installation costs for such signs, and the parties shall cooperate with one another on the procurement of such replacement signs.

5.2.2 *Landlord Use of Tenant Controlled Signage*. In addition to the use of certain Base Tenant Controlled Signs as described in the last three sentences of Section 5.2.1, Landlord reserves the right to use 1 to 3 minutes of each hour for such public arts programming content on the Tenant Controlled Signage. If in any hour Landlord does not use such 1 to 3-minute allotment of time for public arts programming, then such 1 to 3-minute allotment shall be forfeited and may not be

used in any other hour. In addition, Landlord shall be permitted to override programming on Tenant Controlled Signage in the event of an emergency.

5.2.3 *Additional Retail Signage.* In addition to any Tenant Controlled Signage, from and after the Opening Date hereof, Tenant and/or any Subtenant shall have the right to place additional signs in the Retail Usage Area ("Additional Retail Signage"), provided that such Additional Retail Signage (i) complies with the Design Guidelines, (ii) is for the exclusive use and benefit of the Subtenants and relates to their operations at their respective Sublet Premises, and (iii) are installed, maintained and repaired in accordance with the Concept of Operations.

5.2.4 *Limitations on Landlord Controlled Signage.* Landlord shall not permit any commercial or revenue-generating activity on the Landlord Controlled Signage.

5.2.5 *Landlord Controlled Signage.* Landlord shall be solely responsible for maintaining the Landlord Controlled Signage and Landlord (and its employees, agents and contractors) shall have the right to maintain and replace such signage.

*5.3 Arts Programming.* Landlord hereby reserves the right to use, intermittently from time to time, portions of the Public Circulation Areas to sponsor public arts programs in the Premises, including those currently produced by Landlord under its "MTA Arts for Transit" and "Music Under New York" programs. Landlord and Tenant shall reasonably cooperate, and Tenant shall require that all Subtenants reasonably cooperate, with each other in implementing the above-described public arts programs in the Fulton Center. For each such individual program other than Music Under New York performances, Landlord shall give Tenant not less than 10 days' prior notice of such program, which notice shall describe the particular program, including the content, media, duration, proposed location within the Premises where the program will be located and the size of the area to be used for the program. The location of any such program shall be subject to the approval of Tenant, which approval shall not be unreasonably withheld or delayed. If Tenant objects to Landlord's proposed location, then Tenant shall suggest an alternative location. For all programs, the size of the area in which the program will be located shall be insubstantial, and the location of the program shall be such that none of the installation, the performers (if applicable), or the anticipated audience, for such program will interfere with the business of any Subtenant in any material respect. In addition, no noise emanating from the programs shall be unreasonably loud so as to interfere with the business of any Subtenant in any material respect. It is anticipated that Music Under New York performances will be accommodated principally at the two locations set forth on **Exhibit B**, and Tenant hereby approves such locations.

*5.4 Use of NYCT Retained Areas.* Except in connection with the operation of Tenant Controlled Signs that are located in the A/C Mezzanine, in no event shall Tenant have the right to use or access the NYCT Retained Areas to conduct its operations or business, and the NYCT Retained Areas are expressly excluded from the Premises.

5.5 *Storage Areas/Deliveries.* Landlord shall have no responsibility for any property stored by Tenant or any Subtenants within or outside of the Premises regardless of whether the loss results from the negligence of Landlord or its employees, servants, agents or workers. Deliveries may be made to the Premises only through the loading facility on John Street and may be brought through the Fulton Center only through the service corridors. Such loading facility and service corridors shall be for the exclusive use of, and controlled by, Tenant and Subtenants, subject to Landlord's access rights hereunder, Section 7.4 and the Concept of Operations.

5.6 *Trade Name.* Initially, Tenant covenants to conduct business in the Premises only under the trade name Westfield or Westfield Fulton Center. Thereafter, Tenant may conduct business in the Premises under a new trade name so long as such trade name satisfies the Retail Standard and is consistent, where applicable, with the trade name used by Tenant at other shopping centers owned by Tenant or any of its Affiliates. At Tenant's request, Landlord shall confirm in writing that its trade name complies with the requirements of this paragraph. Notwithstanding the foregoing, neither Landlord nor Tenant shall have the right to grant naming rights to any third-party for any commercial consideration without the consent of the other party, which may be withheld in such other party's sole discretion, and if Landlord consents to Tenant granting any such naming rights, the resulting consideration shall be treated as Sponsorship Revenues.

5.7 *Operating Hours.* Tenant shall determine the hours of operation of the Retail Usage Areas from and after the Opening Date, provided that, subject to events causing Unavoidable Delays, such hours shall be not less than 12 consecutive hours per day, Monday through Saturday, and 8 hours on Sundays and Thanksgiving, Christmas, New Years Day and Easter (the "Operating Hours"). Subject to events causing Unavoidable Delays, Landlord shall keep the balance of the Fulton Center open to the public during the Operating Hours at least. Notwithstanding the foregoing, Tenant acknowledges that Landlord currently expects to keep the platforms serving the subway lines at the Fulton Center open to the public 24 hours per day, 7 days per week throughout the Term, thereby allowing subway patrons using the A/C/E/J/Z/R/1/2/3/4/5 subway lines to have weather-protected access from such platforms to the Fulton Building and from each of these subway lines to each of the others, and Tenant shall likewise keep the Public Circulation Areas open to the public during the same periods that Landlord keeps substantially all of such platforms open to the public. Notwithstanding the foregoing, Tenant shall have the right to close the restrooms in the Public Circulation Areas between 12:00 a.m. and 5:00 a.m. daily.

5.8 *Tenant's Manner of Operation: No Unauthorized Use of Public Areas.* Tenant shall furnish and install, or use commercially reasonably efforts to cause Subtenants to furnish and install, all trade fixtures that may be necessary or desirable for carrying on Tenant's or any Subtenant's business, shall maintain, or cause to be maintained, adequately trained personnel for efficient service to customers, shall light, or cause to be lit, the display windows and signs of the Retail Usage Area (excluding the RMUs) during Operating Hours and shall operate the entire Premises, and shall use commercially reasonable efforts to cause the Subtenants to operate their respective Sublet Premises and their businesses, in a manner consistent with the Retail Standard. Subject to the performance by Landlord of its obligations

hereunder, from and after the Opening Date, Tenant shall operate and maintain the Premises, or use commercially reasonable efforts to cause the Subtenants to operate and maintain their respective Sublet Premises, in accordance with the Concept of Operations and otherwise as required by this Article 5. Except as otherwise expressly permitted herein, neither Tenant nor any Subtenant shall use the Public Circulation Areas or the sidewalks adjacent to the Fulton Center for any purpose other than ingress to or egress from the Premises, nor, without limiting the generality of the foregoing, shall Tenant or any Subtenant place or conduct any advertising, marketing, promotion, distribution of samples, or storage of goods, materials or trash in, on, or about such areas, except as permitted expressly permitted by this Lease.

*5.9 Pest Control; Trash Disposal.*

(a) From and after the Opening Date, Tenant shall, at Tenant's sole cost and expense, cause the Premises to be serviced by a qualified and licensed pest control contractor designated or approved by Landlord, which approval shall not be unreasonably withheld or delayed, as necessary to comply with the Concept of Operations. Landlord shall make good faith efforts to resolve any pest control issue emanating from the NYCT Retained Areas.

(b) The water and wash closets and other plumbing fixtures in the Premises shall not be used for any purposes other than those for which they were designed or constructed and in accordance with the Concept of Operations, and no sweeping, rubbish, rags, sanitary napkins, grease, acids or other similar substances shall be deposited therein.

(c) Tenant shall not place or allow its Subtenants or its or their contractors to place or accumulate in public or other areas of the Fulton Center outside of the Premises any garbage, rubbish or refuse generated in the Premises. Tenant shall be responsible, at Tenant's sole cost and expense, for the removal and disposal of all garbage and refuse resulting from the operation of the Premises. All garbage and refuse from the Premises shall be stored, handled and transported in such manner as will prevent odors and vermin and otherwise in accordance with the Concept of Operations. Under no circumstances may garbage be stored at any curbside adjacent to the Premises. In the event of any interruption of regularly scheduled garbage pickups, Tenant shall take, or cause to be taken, all action required to remove Tenant's and Subtenants' garbage and refuse from the Premises on a daily basis.

*5.10 Grease Traps.* If there shall be one or more grease traps located in the Premises, then Tenant shall, at Tenant's sole cost and expense, (a) keep, or cause Subtenants to keep, such grease traps in a clean condition, and (b) maintain and repair, or cause Subtenants to maintain and repair, such grease traps in accordance with all applicable Laws and the Concept of Operations.

*5.11 Con Ed Equipment and Facilities.* Notwithstanding anything to the contrary contained elsewhere herein, Con Ed shall at all times have access to its facility and transformer rooms on the 6th floor of the Fulton Building, as well as any other Con Ed owned equipment located in any other portion of the Fulton Center, which shall remain at all times inaccessible to Tenant and any Subtenants.

*5.12 MWBE.* Tenant shall at all times during the Term comply with all applicable MWBE programs and requirements, as described in **Exhibit N**.

*5.13 Compliance with Labor Laws.* All employees of Tenant or any Subtenant or any contractor thereof performing work in any portion of the Premises, including those performing any repair and maintenance obligations hereunder, shall be hired and compensated in compliance with all applicable provisions of State wage and labor Laws, including the New York Labor Law.

*5.14 Commencement of Tenant's Responsibilities.* Notwithstanding anything to the contrary herein, Tenant's obligations under this Section 5 and under Sections 6 and 7 shall commence, with respect to the Corbin Building, on the Applicable Delivery Date of the Corbin Building, but shall not commence as to any other portion of the Premises until the Opening Date. Further notwithstanding anything to the contrary herein, prior to the Opening Date, Tenant's responsibility for maintaining Base Building Equipment shall apply only to the extent the Base Building Equipment is located in, and controlled from within, the Corbin Building.

6. Compliance.

*6.1 Generally.* Tenant shall not violate any express written order or notice of violation issued by any Government; cause any imminent risk to health or safety; take any action (or permit any inaction) which will result in, or create a material risk of, any lien or charge affecting Landlord or the Fulton Center or any portion thereof; or create a material risk of forfeiture or loss of the Fulton Center or any portion thereof. Subject to Section 6.2 hereof and subject to compliance by Landlord with its obligations hereunder, Tenant shall during the Term, at Tenant's expense, comply, in all material respects, with all Laws applicable to its operations at the Premises.

*6.2 Landlord as Government Agency.*

6.2.1 Wherever in this Section 6.2 or in any other provision of this Lease, Tenant is directed and agrees to comply with any Laws of Government authorities or to obtain any Approvals, or reference is made to Government authorities "having jurisdiction", or language of like import is used, it is the intention of Landlord and Tenant that Tenant shall comply with such Laws and obtain such Approvals as if such Government authorities actually have jurisdiction with respect to the Premises, notwithstanding Landlord's status as a public benefit corporation of the State. Notwithstanding any other provision of this Lease, no exemptions from local laws, resolutions, ordinances, rules and regulations that are applicable to Landlord under Law shall be applicable to or inure to the benefit of Tenant, any Subtenant and/or Tenant's, or any Subtenant's, use of the Premises, except for those exemptions, if any, that are either (x) consented to in writing by Landlord, in its sole and absolute discretion, and, with such consent, are legally applicable to Tenant, any Subtenant and/or Tenant's, or any Subtenant's use of the Premises, or (y) not consented to by Landlord, but are nonetheless legally applicable to Tenant, Subtenant and/or Tenant's, or any Subtenant's, use of the Premises. Without limiting the generality of the foregoing, and notwithstanding anything to the contrary contained elsewhere herein,

Approvals shall include approvals required by the New York City Department of Health and Mental Hygiene and the New York City Fire Department with respect to any retail uses, as and to the extent applicable, to the extent required by Landlord and/or as Landlord shall otherwise direct.

6.2.2 However, notwithstanding the foregoing or any other provision of this Lease (i) no provision of this Lease shall be deemed to constitute a waiver by Landlord of its immunity or exemption from any Laws, whether for the benefit of Tenant, any Government authority or any other Person, and (ii) Landlord reserves the right to assert its immunity or exemption from any such Laws relating to the Premises, and to direct Tenant or any Subtenant to refrain from complying with any such Laws, as Landlord, in its discretion, shall see fit from time to time, provided, that Landlord shall indemnify, hold harmless and defend Tenant or such Subtenant against any loss, cost or liability that Tenant or such Subtenant incurs by reason of any such direction by Landlord. Without limitation of the foregoing, Landlord hereby directs Tenant that the Premises are not subject to the New York City Zoning Ordinance or the New York City Building Code, and are governed instead by the New York State Building Code (compliance with which is determined by employees of Landlord or an Affiliate thereof acting in its governmental capacity).

6.2.3 Tenant and Subtenants shall be required to comply with the following Laws, which would not be applicable to the Premises but for the status of Landlord as a Governmental entity: Section 5 of Article 2 of the NYS Lien Law; Sections 220 and 231 of the NYS Labor Law; Section 137 of the NYS State Finance Law; and Section 19-0323 of the NYS Environmental Conservation Law.

6.2.4 If any Approvals (other than building permits or certificates of occupancy or equivalent documents issued by Landlord), including any licenses required for employees of Tenant or any Subtenant or any contractor of Tenant or any Subtenant, shall be required for the proper and lawful conduct of the business of Tenant or any Subtenant in the Premises, then, without cost to Landlord, Tenant shall procure and thereafter maintain such Approvals, or shall use commercially reasonable efforts to cause Subtenants and its or their contractors to do so, and Tenant shall submit such Approvals to Landlord for inspection upon Landlord's request. Tenant shall at all times comply, in all material respects, with the terms and conditions of each such Approval applicable to Tenant, and shall use commercially reasonable efforts to cause its Subtenants and its and their contractors to comply, in all material respects, with the terms and conditions of each such Approval applicable thereto.

*6.3 Copies of Notices.* Landlord shall promptly give Tenant a copy of any notice of any kind regarding the Premises, including any notice of nonrenewal or threatened nonrenewal of any Approval, that Landlord receives from any Government, utility company, insurance carrier, or insurance rating bureau.

*6.4 FTA Requirements.* **Exhibit O** has two parts. One part contains the Pertinent Grant Management Requirements. The second part of **Exhibit O** is a table that

allocates responsibility between Landlord and Tenant for compliance with the Pertinent Grant Management Requirements. For the avoidance of doubt, (i) any provisions of Chapter IV of Circular FTA C 5010.1D that are so crossed-out on **Exhibit O** are excluded from the Pertinent Grant Management Requirements for purposes of this Lease and are, accordingly, not included within Tenant's responsibilities, and (ii) Tenant's obligations with respect to the Pertinent Grant Management Requirements are further limited to those responsibilities that are allocated to Tenant in the table comprising the second part of **Exhibit O**. Notwithstanding anything to the contrary herein, Tenant's obligations with respect to FTA requirements are limited to those Pertinent Grant Management Requirements that are so allocated to Tenant. To the extent required of Tenant under **Exhibit O**, Tenant shall perform Tenant's responsibilities with respect to notices, inventory schedules, maintenance and operation schedules, plans and reports, inspection reports and any other information and documentation required in connection with any FTA audit or inspection contained in the Pertinent Grant Management Requirements, all as more particularly provided in **Exhibit O**. Notwithstanding anything to the contrary herein, as between Landlord and Tenant, Landlord shall be solely responsible for making any payments to the FTA and obtaining any FTA approvals required by the Grant Management Requirements, but Tenant shall be responsible for preparing the documentation required to obtain such FTA approvals so long as the information for such documentation is available to Tenant and to consult with Landlord prior to taking any action that requires FTA approval under the Grant Management Requirements.

*6.5* *Prohibited Persons*. Prior to Tenant entering into a Vettable Transaction or prior to a Transfer of Equity Interests in Tenant or Guarantor pursuant to clause (b) of the definition of Permitted Equity Interest Transfer, Tenant shall determine whether any applicable Vettable Person is a Prohibited Person by undertaking the process described on **Exhibit S** (the "Prohibited Person Vetting Process"). Absent actual knowledge to the contrary, Tenant shall be entitled to rely exclusively and conclusively on the Prohibited Person Vetting Process to (i) identify Vettable Persons, and (ii) determine whether any of the matters described in paragraphs (a) – (f) in the definition of Prohibited Person applies to any such Vettable Person. Unless Tenant shall have actual knowledge to the contrary prior to engaging a Vettable Person, Tenant shall have no liability or responsibility to Landlord if the Prohibited Person Vetting Process does not accurately disclose pertinent or current information with respect to the preceding clauses (i) or (ii), or if any such Vettable Person is not a Prohibited Person at time the Vettable Transaction is entered into but thereafter becomes a Prohibited Person. (The preceding two sentences are referred to as the "Prohibited Person Determination Standards.")

*7.* *Maintenance, Repairs and Services.*

*7.1* Maintenance and Repairs; Cleaning.

7.1.1 *Tenant's General Obligation to Maintain and Repair*. Subject to compliance by Landlord with its obligations under this Article 7 and Article 15, and except as otherwise provided in this Article 7 and/or in Article 15, Tenant shall, throughout the Term, keep, repair and maintain the Core and Shell/Base Building Improvements and Tenant Controlled Signage, and keep, repair and maintain

(or use commercially reasonable efforts to cause Subtenants to keep, repair and maintain) the Subtenant Improvements and Tenant/Subtenant Equipment, in good order and condition (subject to reasonable wear and tear consistent with the Concept of Operations and the Retail Standard), in accordance with all applicable Laws, the Concept of Operations and all applicable Manufacturer Specifications, and otherwise in accordance with the Retail Standard (it being understood that, except as otherwise expressly provided herein, whenever this Lease refers to an obligation of any Party to make "repairs", such obligation shall include the making of capital replacements as, when and to the extent required in accordance with good industry practice). All such repair and maintenance obligations shall be fulfilled by Tenant or Subtenants within the time frames provided for in the Concept of Operations, without any cost or expense to Landlord except insofar as Tenant shall be entitled to Rent deductions and credits as expressly provided in Article 4 (as Article 4 is supplemented by this Section 7.1 and Section 7.2). To facilitate such maintenance and repair, Landlord will make certain "attic stock" material available to Tenant as set forth in Sections 3.8 and 4.9 of the Concept of Operations.

7.1.2 *Cleaning*. From and after the Opening Date, Tenant shall remove, or cause Subtenants to remove, dirt, trash, snow, and debris from the Premises and the adjoining sidewalks, and maintain them, or cause Subtenants to maintain them, in a clean and passable condition, all in accordance with the Concept of Operations and the Retail Standard and as required by applicable Law, including New York City Department of Sanitation requirements. Without limitation of the foregoing, Tenant shall clean and otherwise maintain the Public Circulation Areas to the same high level of quality as the Commercial Usage Areas. As part of Landlord's Work, Landlord shall provide to Tenant on or prior to the Opening Date the equipment described in Section 3.5 of the Concept of Operations for cleaning public interior spaces in the Fulton Building, and Tenant shall maintain the foregoing equipment at Tenant's expense.

7.1.3 *Treatment of Costs of Repairing and Replacing Non-Structural Components*. The purpose of this Section and Section 7.1.4 is to establish whether costs incurred by Tenant to repair or replace Non-Structural Components are to be treated as deductions from Commercial Revenues (*i.e.*, Ongoing Capital Expenditures, if not Tenant O&M Expenses) or as offsets against Rent (*i.e.*, Capital Expenditure Offset Amounts), in each case to the extent that such costs are not recovered under Warranties and do not result from Tenant Recklessness. For any such repair or replacement that is covered by a Warranty, Tenant shall use commercially reasonable efforts to enforce such Warranty and obtain performance, or recovery for the cost of such repair or replacement, from the applicable warrantor. Any such cost of repairs or replacements resulting from Tenant Recklessness shall constitute neither Ongoing Capital Expenditures nor Capital Expenditure Offset Amounts.

(a) Additional Defined Terms. The following terms are defined below:

(1) "Actual Life Span" means, with respect to any Non-Structural Component listed in Section 4.8 of the Concept of Operations, the period from (A) the

acceptance thereof from the applicable contractor to (B) the date such Non-Structural Component needs to be replaced because it fails or ceases to operate in accordance with its performance specifications.

(2) "Periodic Service" means servicing or repairing a Non-Structural Component or part thereof that is expected to be serviced or repaired periodically during the Useful Life of such Non-Structural Component, including replacing parts that are expected to be replaced periodically (or occasionally, in the normal course); provided, however, that replacing parts materially sooner or materially more often than expected shall not constitute Periodic Service. For purposes of this definition, (x) a substantial overhaul or refurbishment of a Non-Structural Component shall be treated as replacement; and (y) the expectations for periodic or occasional servicing, repairing or replacing shall be based on Manufacturer Specifications and, with respect to escalators, shall also be based on expected usage within the Fulton Center that will result in greater "wear and tear" than would be experienced by escalators located within in Class A commercial office buildings or regional shopping centers.

(3) "Useful Life" means, with respect to each Non-Structural Component listed in Section 4.8 of the Concept of Operations, the expected minimum useful life thereof at the time of installation as set forth in such Section 4.8.

(b) Rules for the Treatment of Costs. Set forth below are the rules for the treatment of costs of repairing and replacing Non-Structural Components to the extent neither recovered under Warranties nor resulting from Tenant Recklessness:

(1) If a repair or replacement is covered by a Warranty but (despite Tenant's commercially reasonable enforcement efforts as contemplated by Section 7.1.3) the applicable warrantor fails to make good on its obligations under such Warranty, then Tenant's unrecovered cost of making such repair or replacement (including any unrecovered cost of endeavoring to enforce such Warranty) shall be a Capital Expenditure Offset Amount.

(2) To the extent not covered by Warranties (and not treated as Tenant O&M Expenses), Periodic Service costs shall be Ongoing Capital Expenditures.

(3) To the extent not covered by Warranties, the treatment of the costs of replacing Non-Structural Components or parts thereof other than in connection with Periodic Service shall be determined as follows:

A. If the replacement would never have been covered by a Warranty, regardless of the passage of time, then the cost thereof shall be an Ongoing Capital Expenditure, unless the replacement occurs within the last 7 years of the then current Term, in which case Section 7.1.4(a) shall apply to such cost.

B. If the replacement would have been covered by a Warranty but for the passage of time, then:

I. If the replacement occurs prior to the expiration of 80% of the Useful Life of the applicable Non-Structural Component, then:

1. The portion of the replacement cost attributable to the Actual Life Span of such Non-Structural Component (*i.e.*, such cost multiplied by the fraction the numerator of which is the Actual Life Span and the denominator of which is 80% of the Useful Life of such Non-Structural Component (such cost being referred to as the "Actual Life Span Cost")) shall be an Ongoing Capital Expenditure, unless the replacement occurs within last 7 years of the then current Term, in which case Section 7.1.4(a) shall apply to the Actual Life Span Cost; and

2. The portion of the replacement cost attributable to the remainder of 80% of the Useful Life of such Non-Structural Component (*i.e.* such cost multiplied by the fraction the numerator of which is 80% of the Useful Life less the Actual Life Span and the denominator of which is 80% of the Useful Life (such portion being referred to as the "Remaining Useful Life Cost")) shall be a Capital Expenditure Offset Amount.

II. If the replacement occurs after expiration of 80% of the Useful Life of the applicable Non-Structural Component, then the cost thereof shall be an Ongoing Capital Expenditure, unless the repair or replacement occurs during the last 7 years of the then current Term, in which case Section 7.1.4(a) shall apply to such cost.

(4) Failure Arising from Casualty. Notwithstanding anything to the contrary in this Section 7.1.3, if a repair or replacement of a Non-Structural Component is necessitated by a Casualty, then such repair or replacement shall be governed by Section 15.

(c) Landlord's Right to Contest; Burdens of Proof. If Tenant claims entitlement to an offset in the amount of a Remaining Useful Life Cost, Tenant shall so notify Landlord and Landlord shall have the right to contest such claim by initiating an Arbitration. Landlord shall be deemed to have irrevocably waived its right to initiate such a contest with respect to any such claim if Landlord fails to initiate such contest within 60 days after Tenant notifies Landlord of such claim and produces the maintenance records and certification referred to below, provided that Tenant's notice of such claim shall reference this provision and so stipulate. Tenant shall not be required to delay the commencement or prosecution of any such work while such 60-day period runs or, if Landlord does initiate such contest, while such contest remains unresolved. Tenant shall have the burden of proving that the Non-Structural Component in question shall have reached the end of its Actual Life Span prior to the end of its Useful Life despite Tenant having substantially complied with the Manufacturer Specifications for the

applicable Non-Structural Component. The production by Tenant of maintenance records showing that Tenant substantially complied with the scope and frequency of the inspection and maintenance activities prescribed by such Manufacturer Specifications, together with a certificate of a senior officer of Tenant certifying that Tenant is not aware of the occurrence of any event or other circumstance that would have caused the applicable Warranty to be inapplicable if such Warranty were still in effect, shall constitute *prima facie* evidence (rebuttable by Landlord) that the failure of the Non-Structural Component in question would have been covered by the applicable Warranty had such Warranty not expired.

(d) Section 7.1.4(c) Applies. Section 7.1.4(c) shall apply to any replacement undertaken by Tenant pursuant to this Section 7.1.3.

7.1.4 *Offset-Eligible Replacements.*

(a) *Allocation of Cost.* Except as otherwise provided in Section 7.2.1 or Section 15.2, if Tenant makes a Capital Expenditure for the replacement or repair of any Core and Shell/Base Building Improvements in the last 7 years of the then current Term and the useful life of such replacement or repair extends beyond the then Scheduled Expiration Date (each, an "Offset Eligible Replacement"), then, whether or not Section 7.1.3 shall apply and unless the need for such replacement or repair arises from Tenant Recklessness, (i) Tenant shall have the right to offset against Rent (as contemplated by Section 4.5) a portion of such Capital Expenditure (referred to herein as a "Capital Expenditure Offset Amount") equal to the product of (1) the total cost of such Offset Eligible Replacement (or the Actual Life Span Cost, if clause B.I.1 of Section 7.1.3(b) applies) multiplied by (2) a fraction, the numerator of which shall be 10 minus the number of years (to the near quarter year) remaining in the then current Term at the time such Offset Eligible Replacement is made and the denominator of which shall be 10, and (ii) the balance of such Capital Expenditure shall be included in Ongoing Capital Expenditures for purposes of determining the Commercial Net Revenues. Tenant may offset the Capital Expenditure Offset Amount against Rent for the Lease Year in which such replacement or repair is made, and the balance of any Capital Expenditure Offset Amount remaining after application of such offset may be applied to offset Rent in subsequent Lease Years. If the need for any such replacement or repair arises from Tenant Recklessness, then the cost of such replacement or repair shall be borne solely by Tenant and such replacement or repair shall not be an Offset Eligible Replacement. Any contest to establish that the need for any Offset Eligible Replacement arose from Tenant Recklessness shall be subject to Arbitration. If Landlord fails to bring any such contest within 60 days after Tenant notifies Landlord of its intention to commence the applicable repair or replacement, then Landlord shall be deemed to have irrevocably waived its right to initiate such contest, provided that Tenant's notice to Landlord shall reference this provision and so stipulate. The burden of proof that the need for any replacement or repair arose from Tenant Recklessness shall be on Landlord.

(b) *Reimbursement Upon Exercise of Renewal Options.* If Tenant exercises a Renewal Option, then for any Offset Eligible Replacement theretofore made by Tenant under Section 7.1.3 or Section 7.1.4, Tenant shall no longer be entitled to the applicable Capital Expenditure Offset Amount, and, within 10 days after Landlord acknowledges in writing that Tenant has satisfied all conditions to the effectiveness of Tenant's exercise of such Renewal Option, Tenant shall reimburse Landlord for any offset theretofore taken against Rent on account

of such Offset Eligible Replacement (such reimbursement being referred to herein as a "Capital Expenditure Offset Reimbursement"). The preceding sentence shall not apply to the Remaining Useful Life Cost of the applicable Non-Structural Component determined in accordance with clause B.I.2 of Section 7.1.3(b).

(c) *Procedures Applicable to Offset-Eligible Replacements.* Prior to undertaking any Offset Eligible Replacement, Tenant shall provide to Landlord reasonably satisfactory evidence of the estimated cost (which may include a market rate construction management fee) and the useful life thereof. If Tenant intends to replace, as opposed to repair, all or substantially all of a major Base Building Equipment or a major part thereof, then the model of the replacement item shall be comparable (or better) in quality and useful life relative to alternative models then commercially available and feasible as the component being replaced relative to alternative models that were commercially available and feasible at the time such item was installed. In addition, no capital replacement and/or repair may be undertaken by Tenant without Tenant obtaining the required Approvals therefor, without advance notice to Landlord of the proposed work and without conferring and coordinating with Landlord about the schedule for such work. Tenant shall not be entitled to apply any Capital Expenditure Offset Amount against Rent until satisfactory completion of the applicable Offset Eligible Replacement, as evidenced by a certificate of the architect or engineer of record certifying that such Offset Eligible Replacement was completed substantially in accordance with the Plans and Specifications therefor, and presentation of paid invoices therefor and appropriate lien waivers and releases from all contractors and subcontractors performing such Offset Eligible Replacement.

(d) *Termination Rights Arising From Offset-Eligible Replacements.*

(1) Cap on Offset-Eligible Replacements. Notwithstanding the preceding provisions of Section 7.1.4, the foregoing, the aggregate Capital Expenditure Offset Amount to which Tenant shall be entitled in any Lease Year pursuant to this Section 7.1.4 shall be capped at $2,000,000 per Lease Year (subject to Annual Escalation). If an Offset Eligible Replacement under this Section 7.1.4, considered by itself or with any other Offset Eligible Replacement theretofore performed under this Section 7.1.4, would result in an aggregate Capital Expenditure Offset Amount in excess of such cap in any Lease Year, then within 30 days following submission to Landlord of the estimated cost of such Offset Eligible Replacement, Landlord may elect, by notice to Tenant, to accept a Capital Expenditure Offset Amount in excess of such cap or to adhere to such cap. If Landlord does not make an election within such 30-day period, then (provided that Tenant's notice shall have referenced this provision and so stipulated) Landlord shall be deemed to have elected to adhere to such cap. If Landlord elects, or is deemed to have elected, to adhere to such cap, then Tenant shall have the right to terminate this Lease by notice given to Landlord within 30 days following expiration of the 30-day period referred to in the preceding sentence. If Landlord elects to accept a Capital Expenditure Offset Amount in excess of such cap, then Tenant shall proceed with such Offset Eligible Replacement, subject, however, to Tenant's right to terminate pursuant to paragraph (2) below.

(2) Available Rent Offset Exceeds Rent. Regardless of whether an Offset Eligible Replacement would cause such cap to be exceeded or whether Landlord elects not to adhere to such cap, if an Offset Eligible Replacement under this Section 7.1.4, considered with any other Offset Eligible Replacement theretofore performed under this Section 7.1.4,

would result in the aggregate Available Rent Offset for the remainder of the then current Term (together with any Renewal Term with respect to which Tenant theretofore exercised the Renewal Option), exceeding the aggregate Rent for the remainder of the then current Term (together with any Renewal Term with respect to which Tenant theretofore exercised the Renewal Option), based on reasonable (and reasonably detailed and supported) projections submitted by Tenant to Landlord (any such excess being a "Rent Offset Deficit"), then Tenant shall have the right to terminate this Lease, by notice given to Landlord within 60 days following submission of such projections to Landlord. In electing to terminate this Lease, Tenant shall be deemed to have irrevocably waived its right to exercise any Renewal Option that Tenant has not theretofore exercised if Landlord elects to negate Tenant's termination of this Lease in accordance with the following sentence. Any such termination shall be effective on the date specified in Tenant's termination notice, which date shall be no earlier than 180 days after the giving of Tenant's termination notice; provided, however, that (i) Tenant shall have the right (in such termination notice) to accelerate such effective date if the commencement of the applicable Offset Eligible Replacement is essential to the operation of the Premises, but in no event shall such accelerated effective date be prior to 60 days after the date of such termination notice, and (ii) Landlord shall have the right to negate such termination by notice to Tenant given not later than 30 days prior to such effective date and undertaking to pay the applicable Rent Offset Deficit to Tenant (parri passu with the balance of the cost of the applicable Offset Eligible Replacement) when and as needed to allow Tenant to fund such cost. Any such negation shall apply only to Tenant's termination right that was triggered by the specific Offset Eligible Replacement at issue and not to any termination right that may be triggered by any other Offset Eligible Replacement.

(3) Relationship to Retail Standard. Notwithstanding paragraphs (1) and (2) above, if the failure to undertake the applicable Offset Eligible Replacement would not materially and adversely affect Tenant's ability to meet the Retail Standard, as reasonably demonstrated by Tenant, then Tenant shall not be obligated to undertake the applicable Offset Eligible Replacement, and Tenant shall not have the right to terminate this Lease on account of such Offset Eligible Replacement pursuant to either paragraph (1) or (2) above. A hypothetical example of a failure to undertake an Offset Eligible Replacement that may not materially and adversely affect Tenant's ability to meet the Retail Standard would be if Tenant elected to upgrade Base Building Equipment with a higher performing model even though the Base Building Equipment to be replaced was performing at manufacturer specifications at the time

7.1.5 *Changes in Law*. Without limitation of the foregoing (but subject to Section 6.2), Tenant shall be responsible for remedying any non-compliance of the Non-Structural Components with any amendment to any existing Law or any new Law promulgated after the Lease Execution Date; provided, however, that, notwithstanding the foregoing, Landlord shall be responsible for remedying any such non-compliance to the extent, if any, that such non-compliance relates to the Public Circulation Areas. Landlord shall be responsible for remedying any non-compliance of the Non-Structural Components (or the Structural Components) with any existing Law as of the Opening Date, except to the extent such non-compliance is covered by a Warranty so that Section 7.1.3 applies with respect thereto.

7.2 *Maintenance and Repair of Structural Components.* Notwithstanding Section 7.1(a), responsibility for the inspection, maintenance and repair of the Structural Components shall be allocated between Landlord and Tenant as follows:

7.2.1 *Material Structural Failure.* For purposes of this Lease, "Material Structural Failure" shall mean any failure of any Structural Component, at any time during the intended useful life of such Structural Component, to function (safely, reliably and in accordance with applicable Laws, whether now or hereafter in force) for such Structural Component's intended purpose, without regard to whether such failure shall be or ever was covered by any Construction Warranty or the E&O Policy. Except as specifically provided in this Section 7.2.1 or as the Parties may otherwise agree, any Material Structural Failure, or any prospective Material Structural Failure requiring remedial action, will be treated as a Casualty for all purposes of this Lease, whether or not the cause of such Material Structural Failure shall be a peril covered by "all risk" property insurance policies of the type contemplated by Article 14, and Landlord shall be responsible for restoring the affected Structural Component (and any other Core and Shell/Base Building Improvements impacted by such Material Structural Failure, whether due to collapse, water penetration or otherwise) following any Material Structural Failure, or for performing any remedial work required in order to prevent any Material Structural Failure, to the same extent that Landlord would be responsible for such restoration under Article 15 if such Material Structural Failure did constitute such a peril. In addition, if the timing or magnitude of any such restoration or remedial work would result in such Casualty being a Substantial Casualty, then the Parties shall have the termination rights arising from a Substantial Casualty as set forth in Section 15.2. Notwithstanding the foregoing, if a Material Structural Failure materially impairs the operations of the Premises, or if a prospective Material Structural Failure requiring remedial action becomes apparent (collectively, a "Tenant Curable Material Structural Failure"), then as soon as possible but in any event within 30 days thereafter, the Parties shall initiate meetings to discuss and consider the schedule for performing the work necessary to remedy the Tenant Curable Material Structural Failure. At such meetings, Landlord shall provide a detailed schedule for, if applicable, retaining consultants as necessary, preparing plans for the required work, hiring a contractor(s) to perform the required work, and commencing and completing the required work, together with an estimate of the cost thereof. Subject to Landlord's consent, which shall not be unreasonably withheld, Tenant shall have the right to perform such work if Tenant is able to reasonably substantiate, by submission of a proposal from a reputable contractor, that Tenant can complete the work sooner than Landlord and at a comparable cost compared to Landlord's proposal. If Tenant so performs such work, then 100% of the cost incurred by Tenant in undertaking such work shall be treated as a Capital Expenditure Offset Amount available for offset against Rent pursuant to Section 4.5.

7.2.2 *Inspection and Maintenance.* At its own expense, but without limitation of any provision of Article 4 as Article 4 is supplemented by Sections 7.1 and 7.2, Tenant shall perform the inspection and maintenance obligations

with respect to the Structural Components that are set forth in the Concept of Operations. Tenant shall at its own cost repair any damage to the Structural Components to the extent such damage results directly from gross negligence or willful misconduct of Tenant or its contractors in performing (or failing to perform) such obligations, or to the extent such damage would have been prevented but for such gross negligence or willful misconduct.

*7.3* *Utilities*. As part of Landlord's Work, Landlord shall arrange for the installation, to the extent set forth and in accordance with the Core and Shell/Base Building Plans and Specifications, of equipment required for the provision of gas, electric power, water, sewage, steam and telecommunications service to the Premises. Tenant shall be responsible for making (or causing Subtenants to make) any and all improvements required to provide for the distribution of electrical or telecommunications services to RMUs and/or, to the extent not provided for in the Core and Shell/Base Building Plans and Specifications, for the distribution of utilities (and/or measurement of utility consumption by Subtenants) within the Commercial Usage Areas. Landlord shall pay all charges for utilities consumed in the Premises, except for those consumed directly by Subtenants (including RMU operators) or by Tenant in providing HVAC or other services to the Commercial Usage Areas (exclusive of RMUs). From and after the Applicable Delivery Date, Tenant shall pay (or cause Subtenants to pay) all charges for such utilities serving the Commercial Usage Areas, in accordance with **Exhibit R**. Tenant shall make commercially reasonable efforts to conserve gas, electric power and water, without regard to the foregoing allocation of utility expenses.

*7.4* *Center Security*.

(a) Landlord shall (without thereby assuming liability for any injury or loss resulting from wrongful acts of persons not employed by Landlord or by any agent or contractor of Landlord) retain primary responsibility for endeavoring to maintain public safety and security at the Fulton Center. In furtherance thereof, Landlord shall arrange for the provision of security services for the entire Premises, excluding only the Commercial Usage Areas, which service will provide both patrol and monitoring by security cameras in Landlord's reasonable discretion. Subject to Landlord's legal obligations, Landlord shall hire a private contractor, at Landlord's own cost and expense, to provide such security services; and Landlord shall, at Landlord's own cost and expense, also install and maintain such security cameras as it deems necessary for such purpose in the Public Circulation Areas and the Back of House Areas (with the express exclusion of Commercial Usage Areas of the Corbin Building). Tenant shall have no responsibility for maintaining, repairing or operating such cameras or related equipment. Tenant may, at any time, request the addition of security cameras within the Public Circulation and Back of House areas. Landlord agrees that it will review and consider Tenant's request(s), but the determination as to whether to approve such request(s) shall be in the sole discretion of the Landlord.

(b) The security cameras and related equipment, which constitute Landlord Controlled Equipment, are used for two separate and independent systems, one for the NYPD monitoring network (the "NYPD Security System"), and the other for Fulton Center security use (the "Fulton Center Security System" or "FCSS"). Tenant may view FCSS live footage at any time from (i) the room within the Fulton Building designated by Landlord for such purpose, (ii) Tenant's office at the Corbin Building, and (iii) the office of Tenant's Affiliate

at the World Trade Center, provided that the video feed is transmitted to such office at the World Trade Center by cable, the installation of which shall be the responsibility and cost of Tenant. Landlord shall retain all FCCS video footage for 45 days, and Tenant shall be able to obtain from Landlord a copy of video footage that is not older than 45 days promptly following submission to Landlord of a completed request form. Notwithstanding the preceding sentence, Tenant's request for a copy of particular footage may be subject to limitations or prohibitions on availability imposed by the NYPD, Federal Bureau of Investigation or other law enforcement agencies. FCCS video footage may contain sensitive information, and, accordingly, Tenant shall not distribute, transmit or otherwise disseminate any such video footage other than for a valid business rationale. Notwithstanding anything else contained in this provision, Tenant shall not make any such video footage available to the general public on the internet, and Tenant shall instruct any person to whom Tenant distributes, transmits or otherwise disseminates any such video not to make such video footage available to the general public on the internet or by any other means. If Tenant needs a copy of particular video footage from the NYPD Security System, Landlord shall reasonably cooperate with Tenant in making such request to the NYPD, but the decision to grant or withhold NYPD Security System footage and the decision to impose any conditions to granting such request rest solely with the NYPD.

(c) Notwithstanding the foregoing, (i) Landlord shall not be responsible for providing security services or security cameras for the Commercial Usage Areas; and Tenant shall provide, or cause Subtenants to provide, for security arrangements in such areas that shall be consistent with the Concept of Operations and the Retail Standard, (ii) Landlord shall be required to post no more than one guard at a time at the facility's loading dock, which guard shall be required to notify (by telephone) the intended recipient of each delivery, and any supplemental personnel required to provide further for the efficient handling of deliveries at such loading dock shall be the responsibility of Tenant, and (iii) any supplemental security specially required in connection with Sponsorship Events shall (as the parties may determine on a case by case basis) either be arranged and paid for directly by Tenant or else arranged through Landlord's contractor but at Tenant's expense.

(d) In order to maintain safety and security at the Fulton Center, Landlord reserves the right to install additional safety and security systems and devices for access to Back of House Areas, and/or to enact, apply and enforce any procedures and regulations as to Tenant, its Subtenants, their respective contractors, and the employees and agents of the foregoing (collectively, "Fulton Personnel"), as Landlord may from time to time deem necessary or desirable in its sole discretion. Such procedures and regulations may set forth guidelines for conducting background checks and Government security clearance for Fulton Personnel to be performed by Tenant (at Tenant's sole expense) and/or the production of photo-identification key cards to be issued by Landlord (at Landlord's sole expense) in order for Fulton Personnel to access the Back of House Areas, provided that any such background checks and security clearance and the procedures for performing or obtaining them shall be subject to Tenant's approval, which approval shall not be unreasonably withheld. Tenant shall comply, and shall use commercially reasonable efforts to cause Fulton Personnel to comply, with such safety and security procedures. In addition, Tenant shall cooperate with Landlord with respect to, and Tenant shall have no right to dispute, contest or challenge, any security procedures and requirements now or hereafter adopted by Landlord, NYPD, NYC Transit Security and/or the

MTA Police Department for the Public Circulation Areas, provided that the implementation and enforcement of such procedures and requirements shall be at Landlord's sole cost and expense. Tenant further acknowledges that the NYPD, NYC Transit Security and MTA Police Department shall have access to the Premises as the NYPD, NYC Transit Security and the MTA Police Department, respectively, may determine in their sole and absolute discretion at any time and for any reason. Tenant shall, and shall direct any Subtenants to, alert the MTA Police Department, NYC Transit Security or the NYPD to any suspicious activities observed in or around the Premises.

*7.5 Sprinkler System.* As part of Landlord's Work, Landlord shall provide a fire protection sprinkler system in accordance with the Core and Shell/Base Building Plans and Specifications. Notwithstanding anything elsewhere in this Lease to the contrary, if applicable Law or Insurance Requirements require or recommend any modifications to such sprinkler system (such as additional risers, feed or cross mains or branch lines), alterations, or additional sprinkler heads or other equipment be made or supplied in an existing sprinkler system by reason of Subtenant Improvements, including the location of partitions, space design, layout, trade fixtures or other contents of any Sublet Premises, then Tenant or the applicable Subtenant shall modify the sprinkler system in such Sublet Premises, subject to Landlord's prior approval of the design of such modification, at Tenant's or such Subtenant's cost. Landlord shall, throughout the Term, at Landlord's cost and expense and in accordance with the Concept of Operations, maintain, test, repair and, to the extent required, replace, any and all portions of the fire protection sprinkler system within and/or serving the Premises, which shall constitute Landlord Controlled Equipment, excluding the portions of the sprinklers and auxiliary hose valve stations located within each Sublet Premises, which shall be the responsibility of Tenant or the applicable Subtenant to maintain, repair and replace as necessary. Testing of the sprinkler system shall comply with the requirements and conditions set forth in the Concept of Operations.

*7.6 Fire Alarm System.* As part of Landlord's Work, Landlord shall install a fire and life safety system throughout the Premises that complies with applicable Law, and Landlord shall provide the Premises with a junction box wired to Landlord's fire alarm system for the connection of the fire alarm equipment installed by Tenant or Subtenants in each Sublet Premises, as required by applicable Laws (or any requirements of the FDNY) and as described in the Concept of Operations. All fire alarm equipment installed by Tenant or any Subtenant in the Commercial Usage Areas (excluding the RMUs, with respect to which Tenant or any Subtenant will not be required to install fire alarm equipment) shall be compatible with Landlord's fire alarm system and, upon request, Landlord shall provide the supplier's name of compatible fire alarm equipment. Tenant shall require that each Subtenant, at its expense, contract directly with Landlord's then designated electrical contractor for the connection of such Subtenant's fire alarm at the junction box. Tenant shall require each Subtenant to arrange for the inspection of the fire and life safety equipment in its Sublet Premises prior to opening for business and to obtain a certificate of fitness from the appropriate Government authority with respect thereto. Landlord shall, throughout the Term, at Landlord's cost and expense and in accordance with the Concept of Operations, operate, maintain, repair and, to the extent required, replace, any and all portions of the fire and life safety system serving the Premises, including the fire command center, which shall constitute Landlord Controlled Equipment, excluding, however, any fire alarm and

emergency system devices, including any doors, fans, fire alarm panels and control modules, located within each Sublet Premises. Tenant or each applicable Subtenant shall be responsible for maintaining, repairing and replacing, as necessary, and for testing, any fire alarm and emergency system devices located within each Sublet Premises, and any such testing shall be coordinated with Landlord.

*7.7* *Compliance with FTA Requirements*. Notwithstanding anything to the contrary contained elsewhere herein, the respective obligations of Landlord and Tenant under this Article 7 for maintenance, repairs and services in and to the Premises shall at all times be in accordance with the respective obligations of Landlord and Tenant with respect to the Pertinent Grant Management Requirements as set forth in **Exhibit O**. Both Landlord and the FTA shall have the right to inspect any and all portions of the Premises upon appropriate notice to Tenant, which, in the case of the FTA, shall be in accordance with the Grant Management Requirements. In addition to such periodic inspections, the FTA shall have the right at any time to inspect all of the assets incorporated in the Core and Shell/Base Building Improvements as of the Opening Date and to review any provided inventory and any and all books and records of Tenant kept in connection with the Premises and the repair, maintenance, services and other operations thereof, in the form required by the Pertinent Grant Management Requirements. Landlord shall coordinate any and all inspections by the FTA under this Section 7.7.

*7.8* *No Other Services*. Except as otherwise expressly provided in this Article 7 or elsewhere in this Lease, Landlord shall not be required to furnish or make available any other services to the Premises.

*8.* *Construction*.

*8.1* *Construction*. During the Term, Tenant shall have the right to commence and complete, or cause Subtenants to commence and complete, Construction, subject to compliance with the following requirements:

(a) From and after the commencement of any Construction through and including the completion of same, Tenant shall carry, or cause Subtenants to carry, the insurance required pursuant to Section 14.3.

(b) Tenant shall deliver, or cause Subtenants to deliver, to Landlord or Landlord's Representative:

(1) upon request from Landlord in connection with any Major Construction, a copy of all Construction Documents with respect thereto;

(2) in connection with any Construction, a copy of any and all submissions, approvals and sign-offs required by the FTA in accordance with the Pertinent Grant Management Requirements, if any;

(3) in connection with any Construction, a copy of any and all Approvals as required by Law and Landlord's Code Compliance Officer necessary to enable Tenant and/or any Subtenant, as applicable, to commence and complete such Construction; and

(4) in connection with any Construction, Plans and Specifications prepared by an Architect to the extent applicable Law requires preparation of Plans and Specifications for the type of Construction being proposed.

(c) Tenant shall adhere to the Design Guidelines, and all applicable building and fire codes. To the extent that Tenant, or any Subtenant, commences any Construction, Tenant shall complete, or use commercially reasonable efforts to cause such Subtenant to complete, such Construction with reasonable diligence and within a reasonable period of time. Tenant shall pay, or use commercially reasonable efforts to cause the applicable Subtenant to pay, for all Construction when and as required by the parties that perform such Construction.

(d) Notwithstanding anything to the contrary herein, Tenant shall use commercially reasonable efforts to prevent any Construction from disturbing in any manner whatsoever any NYCTA facilities and operations, including Landlord Controlled Property; if any Construction damages any Landlord Controlled Property, then Tenant shall be responsible for the reasonable costs of repairing or replacing such Landlord Controlled Property; and NYCTA shall have unrestricted access to any such NYCTA facilities and operations and Landlord Controlled Property, for the repair and maintenance of the thereof (including cameras within and/or adjacent to any vertical transportation equipment), all in accordance with the Concept of Operations, subject, however, to reasonable restrictions to such access during any Construction.

(e) If any Construction occurs in the Public Circulation Areas or otherwise adjacent to any NYCT Retained Areas or affects any Landlord Controlled Property, Tenant shall be required to comply with the rules, regulations and procedures promulgated from time to time during the Term by the NYCTA Department of Security and/or NYCTA Maintenance of Ways Departments, respectively. In such event, Tenant shall pay NYCTA its standard charges for overseeing and inspecting such Construction.

*8.2 Plans and Specifications; Code Compliance.*

(a) Plans and Specifications (including working plans and specifications and "as-built" plans and specifications and surveys, as and to the extent required by applicable Law) for any Construction, shall be prepared by the Architect and promptly be submitted to Landlord for Landlord's approval, as and to the extent herein required. Insofar as such Plans and Specifications relate to the Commercial Usage Areas, Landlord, in its capacity as landlord, may object to such Plans and Specifications only to the extent they call for alterations that would be inconsistent with the Design Guidelines (and Landlord refuses to waive any non-compliance following request by Tenant, which refusal may be in Landlord's sole discretion), and any such objection by Landlord shall include a listing of the specific items of non-compliance with the Design Guidelines. Landlord shall approve or disapprove of the Plans and Specifications within the period of time set forth in the Design Guidelines. The approval of Plans and Specifications or the consent by Landlord to any Construction, to the extent such approval is required under this Lease, does not constitute Landlord's representation that such Plans and Specifications or any Construction complies with any Laws. Landlord shall not be liable to Tenant or any other party in connection with Landlord's approvals or disapprovals, as aforesaid.

(b) Tenant shall be responsible to complete any and all Construction in compliance with the applicable building and fire codes specified from time to time by Landlord's Code Compliance Officer. Landlord, in its capacity as a Government authority in determining Code Compliance and not as the landlord to this Lease, will not act in an arbitrary or capricious manner in connection therewith (such review process in Landlord's capacity as a Government authority being sometimes referred to herein as the "Code Compliance Review Process"). Tenant acknowledges that (x) the Code Compliance Review Process is separate from, and in addition to, the Design Review Process, and (y) the Code Compliance Review Process and Design Review Process may be conducted by different individuals any one of whom may be deemed to be Landlord's Code Compliance Officer in processing any required approvals, permits and certificates of compliance and occupancy in conformity with Code Compliance.

(c) In reviewing Tenant's Plans and Specifications in connection with any Construction in its capacity as a Government authority, pursuant to the Code Compliance Review Process, Landlord and Landlord's Code Compliance Officer shall not be bound by any of the restrictions on scope of review, standards of reasonableness, or any other limitations, or restrictions imposed by this Lease on Landlord in its capacity as landlord, if any.

(d) Landlord's fees for the review and approval of Plans and Specifications for Subtenant Improvements in accordance with the Design Review Process and the Code Compliance Review Process and for the issuance of Approvals for such Subtenant Improvements shall be in accordance with the following schedule (in each case multiplied by the CPI Adjustment Factor):

(1) $3,000 for a retail store in the Fulton Building;

(2) $6,000 for food service establishments or restaurants located on the street, platform or concourse levels of the Fulton Building;

(3) $10,000 for food service establishments or restaurants located on the second or third levels of the Fulton Building;

(4) $3,000 for a retail store on the ground floor of the Corbin Building;

(5) $6,000 for a food service establishment or restaurant on the ground floor of the Corbin Building;

(6) $5,000 for each upper floor of the Corbin Building; and

(7) a single payment of $10,000 (exclusive of fees paid by Tenant directly to James Carpenter Associates for its participation in design development of the RMUs as contemplated by the Design Guidelines) to cover all RMUs.

No application or permit fees shall be required for any work performed by Tenant pursuant to the Concept of Operations.

*8.3 Corbin Building.* Notwithstanding anything to the contrary contained elsewhere herein, in no event shall Tenant, nor shall Tenant permit any Subtenant to, make any changes or alterations, additions or improvements, whatsoever, to the Corbin Building without full regulatory approval, including the approval of Landlord, the FTA, and the State Historic Preservation Office, to the extent required in connection therewith and as provided in the Design Guidelines.

*8.4 Security for Tenant's Work.*

8.4.1 Before proceeding with any Construction costing in the aggregate more than $250,000.00 (each, a "Required Bond Improvement"), as estimated by a reputable contractor designated by Tenant and reasonably acceptable to Landlord, Tenant shall post, or cause the applicable Subtenant to post, a bond issued by a corporate surety licensed to do business in the State or other form of undertaking guaranteeing prompt payment of moneys due to all contractors, all subcontractors and all other persons furnishing labor or materials in the prosecution of such Required Bond Improvement. Each such bond or undertaking shall comply with the requirements set forth in Section 5 of Article 2 of the New York Lien Law. Prior to the commencement of any Required Bond Improvement, Tenant shall submit for review by Landlord a copy of the relevant bond or undertaking evidencing Tenant's compliance with such requirements, and such Required Bond Improvement shall not be commenced without the Landlord's prior written approval of such bond or undertaking.

8.4.2 Upon (i) the completion of any Required Bond Improvement in accordance with the terms of this Lease and (ii) the submission to Landlord of proof evidencing payment in full for such Construction, the security deposited with Landlord, or the balance thereof if Landlord has drawn on such bond or other undertaking, shall be returned to Tenant.

8.4.3 In the event that Tenant or the applicable Subtenant shall fail to properly perform, complete and fully pay for any Required Bond Improvement, as reasonably determined by Landlord, Landlord shall be entitled to draw on the security deposited under this Section 8.4 to the extent that Landlord deems necessary in accordance with the Lien Law.

*8.5 Labor Harmony.* Tenant shall not, and Tenant shall use commercially reasonable efforts to cause its Subtenants to not, at any time prior to or during the Term, either directly or indirectly, use any contractors, laborers or materials the use of which would create any conflicts with other contractors and/or laborers employed by Landlord in the construction, maintenance or operation of the Fulton Center or cause any jurisdictional or other labor disputes thereat.

*9.* Subleasing.

*9.1 Subleases.* Tenant shall undertake to lease the Commercial Usage Areas to qualified Subtenants in accordance with sound business practices intended by Tenant, in its

business judgment, to foster the success of the Premises as a retail center in accordance with the Retail Standard. So long as a Subtenant is not an Affiliate of Tenant and complies with the Retail Standard and its Sublease complies with Section 9.4, Tenant, without Landlord's consent, may enter into or Modify such Sublease, or grant any consent under such Sublease consistent with the terms and conditions of this Lease. In addition, Subtenant may evict any Subtenant without the consent of Landlord. Any Sublease with an Affiliate of Tenant shall be on market terms and require the prior written approval of Landlord (which may be withheld in Landlord's discretion and may be conditioned, among other things, on Tenant agreeing to account for revenues and expenses attributable to such Sublease in a manner satisfactory to Landlord for purposes of the calculations required by Article 4). No Sublease shall affect any obligations of Tenant, or rights of Landlord, under this Lease, all of which shall continue in full force and effect notwithstanding any Sublease; provided, however, that if any Subtenant causes any Default, Landlord shall not have the right to exercise any remedies hereunder against Tenant on account of such Default so long as Tenant is using commercially reasonable efforts to enforce Tenant's rights against such Subtenant to remedy such Default. As used throughout this Lease, the phrase "Tenant shall use commercially reasonable efforts to cause Subtenants" to comply with a particular covenant, or words to that effect, means that Tenant shall not (by the terms of the Subleases it enters into or otherwise) empower Subtenants to violate or ignore such covenant, and that Tenant shall (over such period of time as shall be reasonable under the circumstances and appropriate given the nature and severity of the non-compliance, but without undue delay) take such enforcement action against non-complying Subtenants as is permitted under applicable Law so as to induce such Subtenants to comply with such covenant, and if Tenant does not succeed in inducing such compliance, then Tenant shall seek to dispossess such Subtenants unless the exercise of self-help by Tenant shall, in Tenant's reasonable judgment, be a more effective enforcement remedy.

*9.2 Recognition of Subtenants.* Tenant acknowledges that Landlord does not expect, and will not be obligated, to grant non-disturbance agreements in favor of Subtenants except in its discretion under unusual circumstances. In such circumstances, Landlord shall, at Tenant's request, in good faith consider recognizing a Subtenant as the direct tenant of Landlord upon the termination of this Lease (other than pursuant to Article 15), provided that at the time of such termination (a) no default exists and is continuing under such Subtenant's Sublease that would then permit the landlord thereunder to terminate such Sublease or to exercise any dispossess remedy provided for therein, and (b) such Subtenant delivers to Landlord an instrument confirming the agreement of the Subtenant to attorn to Landlord and to recognize Landlord as such Subtenant's landlord under such Sublease. Any such instrument shall provide, without limitation, that neither Landlord nor anyone claiming by, through or under Landlord, shall be:

9.2.1 obligated to cure any defaults of any prior landlord (including the then defaulting landlord) which occurred prior to the date Landlord obtained legal possession or physical possession of the Premises, except for defaults with respect to maintenance and repair obligations that continue subsequent to Landlord obtaining such legal possession or physical possession;

9.2.2 liable for any acts or omissions of any prior landlord (including the then defaulting landlord) that occurred prior to the date Landlord obtained legal possession or physical possession of the Premises, except for acts or omissions with respect to maintenance and repair obligations that continue subsequent to Landlord obtaining such legal possession or physical possession;

9.2.3 subject to any offsets or defenses that the Subtenant may have against any prior landlord (including the then defaulting landlord);

9.2.4 bound by any payment of rent which the Subtenant might have made for more than 1 month in advance to any prior landlord (including the then defaulting landlord), other than security deposits and other rent payments, to the extent such security deposits and rent payments are received by Landlord;

9.2.5 bound by any covenant to undertake or complete any construction of the Premises or any portion thereof demised by the Sublease, except repair and maintenance obligations thereafter arising; or

9.2.6 bound by any obligation to make any payment to the Subtenant with respect to construction performed by or on behalf of such Subtenant at the Sublet Premises.

*9.3 Assignment of Commercial Revenues*. To secure Tenant's performance hereunder, Tenant hereby assigns, transfers, and sets over to Landlord, subject to the conditions in this paragraph, Tenant's right, title, and interest in and to all Subleases and Commercial Revenues. Tenant grants to Landlord, and its agents and representatives, a right to enter, and to take possession of, the Premises to permit and assure Landlord's collection of Commercial Revenues. Landlord's exercise of such rights shall not constitute an eviction of Tenant. The assignment and other rights set forth in the preceding two sentences shall become operative and effective only if (i) an Event of Default shall occur and be continuing, (ii) this Lease and the Term shall be terminated pursuant to the terms hereof, and (iii) legal possession of the Premises under a dispossess warrant or other judgment, order or decree of a court of competent jurisdiction is obtained by Landlord. When such rights become operative and effective, Landlord may collect Commercial Revenues directly from Subtenants, and apply the net amount collected to the Rent and Tenant shall immediately assign to Landlord all security deposits then held by Tenant pursuant to any such Subleases. No such collection shall be, or be deemed to be, Landlord's waiver of any terms of this Lease, acceptance of any Subtenant as Tenant, or release of Tenant from any obligations under this Lease. Any sums Landlord collects in excess of the net amount Landlord applies against Rent or other obligations of Tenant hereunder shall (so long as this Lease has not been terminated) belong to Tenant and be promptly refunded to Tenant.

*9.4 Required Provisions*. Any Sublease shall expire no later than one day before the Scheduled Expiration Date. Each Sublease shall include (a) a provision in which the Subtenant indemnifies Tenant and Landlord as required by Section 13.4, (b) provisions requiring the insurance coverage for each Subtenant and the construction contractors and service contractors of each Subtenant as set forth in Sections 14.1.2, 14.3.1 and 14.4, (c) a provision in which the Subtenant releases Tenant and Landlord from the claims described in Section

14.1.2(b), (d) a provision in which the Subtenant grants to Tenant and Landlord the reciprocal release that Tenant and Landlord grant to Subtenants in Section 14.9, and (e) a provision requiring each Subtenant to secure from its insurance carrier the waiver of subrogation described in Section 14.9. Each Sublease shall also contain the following provision in substantially the form set forth below.

> "All terms, covenants, and provisions of this Sublease and all rights, remedies, and options of Subtenant under this Sublease are and shall at all times remain fully subject and subordinate in all respects to the Lease. If the Lease terminates, then this Sublease shall terminate, except as provided in the following sentences. In that event, Subtenant, only at the option and request of Landlord (except as Landlord may otherwise have agreed in writing), shall attorn to Landlord and recognize Landlord as Subtenant's direct landlord under this Sublease. Subtenant shall execute and deliver, at any time and from time to time, upon the request of Tenant or Landlord, any instrument necessary or appropriate to evidence such attornment. Subtenant hereby appoints each of Landlord and Tenant as Subtenant's attorney-in-fact, irrevocably, with full power of substitution, to execute and deliver any such instrument. This appointment is coupled with an interest and is irrevocable. Subtenant waives any Law that may allow Subtenant to terminate this Sublease or surrender possession of the premises hereby demised if the Lease terminates."

At least 10 Business Days prior to entering into any Sublease, Tenant shall provide to Landlord the following information in order for Landlord to determine whether any Subtenant meets the Retail Standard: (1) the name and address of the proposed Subtenant; (2) if such proposed Subtenant is not a Comparison Store, a description of the nature, character and history of the business of the proposed Subtenant and its proposed use of its Sublet Premises; and (3) such other information as Landlord may reasonably request for purposes of Landlord ascertaining such proposed Subtenant's compliance with the Retail Standard. If within 10 Business Days following receipt of such information Landlord objects to any Subtenant due to (i) such Subtenant's alleged failure to meet the Retail Standard, or (ii) Tenant's alleged failure to comply with this Article 9, then Tenant shall have the right to dispute Landlord's determination by Arbitration. If Landlord fails to object to any Subtenant within such 10-Business Day period, then Landlord shall have irrevocably waived its right to object to such Subtenant on the bases set forth in the preceding clauses (i) and (ii). In addition, no Sublease shall be effective or have any validity unless Tenant has sent Landlord an executed counterpart of the Sublease containing the provision in quotes set forth in the middle of this Section 9.4.

*9.5 Assignment of Reading Room Agreement.* The Parties hereby acknowledge that a portion of the Corbin Building is currently encumbered by the Reading Room Agreement, and this Lease is being granted subject thereto. Contemporaneously herewith, Landlord shall assign, and Tenant shall assume, pursuant to separate agreement, all of Landlord's right and obligations under the Reading Room Agreement except for the obligation and liability contained in the last sentence of paragraph 1 of the Reading Room Agreement, which obligation and liability shall be retained by Landlord. Tenant shall be the landlord under any lease entered

into pursuant to the Reading Room Lease, and any such lease shall be deemed to be a Sublease. Landlord hereby represents and warrants to Tenant that Landlord proffered the Lease (as defined in the Reading Room Agreement) to the Reading Room by notice delivered to the Reading Room on March 21, 2014 and that the 60-day period for the Reading Room to accept or reject the proffered Lease pursuant to Paragraph 1 of the Reading Room Agreement commenced on March 21, 2014.

*10.* *Communications Protocols*. Tenant agrees that for purposes of communications with Landlord hereunder, as well as with any designees of Landlord and/or appropriate Government agencies or authorities, it will refer at all times and comply with the communications protocols set forth in the Concept of Operations, as such protocols may be amended from time to time upon notice to Tenant, provided that no such amendment shall diminish Tenant's rights to communicate directly with Government agencies or authorities (the "Communications Protocols"). The Communications Protocols shall set forth which specific agencies or individuals within those agencies shall be designated as contacts with respect to particular responsibilities including the granting of consents hereunder, guidance in connection with contract compliance and compliance with the other Exhibits of this Lease, and general communication procedures in the event of emergencies affecting the Fulton Center.

*11.* *Prohibited Liens*.

*11.1* *Tenant's Covenant*. It is the mutual expectation of the Parties that no lien can attach to the Premises or any other portion of the Fulton Center. However, if a Prohibited Lien shall be filed, then Tenant shall, within 90 days after receiving notice from Landlord of such filing, commence appropriate action to cause such Prohibited Lien to be paid, discharged, bonded or otherwise cleared from title. Tenant shall thereafter prosecute such action with reasonable diligence and continuity. If Landlord receives notice of any such filing, then Landlord shall promptly so notify Tenant. Nothing in this Lease shall be construed to obligate Tenant regarding any lien that results from any act or omission by Landlord. If any Subtenant causes a Prohibited Lien, then Tenant's obligations under this paragraph shall be suspended so long as both (a) Tenant is with reasonable diligence endeavoring to cause the Subtenant to remove the Prohibited Lien; and (b) the holder of the Prohibited Lien has not commenced foreclosure proceedings.

*11.2* *Protection of Landlord*. NOTICE IS HEREBY GIVEN THAT LANDLORD SHALL NOT BE LIABLE FOR ANY LABOR OR MATERIALS FURNISHED OR TO BE FURNISHED TO TENANT OR ANY SUBTENANT UPON CREDIT, AND THAT NO MECHANIC'S OR OTHER LIEN FOR ANY SUCH LABOR OR MATERIALS SHALL ATTACH TO OR AFFECT LANDLORD'S FEE ESTATE IN THE PREMISES. NOTHING IN THIS LEASE SHALL BE DEEMED OR CONSTRUED IN ANY WAY TO CONSTITUTE LANDLORD'S CONSENT OR REQUEST, EXPRESS OR IMPLIED, BY INFERENCE OR OTHERWISE, TO ANY CONTRACTOR, SUBCONTRACTOR, LABORER, EQUIPMENT OR MATERIAL SUPPLIER FOR THE PERFORMANCE OF ANY LABOR OR THE FURNISHING OF ANY MATERIALS OR EQUIPMENT FOR ANY CONSTRUCTION, NOR AS GIVING TENANT OR ANY SUBTENANT ANY RIGHT, POWER OR AUTHORITY TO CONTRACT FOR, OR PERMIT THE RENDERING OF, ANY SERVICES, OR THE FURNISHING OF ANY MATERIALS THAT WOULD GIVE RISE TO THE FILING OF

ANY LIENS AGAINST SUCH FEE ESTATE. TENANT SHALL INDEMNIFY LANDLORD AGAINST ANY CONSTRUCTION UNDERTAKEN BY TENANT OR ANYONE CLAIMING THROUGH TENANT, AND AGAINST ALL PROHIBITED LIENS.

*12.* *Hazardous Substances.*

*12.1* *Restrictions.* Tenant shall not, and shall use commercially reasonable efforts to cause each Subtenant not to (a) violate, or cause or permit any violation of, any Environmental Law at the Premises during the Term; or (b) use, generate, release, manufacture, refine, produce, process, store or dispose of any Hazardous Substance at the Premises, or transport to or from the Premises any Hazardous Substance, unless such Hazardous Substance is (i) reasonably necessary and customary to conduct any legal business in the Premises or any Sublet Premises in accordance with customary standards in such business, or to operate and maintain the Premises or any Sublet Premises for uses this Lease permits and (ii) used in the Premises or any Sublet Premises in compliance with all Environmental Laws.

*12.2* *Compliance; Clean-Up.* Tenant shall, at Tenant's expense, (a) comply, or use commercially reasonable efforts to cause Subtenants to comply, with Environmental Law and, to the extent Environmental Law requires, clean up any Hazardous Substance Discharge on, at, or under the Premises caused by Tenant or any Subtenant; (b) submit, or use commercially reasonable efforts to cause Subtenants to submit, all information required by Environmental Laws related to the Premises; (c) if any Government requires any clean-up plan or clean-up because of a Hazardous Substances Discharge caused by Tenant or any Subtenant, prepare and submit, or cause the applicable Subtenant to prepare and submit, the required plans and all related bonds and other financial assurances therefor; (d) promptly and diligently carry out, or cause the applicable Subtenant to carry out, all such clean-up plans arising from Hazardous Substances Discharge caused by Tenant or any Subtenant; and (e) indemnify, defend and hold Landlord Indemnitees harmless from any remediation costs or third party claims (including all losses, costs, liability, penalties, judgments, damages or other expense (including Legal Costs) from third party claims) for personal injury, wrongful death or property damage arising from any Hazardous Substances Discharge or violation of Environmental Law caused by Tenant or any Subtenant. Tenant's obligations under this paragraph shall not limit Tenant's rights against third parties.

*12.3* *Pre-Existing Conditions.* Notwithstanding the foregoing, in no event shall Tenant be obligated to remove any Hazardous Substance Discharge, comply with Environmental Laws, or indemnify, defend and hold Landlord Indemnitees harmless, as hereinabove provided, to the extent that any of the foregoing obligations relate to conditions that existed in any portion of the Premises prior to the Applicable Delivery Date for such portion or are caused by any Person that is unrelated to any of Tenant or any Subtenant (collectively, "Pre-Existing Environmental Conditions"). Landlord shall, at Landlord's expense, (a) clean up any Hazardous Substance Discharge on, at, or under the Premises arising from a Pre-Existing Environmental Conditions to the extent required by Environmental Law; (b) submit, or cause to be submitted, all information required by Environmental Laws related to Pre-Existing Environmental Conditions; (c) if any Government requires any clean-up plan or clean-up because of a Hazardous Substances Discharge arising from Pre-Existing Environmental Conditions, prepare and submit, or cause to be prepared and submitted, the required plans and all related bonds and

other financial assurances; (d) promptly and diligently carry out, or cause to be carried out, all such clean-up plans; and (e) indemnify, defend and hold Tenant Indemnitees harmless from any remediation costs or third party claims (including all losses, costs, liability, penalties, judgments, damages or other expense (including Legal Costs) from third party claims) for personal injury, wrongful death or property damage arising from any Hazardous Substances Discharge or violation of Environmental Law arising from Pre-Existing Environmental Conditions. Landlord's obligations under this paragraph shall not limit Landlord's rights against third parties.

*13.* *Indemnification; Liability of Landlord.*

*13.1* *Indemnity by Tenant.* To the fullest extent permitted by applicable Law, Tenant shall indemnify, defend and hold Landlord Indemnitees harmless from any third party claims (including all losses, costs, liability, penalties, judgments, damages or other expense (including Legal Costs) from third party claims) for personal injury, wrongful death or property damage at the Premises ("Third-Party Liability Claims") arising from (a) use, occupancy, control, management, operation, and possession of the Commercial Usage Areas and the Back of House Areas (except for claims arising from the performance of Landlord's security obligations hereunder in the Back of House Areas); (b) any Construction by or on behalf of Tenant or any Subtenant; (c) any negligence, reckless misconduct or willful misconduct by Tenant, any Subtenant or any employee, agent, representative or contractor thereof. Notwithstanding the foregoing, Tenant shall not be required to indemnify, defend or hold harmless any Landlord Indemnitee to the extent any Third-Party Liability Claims arise from any matter for which Landlord is obligated to indemnify Tenant Indemnitees under Section 13.2. Further notwithstanding the foregoing, Tenant's indemnification obligations under this Section 13.1 shall not commence with respect to any portion of the Premises until the Applicable Delivery Date of such portion of the Premises. This paragraph does not apply to Environmental Law and Hazardous Substances Discharges, which are covered in Article 12.

*13.2* *Indemnity by Landlord.* To the fullest extent permitted by applicable Law, Landlord shall indemnify, defend and hold Tenant Indemnitees harmless from any Third-Party Liability Claims arising from (a) use, occupancy, control, management, operation, and possession of the NYCT Retained Areas; (b) construction of the Core and Shell/Base Building Improvements or any other construction performed by or on behalf of Landlord with respect to the Fulton Center; (c) the performance of Landlord's security obligations hereunder (without thereby assuming liability for any injury or loss resulting from criminal acts of persons not employed by Landlord or by any agent or contractor of Landlord); and (d) any negligence, reckless misconduct or willful misconduct by Landlord or NYCTA or any employee, agent, representative or contractor thereof. This paragraph does not apply to Environmental Law and Hazardous Substances Discharges, which are covered elsewhere.

*13.3* *Relationship of Indemnities to Commercial General Liability Insurance.* The scope of the respective indemnities under Sections 13.1 and 13.2 shall not affect (a) Tenant's obligation to maintain commercial general liability insurance as required in Section 14.2.1(b) with respect to which Landlord and the Additional Named Insureds set forth on **Exhibit I** are additional named insureds, (b) the treatment of the premium for such commercial general liability insurance as set forth in clause (a) of the definition of Tenant Commercial Liability Expenses or the treatment of losses within the deductible/self-insured retention, Legal

Costs and the administrative fee charged by the third-party claims administrator as set forth in clauses (b) and (c) of the definition of Tenant Commercial Liability Expenses in the Rent formulas set forth in Article 4 or in the offsets against Rent as set forth in Article 4, or (c) Tenant's obligation to enforce any indemnification obligations of Subtenants, service contractors or construction contractors for Third-Party Liability Claims for which Subtenants, service contractors or construction contractors may be responsible, as set forth in Sections 13.4 and 13.5.

*13.4 Enforcement of Indemnification Obligations of Subtenants.* Tenant shall require that each Subtenant indemnify, defend and hold the Indemnitees harmless from any Third-Party Liability Claims arising within such Subtenant's Sublet Premises (a "Subtenant-Related Liability Claim"), except to the extent any such Third-Party Liability Claim arises from the negligence of Landlord or Tenant or any other Indemnitees. Tenant shall also monitor compliance by each Subtenant with its insurance requirements under its Sublease by requiring the annual submission of insurance certificates evidencing such insurance, which requirements shall not be less protective of Tenant and Landlord than the requirements applicable to Subtenants set forth in Article 14. For each Subtenant-Related Liability Claim, Tenant shall tender such claim to the applicable Subtenant and demand that such Subtenant assume responsibility for such claim and indemnify, defend and hold the Indemnitees harmless therefrom.

*13.5 Enforcement of Indemnification Obligations of Service Contractors and Construction Contractors.* Tenant shall require that each service contractor and construction contractor hired by Tenant or its Affiliates indemnify, defend and hold the Indemnitees harmless from any Third-Party Liability Claims arising from the negligence of such contractor in the performance of its work at the Premises (a "Contractor-Related Liability Claim"). Tenant shall also monitor compliance by each such contractor with its insurance requirements under its service contract or construction contract by requiring the annual submission of insurance certificates evidencing the required insurance, which requirements shall not be less protective of Tenant and Landlord than the requirements applicable to service contractors and construction contractors set forth in Article 14. For each Contractor-Related Liability Claim, Tenant shall tender such claim to the applicable contractor and demand that such contractor assume responsibility for such claim and indemnify, defend and hold the Indemnitees harmless therefrom. Any unreimbursed Legal Costs incurred by Tenant in enforcing a contractor's obligations to assume responsibility for a Contractor-Related Liability Claim and to indemnify, defend and hold the Indemnitees harmless from such Contractor-Related Liability Claim shall be Tenant Commercial Liability Expenses.

*13.6 Management of Third-Party Liability Claims; Landlord's Right to Contest.* The Parties shall administer Third-Party Liability Claims in accordance with **Exhibit U**. As set forth in the definition of Tenant Commercial Liability Expenses, as between Landlord and Tenant and subject to Sections 13.4 and 13.5, losses within the deductible/self-insured retention, Legal Costs and the administrative fee charged by the third-party claims administrator, shall be Tenant Commercial Liability Expenses unless such claim was caused by Tenant Gross Negligence. For any Major Liability Claim, if Landlord seeks to have a determination of whether such claim was caused by Tenant Gross Negligence, then within 60 days after Landlord

receives notice of a Major Liability Claim in accordance with **Exhibit U**, Landlord shall so notify Tenant in accordance with the notice requirements set forth in **Exhibit U**. If for any Major Liability Claim Landlord fails to so notify Tenant within such 60-day period, then as between Landlord and Tenant the cause of such Major Liability Claim shall be deemed to be other than Tenant Gross Negligence, unless a verdict or order of a court of competent jurisdiction for such Major Liability Claim makes a determination of Tenant Gross Negligence. If Landlord does give timely notice that Landlord seeks to determine whether such claim was caused by Tenant Gross Negligence, then unless there is a determination of cause in a verdict or order of a court of competent jurisdiction for such Major Liability Claim, following the settlement of such claim the Parties shall submit such determination to Arbitration.

*13.7 Liability of Landlord.* To the fullest extent permitted by applicable law, during the Term, none of Landlord or any of its Affiliates shall be liable for any injury or damage to any property of Tenant or any Subtenant occurring on or about the Premises, unless caused by the willful misconduct, negligence or breach of this Lease by Landlord or any of its Affiliates; provided, however, that notwithstanding whether the injury or damage is caused by any act or failure to act of any Landlord Indemnitee, no Landlord Indemnitee shall have any liability for any injury or damage for which Tenant or such Subtenant would have been reimbursed under policies of insurance required by the terms of this Lease to be maintained or caused to be maintained by Tenant had Tenant not failed to maintain or caused to be maintained such policies of insurance with at least the limits herein specified.

*13.8 Indemnification Procedures.* Wherever this Lease requires a Party to indemnify any Indemnitee:

13.8.1 *Selection of Counsel.* The indemnifying Party shall select counsel reasonably acceptable to the indemnified Party. Counsel to the insurance carrier of the indemnifying Party shall be deemed acceptable to the indemnified Party. Landlord's in-house counsel shall be deemed acceptable to Tenant when Landlord is the indemnifying Party. Even though indemnifying Party is required to defend the action, an Indemnitee may, at its option and its own expense, engage separate counsel to advise it regarding the claim and its defense. Such counsel may attend all proceedings and meetings. The indemnifying Party's counsel shall actively consult with the indemnified Party's counsel.

13.8.2 *Settlement.* The indemnifying Party may, with the indemnified Party's consent, which consent shall not to be unreasonably withheld, settle the claim. The indemnified Party's consent shall be given for any settlement by which (a) the indemnifying Party procures (by payment, settlement, or otherwise) a release of the indemnified Party; (b) the indemnified Party, whether directly or through the indemnifying Party on behalf thereof, does not admit liability; (c) the continued effectiveness of this Lease is not jeopardized in any way; and (d) the indemnified Party's interest in the Premises is not jeopardized in any way.

*14. <u>Insurance Requirements.</u>*

*14.1 Landlord and Tenant – Property Insurance.*

14.1.1 *Landlord Requirements.* From and after the Lease Execution Date, Landlord shall either procure and maintain in full force and effect the following insurance coverages or else self-insure as if it had done so:

(a) "All Risk" property damage insurance for the Core and Shell/Base Building Improvements, NYCT Retained Premises and Landlord Controlled Property (but not Tenant Controlled Signage, Subtenant Improvements, Tenant/Subtenant Equipment or Tenant/Subtenant FF&E), including fire, flood, sprinkler leakage, windstorm, water damage from all causes (including sprinkler damage, sewer discharge or backup, water line breakage and overflow from any portion of the Fulton Center that is not part of the Premises) and earthquake, in an amount equal to at least 100% of the full replacement cost thereof. Such "All Risk" policy shall not exclude from coverage any loss arising from terrorists acts (and coverage for terrorists acts may be provided in such "All Risk" policy or on a stand-alone basis). The policies of insurance carried in accordance with this Section 14.1.1(a) shall contain (i) a replacement cost endorsement without deduction for depreciation or obsolescence and (ii) a waiver of subrogation clause in favor of Tenant and Subtenants. Such policies shall also include an Ordinance or Change in Law Endorsement (Demolition, Contingent Liability and Increased Cost of Construction) equal to 25% of the property insurance (50% if the Fulton Center is over 10 years old).

(b) Insurance against loss or damage from leakage or explosion of steam boilers, air conditioning equipment, pressure vessels or similar apparatus, now or hereafter comprising the Base Building Equipment.

(c) Boiler and machinery or equipment breakdown insurance covering the major components of the central heating, air conditioning and ventilating systems, boilers, other pressure vessels, high pressure piping and machinery (including elevators and escalators) and other similar equipment comprising the Base Building Equipment, in an amount equal to at least 100% of the full replacement cost thereof.

Landlord shall also carry the following policies with respect to Landlord's (but not Tenant's) activities hereunder:

(d) *Workers' Compensation* — (including employer's liability insurance with limits of not less than $1,000,000, which limit may be met by a combination of primary and excess insurance) meeting the statutory limits of the State.

(e) *Business Automobile Liability* — (I.S.O. Form CA 00 01 10 01 or equivalent) in Landlord's name with limits of liability in the amount of at least $2,000,000 each accident for claims for bodily injuries (including death) to persons and for damage to property arising out of the ownership, maintenance or use of any owned, hired or non-owned motor vehicle.

14.1.2 *Tenant Requirements.* With respect to each portion of the Premises delivered to Tenant, Tenant shall procure and maintain, or shall cause Subtenants to procure and maintain, in full force and effect from and after the Applicable Delivery Date the following:

(a) "All Risk" property damage insurance for the Tenant Controlled Signage, Subtenant Improvements, Tenant/Subtenant Equipment and Tenant/Subtenant FF&E, including fire, flood, sprinkler leakage, windstorm, water damage from all causes (including but not limited to sprinkler damage, sewer discharge or backup, water line breakage, and overflow from any portion of the Fulton Center that is not part of the Premises) and earthquake, with a deductible of not more than $500,000.00 and in an amount equal to at least 100% of the full replacement cost of the Tenant Controlled Signage (except to the extent that Landlord is responsible for the cost of replacing certain Tenant Controlled Signage pursuant to Section 5.2.1), Subtenant Improvements, Tenant/Subtenant Equipment and Tenant/Subtenant FF&E. Such "All Risk" policy shall not exclude from coverage any loss arising from terrorists acts (and coverage for terrorists acts may be provided in such "All Risk" policy or on a stand-alone basis). The policies of insurance carried in accordance with this Section 14.1.2(a) shall contain (i) a replacement cost endorsement without deduction for depreciation or obsolescence and (ii) a waiver of subrogation clause in favor of Landlord and the Additional Insureds listed on **Exhibit I**. Such policy will also include an Ordinance or Change in Law Endorsement (Demolition, Contingent Liability and Increased Cost of Construction) equal to 25% of the property insurance (50% if the Fulton Center is over 10 years old).

(b) So-called "Loss of Business Income Insurance," including extra expense and contingent business income coverage, covering Signage Revenues, Commercial Revenues and Sponsorship Net Revenues. The insurance limits for this insurance shall be based upon a minimum of 12 months of income with a 365-day "Extended Period of Indemnity" endorsement. The requirement to obtain "Loss of Business Income Insurance" shall not apply to Subtenants, provided that any Subtenant that is not required to obtain "Loss of Business Income Insurance" shall release Tenant and Landlord from any liability for such Subtenant's loss of business income.

*14.2 Tenant's Liability and Other Insurance.*

14.2.1 In addition to the property insurance required by Section 14.1.2, Tenant shall also procure at its sole cost and expense policies of insurance to be in force and maintained at all times during the Term in accordance with the terms and conditions set forth below or its then reasonably available equivalent:

(a) *Workers' Compensation* — (including employer's liability insurance with limits of not less than $1,000,000, which limit may be met by a combination of primary and excess insurance) meeting the statutory limits of the State.

(b) *Commercial General Liability* — (I.S.O. 2001 Form or equivalent approved by Landlord) in Tenant's name with limits of liability in the amount of at least $1,000,000 each occurrence/$2,000,000 general aggregate limit (other than products-completed operations)/$2,000,000 products/completed operations aggregate limit on a combined single limit basis for injuries to persons (including death) and damage to property, together with a $25,000,000 umbrella policy, which will substantially follow the form of the underlying policy and be extended to "drop down" to become primary in the event primary limits are reduced or aggregate limits are exhausted. The primary policy may contain a deductible/self-insured retention clause with a maximum limit of $250,000 per occurrence, which deductible/self-

insured retention will be eroded by legal costs incurred for each claim. Notwithstanding anything to the contrary herein, Tenant's obligation to provide commercial general liability insurance shall commence with respect to any portion of the Premises on the Applicable Delivery Date of such portion of the Premises.

Such policy shall be written on an occurrence form, and shall include:

a. Contractual coverage for liability assumed by Tenant under this Lease;

b. Personal and advertising injury coverage;

c. Products-completed operations;

d. Independent contractors coverage;

e. Liquor liability coverage, when applicable; and

f. Additional named insured endorsement naming the parties set forth on **Exhibit I** as insured for the specified Premises.

(c) *Business Automobile Liability* — (I.S.O. Form CA 00 01 10 01 or equivalent approved by Landlord) in Tenant's name with limits of liability in the amount of at least $2,000,000 each accident for claims for bodily injuries (including death) to persons and for damage to property arising out of the ownership, maintenance or use of any owned, hired or non-owned motor vehicle.

*14.3 Insurance for Construction.*

14.3.1 During the performance of any Construction undertaken by Tenant, Tenant (or its contractor) shall carry, and during the performance of any Construction undertaken by any Subtenant, Tenant shall cause such Subtenant (or its contractor) to carry, the following insurance and such additional insurance having limits as Landlord may from time to time reasonably require, which shall meet all general policy provisions as set forth in this Lease:

(a) *Workers' Compensation* — (including employer's liability insurance with limits of not less than $1,000,000, which limit may be met by a combination of primary and excess insurance) meeting the statutory limits of the State.

(b) *Commercial General Liability* — (I.S.O. 2001 Form or equivalent approved by Landlord) in the contractor's name with limits of liability in the amount of at least $10,000,000 each occurrence/$10,000,000 general aggregate limit (other than products-completed operations)/$10,000,000 products/completed operations aggregate limit on a combined single limit basis for injuries to persons (including death) and damage to property. The limits may be provided in the form of a primary policy or combination of primary and umbrella/excess policy. When the minimum contract amounts can only be met when applying the umbrella/excess policy, the umbrella/excess policy must substantially follow the form of the underlying policy and be extended to "drop down" to become primary in the event primary limits

are reduced or aggregate limits are exhausted. Notwithstanding the foregoing, Tenant shall have the right to require less than $10,000,000 of commercial general liability coverage depending on the nature of the work, the dollar value of the job, and the size of the contractor performing such work, but in no event shall Tenant require less than $1,000,000 of commercial general liability coverage.

Such policy shall be written on an occurrence form, and shall include:

a. Contractual liability coverage;

b. Personal and advertising injury coverage;

c. Products-completed operations;

d. Independent contractors coverage;

e. "XCU" coverage (explosion, collapse, and underground hazards) where necessary;

f. Contractual liability exclusion, applicable to construction or demolition operations to be performed within 50 feet of railroad tracks, must be removed, where necessary; and

g. Additional Insured endorsement (I.S.O. Form CG 20 10 07/04 "Form B" version or its equivalent approved by Landlord) naming the Additional Insureds listed on **Exhibit I**.

(c) *Business Automobile Liability* — (I.S.O. Form CA 00 01 10 01 or equivalent approved by Landlord) in the contractor's name with limits of liability in the amount of at least $2,000,000 each accident for claims for bodily injuries (including death) to persons and for damage to property arising out of the ownership, maintenance or use of any owned, hired or non-owned motor vehicle.

(d) *Builder's Risk/Installation Floater* — Tenant or the applicable Subtenant or its contractor shall furnish evidence to Landlord that it carries primary coverage for builder's risk/installation floater on an all-risk completed value form in an amount equal to the total contract price. The insurance shall cover any and all real and personal property owned, used or intended for use or hereafter created, installed or acquired, including while in the course of building, erection, installation and assembly. The policy shall also include coverage for machinery, supplies and equipment, and other personal property of any kind owned, rented or in the care, custody and control of the contractor, and its subcontractors to be incorporated in the building, erection, assembly and installation of the project. Such policy shall remain in force until the construction is completed and accepted.

Such policy shall provide that:

a. Any requirement for co-insurance must be removed;

b. In the event the policy has a deductible, such deductible amount shall not exceed $250,000 except with the express permission of Landlord;

c. Such policy is to be written with the Person purchasing such policy (i.e., Tenant or its contractor, or Subtenant or its contractor, as the case may be) as First Named Insured and naming the Additional Named Insureds and Loss Payee listed on **Exhibit I**;

d. Losses are to be adjusted in conjunction with the Additional Named Insureds as listed on **Exhibit I**; and

e. Evidence of coverage requires submission of a policy; however, a temporary binder may be accepted pending issuance of the policy.

(e) *Professional Liability Insurance* — In the event that professional services are to be performed, Tenant shall cause such consultant to provide insurance covering actual or alleged negligent acts, errors or omissions committed in the performance of activities and/or arising out of work under this Lease, regardless of the type of damages. The policy shall also extend to include personal injury, bodily injury and property damage. The policy shall have a limit of liability of not less than $5,000,000 per claim. Defense costs must be in addition to the limit of liability. If such policy is subject to an aggregate limit, replacement insurance will be required if it is likely such aggregate will be exhausted. The policy may contain a deductible/self-insured retention clause with a maximum limit of $250,000 which is the sole responsibility of the consultant. If the deductible/self-insured retention exceeds the maximum allowed, prior approval by Landlord is required. Such insurance shall be subject to the terms and conditions and exclusions that are usual and customary for this type of insurance. Tenant shall cause such consultant to maintain continuous insurance coverage while such consultant is employed in connection with the Premises and for 3 years following completion of the applicable project. Notwithstanding the foregoing, Tenant shall have the right to require less than $5,000,000 of professional liability coverage depending on the nature of the work, the dollar value of the job, and the size of the professional providing the professional services, but in no event shall Tenant require less than $1,000,000 of professional liability coverage.

(f)

In addition to the coverage requirements above, the policy shall include:

a. A retroactive date to coincide with or precede the insureds' initial services under the Lease and shall continue until the expiration or earlier termination of the Lease (including subsequent policies purchased as renewals or replacements);

b. Policy allows for reporting of circumstances or incidents that might give rise to future claims; and

c. An extended reporting period of at least 1 year will be available and must be purchased in the event ongoing coverage is not maintained.

*14.4 Subtenant's and Service Contractor's Insurance.*

14.4.1 Tenant shall require all Subtenants and all contractors providing repair and maintenance services to Tenant to procure at the sole cost and expense of each Subtenant or service contractor, as applicable, policies of insurance to be in force and maintained at all times during the term of their respective Sublease or service contract, as applicable, in accordance with the terms set forth below:

(a) *Workers' Compensation* – including Employer's Liability Insurance with limits of not less than $1,000,000, which limit may be met by a combination of primary and excess insurance) meeting the statutory limits of the State.

(b) *Commercial General Liability* – (I.S.O. 2001 Form or equivalent approved by Tenant) in the Subtenant's name with limits of liability in the amount of at least (i) $5,000,000 each occurrence/$5,000,000 general aggregate limit (other than products-completed operations)/$5,000,000 products/completed operations aggregate limit on a combined single limit basis for injuries to persons (including death) and damage to property for restaurant and food service establishments, and (ii) $2,000,000 each occurrence/$2,000,000 general aggregate limit (other than products-completed operations)/$2,000,000 products/completed operations aggregate limit on a combined single limit basis for injuries to persons (including death) and damage to property for retail stores. The limits may be provided in the form of a primary policy or combination of primary and umbrella/excess policy. When the minimum contract amounts can only be met when applying the umbrella/excess policy, the umbrella/excess policy must follow form of the underlying policy and be extended to "drop down" to become primary in the event primary limits are reduced or aggregate limits are exhausted. Notwithstanding the foregoing, with respect to service contractors, Tenant shall have the right to require less than $5,000,000 or $2,000,000, as the case may be, of commercial general liability coverage depending on the nature of the service, the dollar value of the contract, and the size of the service contractor performing such service, but in no event shall Tenant require less than $1,000,000 of commercial general liability coverage.

Such policy shall be written on an occurrence form, and shall include:

a. Contractual coverage for liability;

b. Personal and advertising injury coverage;

c. Products-completed operations;

d. Independent contractors coverage;

e. Liquor liability coverage, when applicable;

f. "XCU" coverage (explosion, collapse, and underground hazards) where necessary;

g. Contractual liability exclusion, applicable to construction or demolition operations to be performed within 50 feet of railroad tracks, must be removed, where necessary; and

h. Additional Insured endorsement (I.S.O. Form CG 20 26 07/04 and CG 20 37 07/04 or its equivalent approved by Tenant) naming Tenant and the Additional Insureds as set forth on **Exhibit I**.

(c) *Business Automobile Liability* — (I.S.O. Form CA 00 01 10 01 or equivalent approved by Tenant) in the name of the Subtenant or the service contractor, as applicable, or with limits of liability in the amount of at least $1,000,000 each accident for claims for bodily injuries (including death) to persons and for damage to property arising out of the ownership, maintenance or use of any owned, hired or non-owned motor vehicle.

*14.5 General Insurance Requirements.*

14.5.1 All policies must comply with the following additional requirements:

(a) Tenant's commercial general liability policy shall be endorsed to be primary and non-contributory to any other valid and collectible insurance of Landlord and must be exhausted before implicating any of Landlord's policies.

(b) Tenant's or any Subtenant's policies shall apply as primary and not on an excess or contributing basis with any policies which may be available to Landlord, and any policies maintained by Tenant's or any Subtenant's contractor, primary and excess, must be exhausted before implicating any of Landlord's policies. In addition, a policy maintained by Tenant's or any Subtenant's contractor shall state or be endorsed to provide that, if a subcontractor's policy contains any provision that may adversely affect whether contractor's policies are primary and must be exhausted before implicating any of Landlord's policies, contractor's and subcontractor's policies shall nevertheless be primary and must be exhausted before implicating any of Landlord's policies.

(c) Such policies be written by companies with an A.M. Best Company rating of A- VII or better, licensed (or otherwise allowed) to do business by the State.

(d) If any of the policies listed herein be canceled, materially changed or not renewed, notice shall be delivered in accordance with the policy.

(e) Policies written on a "claims-made" basis are not acceptable except for Professional Liability.

(f) The Parties shall endeavor to provide evidence of renewal or replacement insurance with the same terms and conditions as required in this Lease at least two weeks prior to the expiration date or as soon thereafter as practicable.

(g) All such insurance, except property, builders risk and professional liability, may contain deductibles or self-insured retentions of not more than $250,000 unless

approved by Landlord or as otherwise provided herein. Tenant shall be responsible for all claim expense and loss payments within the deductible or self-insured retention on the same basis as would be the case if commercial insurance was available for the loss, subject, however, to the treatment of Tenant Commercial Liability Expenses in the Rent formulas set forth in Article 4 or in the offsets against Rent as set forth in Article 4.

(h) All references to the required forms shall comply with the Insurance Services Office, Inc. ("ISO") or its equivalent approved by the Insurance Department of the State of New York.

(i) Landlord may increase the limits of any insurance required under this Lease up to once every 3 years, upon at least 180 days' notice to Tenant, provided that any increased limit (a) does not exceed the limit required on the Opening Date multiplied by the CPI Adjustment Factor, rounded to the nearer multiple of $1,000,000; and (b) generally conforms to the limits customarily required by prudent landlords or institutional lenders for similar retail properties in lower Manhattan, New York City.

*14.6 Insurance Submission Requirements.*

14.6.1 Tenant shall furnish evidence of all policies prior to occupancy or start of any Construction to:

REAL ESTATE MANAGER
Metropolitan Transportation Authority
c/o MTA Real Estate Department
347 Madison Avenue – 8th floor
New York, NY 10017

14.6.2 On or about the Opening Date, and thereafter when it makes pertinent changes, Landlord shall notify Tenant as to the extent to which Landlord is then self-insuring some or all of the coverages required under Section 14.1.1. If Landlord is purchasing some or all of the required coverage, then Landlord shall provide Tenant with evidence of such policies.

14.6.3 Certificates of insurance may be supplied as evidence of the aforementioned policies, but full copies of any stand-alone policies and relevant excerpts from blanket policies will promptly be furnished upon request therefor. If a certificate of insurance is submitted it must (1) be provided on the MTA Certificate of Insurance Form, which is attached hereto as **Exhibit J**; (2) be signed by an authorized representative of the insurance carrier or producer and notarized; (3) disclose any deductible, sub-limit, self-insured retention, aggregate limit or any exclusions to the policy that materially change the coverage; (4) indicate the Additional Insureds and Named Insureds as required herein and be accompanied by a copy of the Additional Insured endorsement as required in the foregoing and include the policy numbers; (5) reference this Lease on the certificate; and (6) expressly reference the inclusion of all required endorsements. Tenant shall be responsible for managing and tracking insurance compliance for all Subtenants and their contractors throughout the Term.

Tenant shall request that its vendors, contractors and Subtenants provide certificates of insurance on the MTA Certificate of Insurance Form, but Landlord shall accept the standard industry form of certificate of insurance (currently the ACORD form) from such parties in lieu of the requirements set forth in clauses (1) through (6) above.

*14.7 No Limit on Tenant's Liability.* The minimum amounts of insurance required under Sections 14.2 and 14.3 of this Lease shall not be construed to limit the extent of Tenant's liability under this Lease.

*14.8 Right to Request Additional Insurance and Limits.* Tenant further agrees to provide, at Tenant's sole cost and expense, such expanded insurance coverages as Landlord may, from time to time, reasonably deem appropriate based on coverages provided in comparable facilities.

*14.9 Waiver of Subrogation.* Landlord and Tenant shall each secure an appropriate clause in, or endorsement upon, each insurance policy covering or applicable to the Core and Shell/Base Building Improvements, NYCT Retained Premises and Landlord Controlled Property, in the case of Landlord, and the Tenant Controlled Signage, Subtenant Improvements, Tenant/Subtenant Equipment, the Tenant/Subtenant FF&E and business interruption, in the case of Tenant, pursuant to which the insurance company waives subrogation or permits the insured, prior to any loss, to agree with a third party to waive any claim it might have against such third party with respect to loss, damage or destruction to portions of the Core and Shell/Base Building Improvements, NYCT Retained Premises, Landlord Controlled Property, Tenant Controlled Signage, Subtenant Improvements, Tenant/Subtenant Equipment or Tenant/Subtenant FF&E, as applicable, by fire or other Casualty covered by such insurance, without invalidating the coverage under such insurance policy. The waiver of subrogation or permission for waiver of any claim shall extend to Landlord and Tenant and their Affiliates, respectively as well as each of their respective agents and employees, and to any Subtenants and their respective agents and employees. Landlord and Tenant each hereby releases the other Party, and their respective agents and employees, and Landlord hereby releases each Subtenant, and their respective agents and employees, in respect of any claim (including a claim for negligence) which it might otherwise have against the other Party (or any Subtenant) or their respective agents or employees for loss, damage or destruction to such property by fire or other Casualty covered by such insurance (or by Landlord's self-insurance).

*14.10 Blanket and/or Master Policies.* The insurance required to be carried by Tenant or any Subtenant pursuant to the provisions of this Lease may, at Tenant's or such Subtenant's option, be effected by so-called "blanket", "wrap-up" and/or "master" policies issued to Tenant, such Subtenant and/or their respective Affiliates and covering the Premises as well as other properties owned or leased by Tenant, such Subtenant and/or their respective Affiliates, as applicable, provided such policies (a) otherwise comply with the provisions of this Lease and (b) by endorsement, allocate to the Premises the specified coverage and limits of coverage herein required for all insureds required to be named as insureds hereunder.

*14.11 Suspension of Work / Event of Default.* If, at any time during the Term, insurance as required is not in effect, or proof thereof is not provided to Landlord, Landlord, without any liability to Tenant, shall have the option to (a) direct Tenant or the applicable

Subtenant to suspend Construction or operation; or (b) treat such failure as a material Default, subject to notice and cure pursuant to Section 22.1.4.

*15. Losses and Loss Proceeds.*

*15.1 Prompt Notice.* If either Party becomes aware of any Casualty or actual or threatened Condemnation, then such Party shall promptly notify the other Party.

*15.2 Casualty.* If any Casualty occurs after the Lease Execution Date, then (a) unless this Lease is terminated as hereinafter provided, (x) this Lease shall continue in full force and effect and (y) Landlord shall, at its sole cost and expense (subject to the provisions of this Section 15.2), immediately safeguard the affected portions of the Core and Shell/Base Building Improvements (as well as any affected portions of the NYCT Retained Areas and Landlord Controlled Property) and as promptly thereafter as reasonably possible commence and complete the Restoration thereof to (insofar as the Premises are concerned, and subject to changes in Law and except as the Parties may otherwise agree) substantially the condition they were in prior to such Casualty, it being agreed and understood that Tenant shall be responsible for the Restoration of the Tenant Controlled Signage (except to the extent that Landlord is responsible for the cost of replacing certain Tenant Controlled Signage pursuant to Section 5.2.1), the Subtenant Improvements, the Tenant/Subtenant FF&E and the Tenant/Subtenant Equipment. Tenant shall exercise reasonable efforts, at Tenant's sole cost, to cooperate with Landlord and coordinate, to the maximum extent reasonably possible, Tenant's own operations and Restoration obligations to enable Landlord to perform its Restoration obligations as expeditiously and efficiently as possible. Furthermore, Landlord shall exercise reasonable efforts, at Landlord's sole cost, to cooperate with Tenant and coordinate where and to the maximum extent reasonably possible Landlord's own operations and Restoration obligations to enable Tenant to perform its Restoration obligations as expeditiously and efficiently as possible. In any event, the Parties shall use commercially reasonable efforts to commence their respective Restoration work promptly after the damage and destruction, subject to extension of time due to Unavoidable Delays, and each Party shall prosecute its respective Restoration work with diligence until completion, subject to Unavoidable Delays, it being understood, however, that a substantial portion of the Restoration to be performed by Tenant may be conditioned upon completion by Landlord of a substantial portion of the Restoration to be performed by Landlord. Landlord shall have no obligation to repair any damage to, or to replace, any Tenant Controlled Signage (except to the extent that Landlord is responsible for the cost of replacing certain Tenant Controlled Signage pursuant to Section 5.2.1), Subtenant Improvements, Tenant/Subtenant FF&E or Tenant/Subtenant Equipment. If the Casualty is a Substantial Casualty, then either Landlord or Tenant may, by notice to the other Party given within 90 days after the Casualty, elect a Casualty Termination, to be effective 90 days after such notice. In addition, Tenant shall have the right to terminate this Lease on account of a Casualty, by notice to Landlord given within 90 days of such Casualty, if such Casualty occurs during the two years prior to the then Scheduled Expiration Date. Notwithstanding the foregoing, as soon as possible but in any event within 30 days following a Casualty, the Parties shall initiate meetings to discuss and consider the schedule for performing the Restoration. At such meetings, Landlord shall provide a detailed schedule for, if applicable, retaining consultants as necessary, preparing plans for the required work, hiring a contractor(s) to perform the required work, and commencing and completing the

required work, together with an estimate of the cost thereof. Subject to Landlord's consent, which shall not be unreasonably withheld, Tenant shall have the right to perform such work if Tenant is able to reasonably substantiate, by submission of a proposal from a reputable contractor, that Tenant can complete the work sooner than Landlord and at a comparable cost compared to Landlord's proposal. If Tenant so performs such work, then 100% of the cost incurred by Tenant in undertaking such work shall be treated as a Capital Expenditure Offset Amount available for offset against Rent pursuant to Section 4.5.

*15.3 Disposition of Insurance Proceeds.* Upon any Casualty Termination, Tenant shall be entitled to retain all resulting Property Insurance Proceeds of Tenant's Property Insurance, and, in addition, Landlord shall remit to Tenant all resulting Property Insurance Proceeds of Landlord's Property Insurance or, if applicable, Landlord's self-insurance, to the extent (but only to the extent) necessary to compensate Tenant for Tenant's unamortized investment in the Premises at the time of the Casualty. For purposes of the foregoing, (a) such investment shall be deemed to equal the sum of the Initial Capital Expenditures, the Ongoing Capital Expenditures and the Signage Capital Expenditures, as documented by Tenant to Landlord's reasonable satisfaction and exclusive of payments to Affiliates of Tenant, and (b) such investment shall be deemed to be amortized on a straight-line basis in accordance with GAAP, except that such investment shall also be deemed to have been "amortized" to the extent of (i) Tenant's Property Insurance Proceeds (or the amount thereof that would have been recoverable thereunder if Tenant carried all of the property insurance that Article 14 requires Tenant to carry), (ii) the return of Signage Capital Expenditures pursuant to Sections 4.1.1(a) and 4.1.2(a), and (iii) the application of any Capital Expenditures Offset Amount, net of any Capital Expenditure Offset Reimbursement. Notwithstanding the foregoing, Landlord's obligation to compensate Tenant for Tenant's unamortized investment shall not apply to any Casualty Termination occurring during the last two years of the Term. Tenant shall be solely responsible for negotiating and adjusting any of Tenant's Property Insurance Proceeds, and Landlord shall be responsible for negotiating and adjusting any of Landlord's Property Insurance Proceeds, but Landlord shall not settle the amount of such proceeds without Tenant's consent unless the amount thereof is sufficient to compensate Tenant for its unamortized investment in the Premises as calculated above.

*15.4 Substantial Condemnation.* If a Substantial Condemnation occurs after the Lease Execution Date, then the Expiration Date shall occur, and the Parties shall apportion Rent, as of the Condemnation Effective Date. The Condemnation Award shall be paid first to Tenant to reimburse Tenant for the cost required to safeguard the Premises and to perform any emergency repairs, then to Tenant until Tenant has received an amount equal to Tenant's unamortized investment in the Premises at the time of the Condemnation as calculated pursuant to Section 15.3, and the balance shall be paid to Landlord (unless Landlord is the condemnor, in which case Tenant shall be entitled to receive the value of its Leasehold Estate to the extent it exceeds such unamortized investment). Landlord may not settle or compromise any Condemnation Award without the consent of Tenant, which consent shall not be unreasonably withheld. Notwithstanding anything contained in this Lease to the contrary, in no event shall Landlord condemn any portion of the Premises if the primary purpose or result of such condemnation is to permit an alternative commercial use of the portion of the Premises so condemned.

*15.5 Insubstantial Condemnation.* If an Insubstantial Condemnation occurs after the Lease Execution Date, then this Lease shall remain in full force and effect and any Condemnation Award shall be allocated between Landlord and Tenant based on the cost of Restoration required to be undertaken by Landlord and Tenant. Regardless of whether the Condemnation Award is adequate, Landlord shall, at its cost, Restore the Base Building Equipment and other Core and Shell/Base Building Improvements, as well as the Landlord Controlled Property, and Tenant shall, at its cost, Restore the Subtenant Improvements, the Subtenant Equipment, the Subtenant FF&E and the Tenant Controlled Signage (except to the extent that Landlord is responsible for the cost of replacing certain Tenant Controlled Signage pursuant to Section 5.2.1), all to the extent feasible.

*15.6 Temporary Condemnation.* In the event of a Temporary Condemnation affecting the Premises, the Lease shall remain in full force and effect without any abatement of the Rent, and Tenant shall be entitled to the entire Condemnation Award (which shall be treated for purposes of Article 4 as if it were business interruption insurance proceeds) and to settle or compromise such award without the approval of Landlord.

*15.7 Condemnation Affecting Tenant Controlled Signage.* If an Insubstantial Condemnation affects Tenant Controlled Signage by requiring the removal of any Tenant Controlled Signs or by impairing exposure or access to any Tenant Controlled Signs, then Tenant shall be entitled to such portion of the Condemnation Award as is necessary to compensate Tenant for any Unrecovered Signage Capital Expenditures for the affected Tenant Controlled Signs.

*15.8 Disbursement of Loss Proceeds.* All Property Insurance Proceeds from Tenant's Property Insurance and from Landlord's Property Insurance (or Landlord's self-insurance, as applicable) shall be paid to the Party entitled thereto in accordance with the terms of this Article 15. Similarly, the proceeds of any Condemnation Award shall be paid to the Party entitled thereto in accordance with the terms of this Article 15. To the extent a Party receiving any Loss Proceeds or any Condemnation Award is required to perform Restoration obligations, then such Loss Proceeds or Condemnation Award so received shall be used to satisfy such obligations before being used for any other purpose. Each Party shall bear its own costs and expenses in collecting Loss Proceeds.

*15.9 Continuation of Lease.* Except as this Lease expressly provides, this Lease shall not terminate, be forfeited, or be affected in any other manner, and Tenant waives any right to quit or surrender the Premises or any part of the Premises, because of any Loss or any resulting untenantability. Unless and until this Lease has been validly terminated, Tenant's obligations under this Lease, including the obligation to pay Rent, shall continue unabated.

*15.10 Disputes.* Any dispute regarding the allocation of Loss Proceeds between Landlord and Tenant on account of a Condemnation or Casualty shall be subject to Arbitration.

*16. Representations and Warranties.*

*16.1 Due Authorization and Execution.*

(a) Landlord represents and warrants that a Landlord has full right, title, authority and capacity to execute and perform this Lease and any other agreements and documents to which Landlord is a Party and referred to or required by this Lease (collectively, the "Lease-Related Documents"); the execution and delivery of the Lease-Related Documents have been duly authorized by all requisite actions of Landlord; the Lease-Related Documents constitute valid, binding, and enforceable obligations of Landlord, subject to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally and general principles of equity; and neither the execution of the Lease-Related Documents nor the consummation of the transactions they contemplate violates any agreement (including Landlord's organizational documents), contract or other restriction to which Landlord is a party or is bound. Landlord represents and warrants that (i) Landlord is the owner of fee title to the Premises, (ii) the Premises is not encumbered by any lease, license or other occupancy agreement or by any mortgage or other monetary lien that has lien priority over this Lease, (iii) neither the Premises nor the A/C Mezzanine is subject to any recorded instrument that is inconsistent with the Leasehold Estate, and (iv) NYCTA is owner of a leasehold estate in the balance of the Fulton Center pursuant to a long-term master lease with the City of New York.

(b) Tenant represents and warrants that Tenant has full right, authority, and capacity to execute and perform this Lease and any other Lease-Related Documents; the execution and delivery of the Lease-Related Documents have been duly authorized by all requisite actions of Tenant; the Lease-Related Documents constitute valid, binding, and enforceable obligations of Tenant, subject to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and general principles of equity; and neither the execution of the Lease-Related Documents nor the consummation of the transactions they contemplate violates any agreement (including Tenant's organizational documents), contract or other restriction to which Tenant is a party or is bound.

(c) Guarantor represents and warrants that Guarantor has full right, title, authority and capacity to execute and perform the Guaranty; the execution and delivery of the Guaranty have been duly authorized by all requisite actions of Guarantor; the Guaranty constitutes a valid, binding, and enforceable obligation of Guarantor, subject to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and general principles of equity; and neither the execution of the Guaranty nor the consummation of the transactions it contemplates violates any agreement (including Guarantor's organizational documents), contract or other restriction to which Guarantor is a party or is bound.

(d) The Parties hereby agree that the respective Parties' representations and warranties in this paragraph shall continue to apply in full force and effect throughout the Term as if made continuously during the Term.

*16.2 No Litigation.* Tenant and Guarantor each represents and warrants that there is no pending, or to its knowledge, threatened, claim, litigation, suit, action, or proceeding before any court or administrative agency affecting Tenant or Guarantor that would, if adversely determined, materially adversely affect the Premises, this Lease or the Guaranty, the Leasehold Estate, or Tenant's ability to operate the Premises for the uses permitted hereunder.

*16.3 FIRPTA.* Tenant represents and warrants that it is not a "foreign person" within the meaning of Section 1445(f)(3) of the United States Internal Revenue Code of 1986.

*16.4 Office of Foreign Assets Control.* Tenant represents and warrants that (i) neither Tenant nor Guarantor is listed on the list maintained by the United States Department of the Treasury, Office of Foreign Assets Control (commonly known as the OFAC List) or otherwise qualifies as a terrorist, specially designated national and blocked person or a person with whom business by a United States citizen or resident is prohibited; (ii) neither Tenant nor Guarantor is in violation of any anti-money laundering or anti-terrorism statute, including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, U.S. Public Law 107-56 (commonly known as the PATRIOT Act), and the related regulations issued thereunder, including temporary regulations, and Executive Orders (including Executive Order 13224) issued in connection therewith, all as amended from time to time; and (iii) neither Tenant nor Guarantor is a Prohibited Person. Tenant shall indemnify and hold Landlord harmless from and against all claims, damages, losses, risks, liabilities and costs (including fines, penalties and legal costs and expenses) arising from any misrepresentation in this subsection or Landlord's reliance thereon. Tenant's obligations under this subsection shall survive the expiration or sooner termination of the Term.

*16.5 Special Purpose Entity.* Tenant represents and warrants that it complies and will comply throughout the Term with all of the covenants set forth on **Exhibit H**.

*17. Landlord Controlled Equipment.* Landlord shall have the full and sole responsibility for the operation and maintenance of the Landlord Controlled Equipment, and in no event will Tenant's obligations hereunder with respect to the Paid Circulation Area extend to such Landlord Controlled Equipment. In furtherance of NYCTA's functions in the NYCT Retained Areas and the operation, maintenance and periodic upgrading of Landlord Controlled Property, Landlord reserves the right, from time to time, to install, use, maintain, repair, replace, remove and relocate shafts, pipes, ducts, conduits, wires, risers and other facilities and appurtenant fixtures in the walls, floors and ceilings of the Premises, so long as the exercise of such right does not result in a Material Physical Impairment. All such activities shall be conducted in a manner consistent with the Retail Standard and so as to cause as little disruption as reasonably possible to the operations of Tenant and Subtenants.

*18. NYCT Retained Areas.* The NYCT Retained Areas have been reserved for use, operation, repair and maintenance by NYCTA, and Tenant shall have neither access to or use of such NYCT Retained Areas, except to gain access to any Tenant Controlled Signs that are located in the A/C Mezzanine, nor have any obligation whatsoever for any maintenance or repair within the NYCT Retained Areas. NYCTA personnel, agents and contractors shall at all times have unrestricted access to the NYCT Retained Areas and Tenant hereby agrees to cooperate fully with NYCTA in connection therewith.

*19. Transfers.*

*19.1 Transfer of Lease.* Tenant may not Transfer this Lease without Landlord's consent, which may be withheld in Landlord's sole discretion, except for a Transfer of this Lease in connection with a sale of all or substantially all of the shopping centers owned, directly or

indirectly, by Guarantor, and except for a Transfer of this Lease to an Affiliate of the Transferor (collectively, a "Permitted Lease Transfer"), in which case Landlord's consent shall not be required so long as Guarantor, or a replacement guarantor satisfying the requirements of Section 19.3, continues to own, directly or indirectly, 100% of the Equity Interests in Tenant. Any permitted assignee of this Lease shall assume all obligations and liabilities of Tenant under this Lease. Tenant shall pay, or cause to be paid, all transfer and other taxes payable on account of any such Transfer.

*19.2 Transfers of Equity Interests.* A Transfer of Equity Interests in Tenant or Guarantor shall require Landlord's consent unless it is a Permitted Equity Interest Transfer. In connection with a Permitted Equity Interest Transfer other than a Transfer of a Publicly-Traded Equity Interest, Tenant shall determine whether the transferee or any of its Affiliates is a Prohibited Person by doing background checks using the Prohibited Person Vetting Process, subject to the Prohibited Person Determination Standards.

*19.3 Replacement Guarantor.* In connection with a Permitted Lease Transfer or a Permitted Equity Interest Transfer, if a replacement guarantor having a net worth not less than $500,000,000 (subject to Annual Escalation) at the time of such Transfer executes and delivers a guaranty in substantially the same form as the Guaranty, then the Guarantor named herein shall be released from the Guaranty for all liabilities and obligations thereunder arising or accruing from and after the effective date of such Transfer.

*20. Self Help Rights.*

*20.1 Landlord's Right to Cure.* Under the following circumstances, Landlord shall have the right, but not the obligation, to take such action as Landlord deems appropriate to respond to such circumstances:

(a) if there exists in the Premises an imminent risk of personal injury to persons or property damage either to the Fulton Center or to property owned by third parties (an "Emergency"), such Emergency arises from a failure by Tenant to perform its obligations hereunder, and Tenant fails to respond within four hours after Landlord notifies Tenant of such Emergency;

(b) subject to clause (c) below, if an Event of Default exists with respect to Tenant's obligation to comply with the Concept of Operations and such Event of Default continues to exist following notice from Landlord; or

(c) if any escalator or elevator is not operating for 48 consecutive hours, unless the repair or replacement of such escalator or elevator is being prosecuted with diligence during the period in which it is not operating.

Landlord may exercise its self-help rights without waiving or releasing Tenant from any obligation or Default. Tenant shall reimburse Landlord, as Additional Rent, for an amount equal to all reasonable costs and expenses (including Legal Costs) incurred by Landlord in exercising such self-help rights, together with Default Interest thereon. Landlord and its agents, representatives, and designees shall have the right to enter the Premises upon reasonable

advance notice (except under clause (a) above) to Tenant for purposes of exercising such self-help rights.

*20.2 Tenant's Right to Cure.* If Landlord fails to perform any of its obligations under this Agreement and such failure has a materially adverse effect on Tenant's use and enjoyment of the Premises, including a materially adverse effect on the business or operations of any Subtenant or the exposure or visibility of any Tenant Controlled Signage, then Tenant shall have the right, but not the obligation, to perform such obligation for Landlord, provided that: (i) Tenant sends Landlord a notice and Landlord fails to commence the work required to remedy such failure within 30 days following receipt of such notice, and Tenant sends Landlord a second notice and Landlord fails again to commence the work required to remedy such failure within 10 days following receipt of such notice; or (ii) after Landlord commences the work required to remedy such failure, Landlord fails to prosecute such work diligently and continually until completion and such failure continues for five days following notice from Tenant to Landlord. In addition, if there exists in the Premises an Emergency, such Emergency arises from a failure by Landlord to perform its obligations hereunder, and Landlord fails to respond within four hours after Tenant notifies Landlord of such Emergency, Tenant shall have the right (but not the obligation) to respond to such Emergency. Tenant has the right to offset against Rent an amount equal to the reasonable costs and expenses (including Legal Costs) incurred by Tenant in exercising such self-help rights, together with Default Interest thereon.

*21. Quiet Enjoyment; Title to Certain Premises; Certain Agreements*

*21.1 Quiet Enjoyment.* So long as this Lease has not been terminated in accordance with the terms of this Lease, Landlord covenants that Tenant shall and may peaceably and quietly have, hold, and enjoy the Premises for the Term, subject to the terms of this Lease, without molestation, hindrance, or disturbance by or from Landlord or by anyone claiming by or through Landlord and free of any encumbrance created or suffered by Landlord and not referenced elsewhere in this Lease.

*21.2 Access and Inspection.* Without limitation of any other provision of this Lease affording Landlord access to the Premises for various purposes, Landlord and its agents, representatives, and designees shall have the right to enter the Premises to (a) ascertain whether Tenant is complying with this Lease; (b) inspect the Premises and any Construction; and (c) perform such tests, borings, and other analyses as Landlord determines may be necessary or appropriate relating to possible non-compliance with any Law or possible Hazardous Substances Discharge. In entering the Premises, Landlord agents, representatives and designees shall not materially interfere with the operations of Tenant or any Subtenant. Notwithstanding the foregoing, except in an emergency, Landlord's entry into the Commercial Usage Areas and the Back of House Areas shall be subject to the right of Tenant to have representatives of Tenant and/or Subtenants accompany Landlord on any such inspection, following reasonable notice and during normal business hours. Landlord's right to enter and inspect the Premises shall impose no liability on Landlord to Tenant or any Subtenant arising from the existence of any condition created by Tenant or any Subtenant that does not comply with Law or the terms of this Lease.

*21.3 Title.* All Improvements and Landlord Controlled Property, other than Subtenant Improvements, shall during the Term be owned by, and belong to, Landlord (subject to Tenant's leasehold interest under this Lease), unless herein elsewhere specifically provided.

22. *Events of Default; Remedies.*

*22.1 Definition of "Event of Default".* An "Event of Default" means the occurrence of any one or more of the following:

22.1.1 *Monetary Default.* If a Monetary Default occurs and continues for 10 Business Days after notice from Landlord, specifying in reasonable detail the amount of money not paid and the nature and calculation of each such payment.

22.1.2 *Prohibited Liens.* If Tenant fails to comply with any obligation regarding Prohibited Liens and does not remedy such failure within 90 days after notice from Landlord.

22.1.3 *Bankruptcy or Insolvency.* If Tenant or Guarantor ceases to do business as a going concern, ceases to pay its debts as they become due or admits in writing that it is unable to pay its debts as they become due, or becomes subject to any Bankruptcy Proceeding (except an involuntary Bankruptcy Proceeding dismissed within 120 days after commencement), or a custodian or trustee is appointed to take possession of, or an attachment, execution or other judicial seizure is made with respect to, substantially all of Tenant's or Guarantor's assets or Tenant's interest in this Lease (unless such appointment, attachment, execution or other seizure was involuntary and is contested with diligence and continuity and is vacated and discharged within 120) days).

22.1.4 *Nonmonetary Default.* If any other Nonmonetary Default occurs and Tenant does not cure it within 30 days after notice from Landlord describing it in reasonable detail, or, in the case of a Nonmonetary Default that cannot with reasonable diligence be cured within 30 days from such notice, if Tenant shall not (x) within 30 days from Landlord's notice advise Landlord of Tenant's intention to take all reasonable steps to cure such Nonmonetary Default; (y) duly commence such cure and then diligently prosecute such cure to completion; and (z) complete such cure within a reasonable time under the circumstances; provided, however, that (i) if any Nonmonetary Default results from a default of a Subtenant, no Event of Default shall exist so long as Tenant is using diligent efforts to cause such Subtenant to remedy such default or Tenant is taking action to prohibit continued occupancy by such Subtenant; and (ii) if Tenant is impeded in curing any such Nonmonetary Default by the failure of Landlord to perform any of its obligations under this Lease, then no Event of Default shall exist for so long as Landlord fails to perform such obligations, and if Landlord remedies such failure, then no Event of Default shall exist so long as Tenant thereafter complies with clauses (x), (y) and (z) above.

22.1.5 *Chronic Default.* If (in the judgment of a court of competent jurisdiction):

(a) Tenant shall have, on multiple occasions and/or in multiple respects, willfully (i) failed to operate and maintain the Public Circulation Areas in accordance with the Retail Standard as required by this Lease, (ii) disregarded material requirements of Article 5, and/or (iii) otherwise failed to fulfill material obligations pertaining to the maintenance and operation of the Premises as set forth in this Lease (such pattern, as opposed to individual instances, of non-compliance being referred to herein as a "Chronic Default");

(b) Tenant shall have succeeded in preventing Landlord from terminating this Lease, by timely availing itself of Tenant's cure rights under Section 22.1.4 whenever presented with Default Notices with respect to particular instances of such Chronic Default, and yet shall have willfully persisted in such Chronic Default;

(c) Landlord shall have notified Tenant of Landlord's intention to invoke this Section 22.1.5 and offered to schedule a meeting between the Chief Executive Officer or Co-Chief Executive Officer of the ultimate parent company of Guarantor and the Chief Executive Officer of the MTA and/or President of NYCTA to discuss and agree upon a plan for Tenant to proactively and comprehensively address Tenant's deficiencies; and

(d) Tenant shall either (i) fail to meet with Landlord and submit a reasonably satisfactory remediation plan as provided in clause (c) within 15 days after receipt of such notice or (ii) thereafter fail to timely implement such remediation plan in all material respects, other than by reason of Unavoidable Delays.

22.1.6 *Remedies.* If an Event of Default occurs, then Landlord shall, at Landlord's option, have any or all of the following remedies, all cumulative (so exercise of one remedy shall not preclude exercise of another remedy), in addition to such other remedies as may be available at law or in equity or under any other terms of this Lease. Landlord's remedies include:

22.1.7 *Taking Possession.* Landlord may re-enter and take possession of the Premises with process of law, whether by summary proceedings or otherwise, and remove Tenant, with or without having terminated this Lease, and without thereby being liable for damages or guilty of trespass. This is intended to constitute an express right of re-entry by Landlord. Except as expressly provided in this Lease or prohibited by Law, Tenant, for and on behalf of itself and all persons claiming by, through or under Tenant, expressly waives any right to service of notice of intention to re-enter provided in any Law and any and all right of redemption provided by any Law, or re-entry or repossession or to restore the operation of this Lease if Tenant is dispossessed by a judgment or by warrant of any court or judge or in case of re-entry or repossession by Landlord or any expiration or termination of this Lease. No re-entry by Landlord, whether had or taken under summary proceedings or otherwise, shall absolve or discharge Tenant from liability under this Lease. The terms "enter," "re-enter," "entry," and "re-entry," as used in this Lease, are not restricted to their technical legal meanings.

22.1.8 *Suits Before Expiration Date.* Landlord may sue for damages or to recover Rent from time to time at Landlord's election.

22.1.9 *Receipt of Moneys.* No receipt of money by Landlord from Tenant after termination of this Lease, or after the giving of any notice of termination of this Lease, shall reinstate, continue, or extend this Lease or affect any notice theretofore given to Tenant, or waive Landlord's right to enforce payment of any Rent payable or later falling due, or Landlord's right to recover possession by proper remedy, except as this Lease expressly states otherwise, it being agreed that after service of notice to terminate this Lease or the commencement of suit or summary proceedings, or after final order or judgment for possession, Landlord may demand, receive, and collect any moneys due or thereafter falling due without in any manner affecting such notice, proceeding, order, suit or judgment, all such moneys collected being deemed payments on account of use and occupation or, at Landlord's election, on account of Tenant's liability.

22.1.10 *No Waiver.* No failure by Landlord to insist upon strict performance of any covenant, agreement, term, or condition of this Lease or to exercise any right or remedy upon a Default, and no acceptance of full or partial Rent during continuance of any such Default, shall waive any such breach or Default or such covenant, agreement, term, or condition. No covenant, agreement, term, or condition of this Lease to be performed or complied with by Tenant, and no Default, shall be Modified except by a written instrument executed by Landlord and Tenant. No waiver of any Default shall affect or alter this Lease. Each and every covenant, agreement, term and condition of this Lease shall continue in full force and effect with respect to any other then existing or subsequent Default of such covenant, agreement, term or condition of this Lease.

22.1.11 *Security Devices.* Following termination of this Lease in accordance with the terms hereof, Landlord may change the locks and other security devices providing admittance to the Premises.

22.1.12 *Conditional Limitation.* Landlord may serve upon Tenant a written 30-day notice of cancellation and termination of this Lease; provided, however, that no such notice of cancellation or termination shall be valid or of any force or effect unless (a) Landlord proceeds, by appropriate judicial proceedings, in a court of competent jurisdiction and obtains a determination that an Event of Default has occurred and is then continuing, and (b) if there is a final, non-appealable determination by the court that an Event of Default has occurred, such Event of Default is not cured within the period otherwise provided in the definition of Event of Default to remedy such default, which period shall commence upon the rendering of such final non-appealable determination. Upon the expiration of such 30-day period, this Lease and the Term shall automatically and without any action by anyone terminate, expire, and come to an end, by the mere lapse of time, as fully and completely as if the expiration of such 30-day period were the Expiration Date. The passage of such 30-day period constitutes the limit beyond which Tenant's tenancy no longer exists. Tenant shall then quit and surrender the Premises to Landlord but

remain liable as this Lease provides. It is a conditional limitation of this Lease that the Term shall terminate and expire as set forth in this paragraph. This paragraph is intended to establish a conditional limitation and not a condition subsequent. Nothing in this paragraph shall limit Landlord's right to commence and prosecute a summary dispossess proceeding under New York Real Property Actions and Proceeding Law Article 7.

22.1.13 *Damages*. Subject to Section 28.2, Landlord may recover from Tenant all damages Landlord incurs by reason of Tenant's Events of Default including reasonable costs of recovering possession, reletting the Premises, and any and all other damages legally recoverable by Landlord, and reimbursement of Landlord's reasonable out of pocket costs, including Legal Costs and bank fees for checks returned by the bank. Such damages may include, at Landlord's election, the net present value of the Rent payable to Landlord for the remainder of the then current Term of this Lease less the market rent for the remainder of such Term as of the date of Lease termination, discounted at 5% per annum. However, Tenant acknowledges that such amount alone would not constitute an adequate measure of damages, as Tenant's undertaking to make various Capital Expenditures and incur various operating expenses when and as required over the entire Term has been a material inducement to Landlord affording Tenant the opportunity to exploit the revenue-generating potential of the Premises from and after the Opening Date.

22.1.14 *Injunction of Breaches*. Whether or not an Event of Default has occurred, Landlord may obtain a court order enjoining Tenant from continuing any Default or from committing any threatened breach or Default. Tenant specifically and expressly acknowledges that damages would not constitute an adequate remedy for any Nonmonetary Default.

22.1.15 *Continue Lease*. Landlord may at Landlord's option maintain Tenant's right to possession. In that case, this Lease shall continue and Landlord may continue to enforce it, including the right to collect Rent when due and any remedies for nonpayment.

22.1.16 *Restoration Funds*. Upon any termination of this Lease pursuant to this Article 22, to the extent that Landlord then holds any Restoration funds, they shall be applied solely as Landlord directs, including as a payment toward any sums then payable to Landlord.

*22.2 Proceeds of Reletting*. Landlord shall apply any proceeds of any reletting as follows, without duplication, but including any Default Interest on all such sums:

22.2.1 *Landlord's Costs*. First, to pay to itself the cost and expense of terminating this Lease, re-entering, retaking, repossessing, repairing, performing any Construction, and the cost and expense of removing all persons and Premises therefrom, including in such costs reasonable and customary brokerage commissions and Legal Costs;

22.2.2 *Preparation for Reletting.* Second, to pay to itself the cost and expense reasonably sustained in securing any new tenants and other occupants, including in such costs all brokerage commissions, Legal Costs, and any other reasonable costs of preparing the Premises for reletting;

22.2.3 *Costs of Maintenance and Operation.* Third, to the extent that Landlord shall maintain and operate the Premises, to pay to itself the reasonable cost and expense of operating and maintaining the Premises; and

22.2.4 *Residue.* Fourth, to pay to itself any balance remaining on account of the liability of Tenant to Landlord.

*22.3 Tenant's Late Payments; Default Interest.* If Tenant fails to make any payment to Landlord required under this Lease within 10 days after such payment is first due and payable, then in addition to any other remedies of Landlord, and without reducing or adversely affecting any of Landlord's other rights and remedies, Tenant shall pay Landlord Default Interest on such late payment, beginning on the date such payment was first due and payable and continuing until the date when Tenant actually makes such payment, which is intended to compensate Landlord for the inconvenience and staff time incurred by Landlord to handle the late or missed payment, shall not be deemed a penalty or compensation for use of funds, and shall not be credited against any other obligations of Tenant under this Lease. With respect to any payment of Rent other than Participation Rent and Guaranteed Minimum Rent, such payment shall not be due and payable until 30 days after demand by Landlord therefor. Default Interest payable on any deficiency determined based on a year-end reconciliation is governed by Section 4.7(c), and Default Interest on any underpayment determined based on an audit by Landlord is governed by Section 4.7.4.

*22.4 Holding Over.* If for any reason or no reason Tenant remains in the Premises after the Expiration Date, then Landlord will suffer injury that is substantial, difficult, or impossible to measure accurately. Therefore, if Tenant remains in the Premises after the Expiration Date, for any reason or no reason, then in addition to any other rights or remedies of Landlord, Tenant shall pay to Landlord, as liquidated damages and not as a penalty, for each month (prorated daily for partial months) during which Tenant holds over after the Expiration Date, a sum equal to 150% of the Participation Rent or Guaranteed Minimum Rent (whichever is higher), calculated on a monthly basis, payable under this Lease during the Lease Year preceding the Expiration Date.

*22.5 Waivers.* LANDLORD AND TENANT IRREVOCABLY WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, COUNTERCLAIM, OR OTHER LITIGATION ARISING OUT OF OR RELATING TO THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT REGARDING THE PREMISES, ENFORCEMENT OF THIS LEASE, TENANT'S USE OR OCCUPANCY OF THE PREMISES, ANY CLAIM OF INJURY OR DAMAGE ARISING BETWEEN LANDLORD AND TENANT, OR ANY ACTIONS OF LANDLORD IN CONNECTION WITH OR RELATING TO THE ENFORCEMENT OF THIS LEASE. TENANT WAIVES ANY RIGHT OF REDEMPTION PROVIDED FOR BY LAW.

*22.6 Accord and Satisfaction; Partial Payments.* No payment by Tenant or receipt by Landlord of a lesser amount than the amount owed under this Lease shall be deemed to be other than a part payment on account by Tenant. Any endorsement or statement on any check or letter accompanying any check or payment of Rent shall not be deemed an accord or satisfaction. Landlord may accept any such check or payment without prejudice to Landlord's right to recover the balance of such Rent or pursue any other remedy.

*22.7 Miscellaneous.* Landlord and Tenant further agree as follows with respect to any Defaults and Landlord's rights and remedies.

22.7.1 *Survival.* No termination of this Lease and no taking possession of or reletting the Premises shall relieve Tenant of its liabilities and obligations hereunder, all of which shall survive such expiration, termination, repossession, or reletting.

22.7.2 *Multiple Suits.* Landlord may sue to recover damages, or sums equal to any installment of Rent payable by Tenant, from time to time at Landlord's election. Nothing in this Lease requires Landlord to await the date when this Lease or the Term would have expired absent an Event of Default and a resulting termination of this Lease.

22.7.3 *Receipt of Monies.* Unless such payment shall fully cure all Monetary Defaults, no receipt of moneys by Landlord from Tenant after the giving of a termination notice or a notice to obtain possession, or after the retaking of possession by Landlord as aforesaid, shall reinstate, continue, or extend the Term or affect any notice previously given to Tenant, waive Landlord's right to enforcement of Rent payable by Tenant or thereafter falling due, or waive Landlord's right to recover possession of the Premises. After the service of any such notice, or commencement of any suit or summary proceedings, or after a final order or judgment for possession of the Premises, Landlord may demand, receive, and collect any moneys due or thereafter falling due without in any manner affecting such notice, proceeding, order, suit, or judgment, unless such payments fully cure all Monetary Defaults. Any sums so collected (without thereby curing all Monetary Defaults) shall instead be deemed payments on account of use and occupation of the Premises or, at Landlord's election, to have been made on account of Tenant's liability under this Lease.

22.7.4 *No Double Recovery.* In no event shall Landlord be entitled, directly or indirectly, to recover twice for the same element of Landlord's damages.

*23.* Arbitration. If in accordance with the express terms of this Lease a dispute is to be resolved by Arbitration, then the following shall govern the Arbitration:

*23.1 Third-Party Arbitration.* A Party shall commence arbitration by delivering a notice to the other Party and to AAA stating that the initiating Party wishes to commence arbitration under this Lease (an "Arbitration Notice"). The arbitration shall be administered by AAA. If the dispute is construction-related, then the arbitration shall be

administered under the Construction Industry Arbitration Rules and Mediation Procedures of the AAA, and if it is non-construction-related, then the arbitration shall be administered under the AAA's Arbitration Rules for the Real Estate Industry in effect at the time of commencement of the arbitration (in either case, the "Rules"), as modified by this Lease or by subsequent written agreement of the Parties. The venue for any such arbitration shall be in New York, New York. Within 10 days after receipt of the Arbitration Notice, the Parties shall apply to the AAA for a list of up to five arbitrators whose credentials best match the subject matter of the dispute. If within 10 days following receipt of such list, the Parties are unable to agree on a proposed arbitrator, then within 3 Business Days following the elapse of such 10-day period each Party shall rank the proposed arbitrators in order of preference, and the arbitrator shall be appointed by the AAA according to the procedures provided in the rules for the appointment of a single arbitrator, which arbitrator (the "Arbitrator") shall be a member of the AAA panel of arbitrators. The Arbitrator shall have at least 10 years of relevant experience in the subject matter of the dispute, and (ii) be disinterested and independent of either Party. The Arbitrator shall be entitled, but not required, to provide that the losing Party in any arbitration will pay all or a portion of the prevailing Party's costs incurred in connection therewith, including the costs and fees of the Arbitrator, provided, however, if the Arbitrator declines to make such a provision, then the costs of the Arbitration will be split equally between the Parties (except that each Party will bear its own expenses and attorneys' fees). The determination of the Arbitrator in the foregoing proceeding shall be binding upon the Parties.

*23.2 Specific Provisions.* The following specific provisions shall apply in respect of any such arbitration proceeding:

(a) Discovery, including any depositions, shall be governed by the Rules; provided, however, that the Arbitrator shall establish a discovery schedule so that all discovery, including depositions, shall conclude not later than 60 days after selection of the Arbitrator.

(b) Not later than 90 days after selection of the Arbitrator, the Arbitrator shall conduct a hearing to resolve the dispute. Such hearing shall have a duration of not more than 5 days and shall be conducted in accordance with the following schedule:

A. Each Party shall be entitled to deliver an opening statement not to exceed 2 hours in length;

B. Each Party shall be entitled to deliver a closing argument not to exceed 2 hours in length; and

C. The Arbitrator shall have the right to require either Party to furnish any additional information they require in order to decide the dispute.

(c) The Arbitrator shall issue a written decision within 30 days after the completion of the arbitration hearing, which decision shall be binding upon the Parties.

(d) Any of the time limits set forth in this Section 23.2 may be extended by the Arbitrator for good cause shown after taking into account the Parties' intent in this Lease that

the arbitration should be expedited. The failure of any Party or the Arbitrator to comply with any time limit shall not invalidate the decision of the Arbitrator. Any dispute over compliance with the time limits set forth in the Rules or this Lease shall be a dispute that is subject to Arbitration.

(e) Except as set forth herein to the contrary or to the extent prohibited by the Rules, any dispute hereunder shall be resolved in accordance with any expedited procedures provided for in the Rules, provided (i) that any notices in connection with an arbitration proceeding shall be given in accordance with Article 25 and (ii) a stenographic record of the arbitration hearing shall be made.

(f) In order to facilitate the comprehensive resolution of related disputes, the Arbitrator shall consolidate the arbitration proceeding with any other arbitration proceeding under this Lease.

*23.3 Binding Effect.* The decision of the Arbitrator under Section 23.1 shall be final and binding on both Parties, and judgment may be entered thereon in any court having jurisdiction. If a Party fails to comply with the determination of the Arbitrator under Section 23.1, then the other Party shall be entitled to bring an action or proceeding in court to enforce such determination.

*23.4 Other Rights and Obligations Not Affected.* Notwithstanding the existence of a dispute, each Party shall continue to perform its respective other obligations under this Agreement.

*24.* <u>*End of Term*</u>. Upon the Expiration Date, (a) all Tenant Controlled Signage, Tenant/Subtenant Improvements and Tenant/Subtenant Equipment shall become Landlord's property unencumbered by this Lease; (b) Tenant shall deliver to Landlord possession of the Premises, in good condition, reasonable wear and tear excepted, subject to any Loss that this Lease does not require Tenant to Restore, provided, that in no event shall Tenant be required to remove any Subtenant Improvements, any Tenant Controlled Signage, Tenant/Subtenant Equipment or any Tenant/Subtenant FF&E (and all Subtenant Improvements, Tenant Controlled Signage ,Tenant/Subtenant Equipment and Tenant/Subtenant FF&E may be delivered to Landlord in their then "As Is" condition), except as otherwise expressly provided in the last sentence of this Article 24; (c) Tenant shall surrender any right, title, or interest in and to the Premises and deliver such evidence and confirmation thereof as Landlord reasonably requires; (d) Tenant shall deliver the Premises free and clear of all (i) Subleases, except as otherwise herein elsewhere specifically provided, and (ii) liens, except liens that Landlord or any of its agents caused; (e) Tenant shall assign to Landlord, without recourse, and give Landlord copies or originals of, all assignable licenses, permits, contracts, warranties, and guarantees then in effect for the Premises; (f) the Parties shall cooperate to achieve an orderly transition of operations from Tenant to Landlord (or a substitute tenant designated by Landlord) without interruption, including delivery of such books and records (or copies thereof) as Landlord reasonably requires; (g) the Parties shall adjust for Impositions and all other expenses and income of the Premises and any prepaid Rent and shall make such payments as shall be appropriate on account of such adjustment in the same manner as for a sale of the Premises (but any sums otherwise payable to Tenant shall first be applied to cure any Default); and (h) Tenant shall assign to Landlord (or a substitute tenant designated by Landlord), and Landlord shall reimburse Tenant for, all utility

and other service provider deposits for the Premises. Notwithstanding anything to the contrary in this paragraph, Tenant may remove from the Premises any Tenant/Subtenant FF&E, but Tenant must do so, if at all, before or within 30 days after the Expiration Date. Tenant shall not, however, remove any Tenant Controlled Signage, Tenant/Subtenant Improvements or Tenant/Subtenant Equipment or any portion thereof, except as Landlord may otherwise agree, and Tenant shall repair any damage to the Core and Shell/Base Building Improvements or Landlord Controlled Property from such removal. During such 30-day period, (x) Tenant may enter the Premises for such purpose, without being deemed a holdover; (y) Landlord shall have no obligation to preserve or protect such Tenant/Subtenant FF&E; and (z) in entering the Premises, Tenant shall comply with Landlord's instructions and requirements. Tenant/Subtenant FF&E not removed within 30 days after the Expiration Date shall be deemed abandoned. Notwithstanding the foregoing provisions with respect to Subtenant Improvements, Tenant/Subtenant Equipment and Tenant/Subtenant FF&E, if at the time Tenant enters into Subleases the obligation to remove tenant improvements and/or property at the end of the term is typically imposed on retail tenants, then Tenant will endeavor to impose such obligation on its Subtenants and shall use commercially reasonable efforts to enforce that obligation, including by seeking compensation from those Subtenants that abandon their improvements and/or property rather than removing it.

*25.* *Notices*. All notices, requests, demands, consents, designations or elections shall be in writing and shall be addressed to Landlord and Tenant (and their designated copy recipients) as set forth in **Exhibit F**. Notices (including any required copies as set forth in **Exhibit F**) shall be delivered either (x) personally, by hand delivery (against a signed receipt), (y) by Federal Express or other overnight (one-night) courier service or (z) by certified mail (return receipt requested) to the addresses set forth in **Exhibit F**, in which case they shall be deemed delivered on the date of delivery (or when delivery has been first attempted, as evidenced by a receipt) to such address(es). Either Party may change its address by giving notice in compliance with this Lease. Notice of such a change shall be effective only upon receipt. Any Party giving a notice may request the recipient to acknowledge receipt of such Notice. The recipient shall promptly comply with any such request, but failure to do so shall not limit the effectiveness of any notice. The Parties' attorneys may give any notice on behalf of their respective clients.

*26.* *Brokers*. Each Party (a) represents and warrants that it did not engage or deal with any broker or finder in connection with this Lease and no person is entitled to any commission or finder's fee on account of any agreements or arrangements made by such Party; and (b) shall indemnify the other Party against any breach of such representation. Tenant shall be responsible for any and all broker or finder's fees, commission, or other forms of compensation which may be due and payable in connection with any Subleases, ad sales and/or Sponsorship Events permitted hereunder.

*27.* *Additional Deliveries; Third Parties*.

*27.1* *Estoppel Certificates*. Up to twice a year, each Party may require the other Party to execute, acknowledge and deliver to the other Party (or directly to a designated third party) up to four original counterparts of an Estoppel Certificate. Such other Party shall sign, acknowledge, and return such Estoppel Certificate within 15 days after request, even if the

requesting Party is in default. Any Estoppel Certificate shall bind the certifying Party to the extent set forth therein. In executing and delivering an Estoppel Certificate, Landlord shall have no obligation to waive any audit rights under this Lease, or to waive any rights with respect to any circumstance that Landlord, following inquiry of Landlord's Representative, does not actually understand to constitute a Default at the time such Estoppel Certificate is delivered, and the execution and delivery of an Estoppel Certificate by Landlord shall not constitute the waiver of such audit rights.

*27.2 Further Assurances.* Each Party shall execute and deliver such further documents, and perform such further acts, as may be reasonably necessary to achieve the Parties' intent in entering into this Lease.

*27.3 Net Lease.* Except as expressly provided in this Lease, this Lease is intended to be, and shall be construed as, an absolutely net lease, and the Rent shall be a completely net return to Landlord throughout the Term; and except as expressly provided in this Lease, Tenant shall pay any and all expenses, costs, obligations and charges whatsoever which shall arise, be incurred or become due during the Term with respect to or in connection with the improvement, operation, management, maintenance and repair of the Premises. Notwithstanding the foregoing, Tenant shall have no obligation to pay any interest, principal or other charges due or to become due under any lien or encumbrance voluntarily or involuntarily created, suffered or incurred by Landlord.

*27.4 Modification.* Any Modification of this Lease must be in writing signed by the Party to be bound.

*27.5 Successors and Assigns.* This Lease shall bind and benefit Landlord and Tenant and their successors and permitted assigns, but this shall not limit or supersede any Transfer restrictions provided for herein. Nothing in this Lease confers on any Person (except Landlord and Tenant) any right to insist upon, or to enforce against Landlord or Tenant, the performance or observance by either Party of its obligations under this Lease.

*28. <u>Miscellaneous</u>.*

*28.1 Costs and Expenses; Legal Costs.* In the event of any litigation or dispute between the Parties, or claim made by either Party against the other, arising from this Lease or the landlord-tenant relationship under this Lease, or either Party's enforcement of this Lease upon a default by the other Party, or to enforce or interpret this Lease or seek declaratory or injunctive relief in connection with this Lease, or to exercise any right or remedy under or arising from this Lease, or to regain or attempt to regain possession of the Premises or terminate this Lease, or in any Bankruptcy Proceeding affecting the other Party to this Lease, the prevailing Party shall be entitled to reimbursement of its Legal Costs with Default Interest and all other reasonable costs and expenses incurred in enforcing this Lease or curing the other Party's default. With respect to an Arbitration, the allocation of Legal Costs is addressed in Article 23. If Tenant requests any amendment or modification to this Lease, then Tenant shall reimburse Landlord's Legal Costs incurred in considering, reviewing, and otherwise processing such request.

*28.2 No Consequential Damages.* Whenever either Party may seek or claim damages against the other Party (whether by reason of a breach of this Lease by such Party, in enforcement of any indemnity obligation, for misrepresentation or breach of warranty, or otherwise), neither Landlord nor Tenant shall seek, nor shall there be awarded or granted by any court, arbitrator, or other adjudicator, any speculative, consequential, collateral, special, punitive, or indirect damages, including loss of profits, whether such breach shall be willful, knowing, intentional, deliberate, or otherwise. The Parties intend that any damages awarded to either Party shall be limited to actual, direct damages sustained by the aggrieved Party.

*28.3 No Waiver by Silence.* Failure of either Party to complain of any act or omission on the part of the other Party shall not be deemed a waiver by the non-complaining Party of any of its rights under this Lease. No waiver by either Party at any time, express or implied, of any breach of this Lease shall waive such breach or any other breach.

*28.4 Performance Under Protest.* If a dispute arises regarding performance of any obligation under this Lease, the Party against which such obligation is asserted shall have the right to perform it under protest, which shall not be regarded as voluntary performance. A Party that has performed under protest may institute appropriate proceedings to recover any amount paid or the reasonable cost of otherwise complying with any such obligation, with interest at the Prime Rate.

*28.5 Survival.* All rights and obligations that by their nature are to be performed after any termination of this Lease shall survive any such termination.

*28.6 Unavoidable Delay.* Each Party's obligation to perform or observe any nonmonetary obligation under this Lease shall be suspended during such time as such performance or observance is prevented or delayed by Unavoidable Delays.

*28.7 Financial Statements.* Tenant shall deliver, or cause to be delivered, on or before May 1 of each calendar year during the Term, a financial statement of Guarantor, certified as true and correct in all material respects as of the date of such financial statement by a financial officer of Guarantor.

*28.8 Development Rights.* Landlord and Tenant agree that Landlord retains any and all unused air rights, development rights and comparable rights of any kind and nature with respect to the land underlying the Premises and that Tenant has no rights in and to same; and, subject to the provisions of this Section 28.8, Tenant hereby consents, without further consideration, to any utilization of such rights by Landlord. Tenant hereby irrevocably waives any and all rights it may have (as a "party-in-interest" or otherwise) in connection with any zoning lot merger or transfer of development rights with respect to the Premises, including any rights it may have to be a party to, to contest, or to execute, any Declaration of Restrictions (as such term is defined in Section 12-10 of the Zoning Resolution of the City of New York effective December 15, 1961, as amended) that would cause the land underlying the Premises to be merged with or unmerged from any other zoning lot pursuant to such Zoning Resolution or to any document of a similar nature and purpose, and Tenant agrees that this Lease shall be subject and subordinate to any Declaration of Restrictions or any other document of similar nature and purpose now or hereafter affecting such land so long as such declaration does not impair in any

respect the Leasehold Estate. Tenant shall cooperate with Landlord, without cost or expense to Tenant, in all respects to effectuate any such zoning lot merger or transfer of development rights. Without limiting the generality of the foregoing, Tenant shall execute and deliver all documents or instruments necessary or desirable to evidence or effectuate any such transfer, and, in confirmation of Tenant's subordination and waiver hereunder, Tenant shall execute and deliver promptly any certificate or instrument that Landlord reasonably may request. In connection with Tenant's cooperation, Tenant hereby irrevocably constitutes and appoints Landlord as Tenant's attorney-in-fact to execute any such certificate or instrument for and on behalf of Tenant, such power of attorney being coupled with an interest. Notwithstanding the foregoing, nothing in this Section 28.8 shall permit Landlord or any other Person to alter the façades or entrances of the Fulton Building or the Corbin Building or to construct any improvements above such buildings, except that (i) Landlord may permit improvements to encroach on the west side of the land on which the Corbin Building and the Fulton Building are situated by cantilevering such improvements not more than 10 feet onto such land, provided that the lowest point of such cantilevered improvements is not less than 30 feet above the highest point of the Fulton Building and Corbin Building and provided that no such cantilevering shall affect the legal right of Landlord following a casualty to rebuild the Fulton Building or the Corbin Building substantially in accordance with the Core and Shell/Base Building Plans and Specifications. To facilitate any transfer of development rights from the land under the Fulton Building and Corbin Building to the block that includes the Dey Street Headhouse, Landlord shall have the right to have the exterior of the Corbin Building designated a "landmark" subject to the jurisdiction of the New York City Landmarks Preservation Commission ("LPC"), provided that such designation subjects the Corbin Building to (a) no material restrictions on Tenant's use of the Corbin Building or on retail signage to which the Corbin Building is not already subject pursuant to the State Historic Preservation Office ("SHPO") requirements that are referenced in the Design Guidelines, and (b) no material requirements for inspecting or maintaining the façade of the Corbin Building to which the Corbin Building is not already subject pursuant to such SHPO requirements, and provided that (A) Landlord compensates Tenant for any incremental cost or expense resulting from such designation, and (B) Landlord is able to demonstrate to Tenant, through a review of applicable LPC and SHPO Law and regulations, that the foregoing clauses (a) and (b) are satisfied. In addition, at any time, Landlord shall have the right to make alterations to the Dey Street Headhouse, allow construction to occur in the airspace over the Dey Street Headhouse, and/or permit new connections to be made between the Dey Street Concourse and adjacent buildings, so long as (A) Landlord fully compensates Tenant for any temporary or permanent loss of net revenues and loss of value suffered by Tenant by reason of such alterations, constructions or connections or the making thereof, including any such loss arising from (i) the removal of RMUs or Tenant Controlled Signage in the Dey Street Headhouse and/or Dey Street Concourse during such construction, (ii) the cost of replacing any such RMUs and Tenant Controlled Signage, including design, construction, installation and purchase costs, and (iii) foot traffic being diverted from the Dey Street Concourse or Dey Street Headhouse, (B) Landlord uses commercially reasonable efforts (i) to minimize interference with Tenant and any Subtenants during the performance of such work, and (ii) to keep the Dey Street Concourse free of debris, dirt, dust, trash, equipment, materials and other byproducts generated by such work, (C) in no event shall the Dey Street Concourse be closed at any time or for any period of time on account of such construction, and (D) if the Dey Street Headhouse is closed, such closure shall

be temporary and it shall be replaced by an entrance that is comparable in size and location to the Dey Street Headhouse.

29. *Interpretation, Execution, and Application of Lease.*

29.1 *Captions.* The captions of this Lease are for convenience and reference only. They in no way affect this Lease.

29.2 *Counterparts.* This Lease may be executed in counterparts.

29.3 *Delivery of Drafts.* Neither Party shall be bound by this Lease unless and until such Party shall have executed and delivered at least one counterpart of this Lease. The submission of drafts or comments on drafts shall bind neither Party in any way. Such drafts and comments shall not be considered in interpreting this Lease.

29.4 *Entire Agreement.* This Lease, together with the letter agreement between Landlord and Tenant executed on the Lease Execution Date, contains all understandings or agreements, oral or written, regarding their respective rights and obligations to each other regarding the Premises. The Parties have no other understandings or agreements, oral or written, about the Premises or Tenant's use or occupancy of, or any interest of Tenant in, the Premises.

29.5 *Governing Law.* This Lease, its interpretation and performance, the relationship between the Parties, and any disputes arising from or relating to any of the foregoing, shall be governed, construed, interpreted, and regulated under the laws of the State, without regard to principles of conflict of laws. The Parties agree that any state or federal district court located in the County of New York, State of New York shall have exclusive jurisdiction over any case or controversy arising from, under or in connection with this Lease and shall be the sole and exclusive forum in which to adjudicate any such dispute, except for any dispute that by the express terms of this Lease is to be resolved by Arbitration.

29.6 *Partial Invalidity.* If any term or provision of this Lease or its application to any Party or circumstance shall to any extent be invalid or unenforceable, then the remainder of this Lease, or the application of such term or provision to persons or circumstances except those as to which it is invalid or unenforceable, shall not be affected by such invalidity. All remaining provisions of this Lease shall be valid and be enforced to the fullest extent Law allows.

29.7 *Principles of Interpretation.* No inference in favor of or against any Party shall be drawn from the fact that such Party has drafted any part of this Lease. The Parties have both participated substantially in its negotiation, drafting, and revision, with advice from counsel and other advisers. A term defined in the singular may be used in the plural, and vice versa, all in accordance with ordinary principles of English grammar, which also govern all other language in this Lease. The words "include" and "including" shall be construed to be followed by the words: "without limitation." Each of the following terms shall be interpreted as if followed by the words "(or any part of it)" except where the context clearly requires otherwise: Base Building Equipment; Landlord Controlled Property; Fee Estate; Leasehold Estate; Premises; Non-Structural Components; Structural Components; Subtenant Improvements;

Tenant/Subtenant Equipment; Tenant/Subtenant FF&E, Tenant Controlled Signage and any other similar collective noun. Every reference to any document, including this Lease, refers to such document as Modified from time to time (except, at Landlord's option, any Modification that violates this Lease), and includes all exhibits, schedules, and riders to such document. The word "or" includes the word "and."

*29.8 Lobby Law Certification.* The Parties recognize that the entry into this Lease is subject to the New York State Finance Law Sections 139j and k (the "Lobbying Law"). Tenant hereby certifies that all information provided to Landlord with respect to the Lobbying Law is complete, true and accurate. Attached as **Exhibit X** is a copy of the Disclosure Statement and Proposer's Affirmation and Certification, in substantially the form completed on behalf of Tenant as part of the competitive bid process for this Lease. Landlord is authorized to terminate this Lease in the event such certification is found to be intentionally and materially false or incomplete by providing written notification to Tenant in accordance with the notice provisions of this Lease.

*[Signatures on Next Page.]*

**IN WITNESS WHEREOF,** Landlord and Tenant have executed this Lease on the Lease Execution Date.

**METROPOLITAN TRANSPORTATION AUTHORITY**

By:____________________________
Jeffrey B. Rosen
Director, Real Estate

**WESTFIELD FULTON CENTER LLC**
a Delaware limited liability company
By: Westfield Property Management LLC, its managing member

By: ____________________________
Peter R. Schwartz
Senior Executive Vice President and Secretary

NYCTA is signing below to evidence its agreement to be bound by Sections 5.1.7 and 5.2.4:

NEW YORK CITY TRANSIT AUTHORITY

By : Metropolitan Transportation Authority

By:________________________
Jeffrey B. Rosen
Director, Real Estate

Guarantor is signing below to evidence its agreement to make the representations and warranties made in Sections 16.1(c) and 16.2:

**WESTFIELD AMERICA LIMITED PARTNERSHIP,**
a Delaware limited partnership,
By: Westfield U.S. Holdings, LLC,
a Delaware limited liability company

By: ________________________
Peter R. Schwartz
Senior Executive Vice President and Secretary