UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                    :

NEW YORK CITY TRANSIT AUTHORITY,

                                    :     Civ. No.  24-cv-1123 (LGS)

                       Plaintiff,

                                      :

           - against -

                                      :

WESTFIELD FULTON CENTER LLC,        :

                       Defendant.     :
------------------------------------------------------------------ X

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

**INGRAM LLP**
150 East 42nd Street, 19th Floor
New York, New York  10017
(212) 907-9600

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ........................................................................................................ 1

A.    Background .................................................................................................................... 2

B.    Westfield's Intent To Cease Operations And Commit A
       Nonmonetary Default .................................................................................................... 5

C.    Relevant Lease Provisions ............................................................................................ 7

D.    Westfield's Cessation Of Operations And Termination Of The Lease
       Would Adversely Affect The Public Interest ................................................................ 8

ARGUMENT ............................................................................................................................. 9

THIS COURT SHOULD GRANT NYCTA A PRELIMINARY
INJUNCTION BECAUSE WESTFIELD HAS ANNOUNCED ITS
INTENTION TO COMMIT A NONMONETARY DEFAULT BY
CEASING OPERATIONS AND TERMINATING THE PARTIES'
LEASE AT FULTON CENTER ................................................................................................ 9

A.    NYCTA Is Likely To Succeed On The Merits .............................................................. 9

B.    NYCTA Is Likely To Suffer Irreparable Harm ............................................................ 13

C.    The Balance Of Hardships Tips Decidedly In NYCTA's Favor ................................... 15

D.    A Preliminary Injunction Will Serve The Public Interest ............................................. 16

E.    The Court Should Not Require NYCTA To Give Security
       Because Westfield Will Not Be Harmed By The Issuance
       Of A Preliminary Injunction ......................................................................................... 17

CONCLUSION .......................................................................................................................... 18

1003971_1/01500-0140

## <u>TABLE OF AUTHORITIES</u>

**Cases**

<b>Page(s)</b>

*Abdul Wali v. Coughlin,*
   754 F.2d 1015 (2d Cir. 1985) ........................................................................ 9

*Benihana, Inc. v. Benihana of Tokyo, LLC,*
   784 F.3d 887 (2d Cir. 2015) ................................................................. 15, 17

*Brook Bev., Inc. v. Pepsi-Cola Bottling Co. of N.Y.,*
   No. 20-cv-9275 (VSB), 2021 U.S. Dist. LEXIS 28558 (S.D.N.Y. Feb. 16, 2021) .... 14, 16

*Citibank, N.A. v. Nyland (CF8), Ltd.,*
   839 F.2d 93 (2d Cir. 1988) ..................................................................... 14

*Continental Cas. Co. v. Coastal Sav. Bank,*
   977 F.2d 734 (2d Cir. 1992) ................................................................... 12

*Doctor's Assocs. v. Stuart,*
   85 F.3d 975 (2d Cir. 1996) ..................................................................... 17

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.,*
   411 F.3d 384 (2d Cir. 2005) ................................................................... 12

*General Mills, Inc. v. Champion Petfoods USA, Inc.,*
   No. 20-CV-181 (KMK), 2020 U.S. Dist. LEXIS 32924 (S.D.N.Y. Feb. 26, 2020) ......... 17

*Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.,*
   441 F.Supp.2d 552 (S.D.N.Y. 2006) ......................................................... 17

*Maryland Cas. Co. v. Pac. Coal & Oil Co.,*
   312 U.S. 270 (1941) .......................................................................... 12

*New York v. Actavis PLC,*
   787 F.3d 638 (2d. Cir. 2015) ............................................................... 9, 13

*North Atl. Instruments, Inc. v. Haber,*
   188 F.3d 38 (2d Cir. 1999) ................................................................... 15

*Princes Point LLC v. Muss Dev. L.L.C.,*
   30 N.Y.3d 127 (2017) ....................................................................... 11

*Reuters, Ltd. v. United Press Int'l, Inc.,*
   903 F.2d 904 (2d Cir. 1990) ............................................................... 13, 15

*Rex Med. L.P. v. Angiotech Pharms. (US), Inc.,*
   754 F.Supp.2d 616 (S.D.N.Y. 2010) ..................................................... 11, 14, 16

1003971_1/01500-0140

**Rules**

Fed. R. Civ. P. 65 ...................................................................................................1

Fed. R. Civ. P. 65(c) ............................................................................................17

## PRELIMINARY STATEMENT

Plaintiff New York City Transit Authority ("NYCTA"), an affiliate of Metropolitan Transportation Authority ("MTA"), submits this memorandum of law in support of its motion, pursuant to Fed. R. Civ. P. 65, for a preliminary injunction enjoining defendant Westfield Fulton Center, LLC ("Westfield") from ceasing its operations and terminating its long-term lease with NYCTA for Premises at the Fulton Center transportation complex in Lower Manhattan.

As described below, Westfield personnel recently informed MTA of Westfield's intention to cease its operations at Fulton Center in telephone communications and in a letter sent to MTA's General Counsel on February 12, 2024. On February 15, 2024, NYCTA promptly commenced this diversity action asserting claims for anticipatory breach of the lease, declaratory judgment, and injunctive relief. NYCTA now moves for a preliminary injunction.

## STATEMENT OF FACTS

Facts and documents cited in this memorandum are set forth in (a) the accompanying Declaration of David Florio, MTA's Chief of Real Estate Transactions and Operations Officer, dated February 27, 2024 ("Florio Decl."), and (b) the accompanying declaration of NYCTA's counsel in this action, John G. Nicolich, dated February 28, 2024 ("Nicolich Decl."). Mr. Florio's Declaration includes as exhibits (a) NYCTA's Complaint in this action, (b) relevant portions of the parties' lengthy lease ("Lease"), and (c) a letter sent on behalf of Westfield to MTA dated February 12, 2024 (Florio Decl., Exhibits A through G). Mr. Nicolich's Declaration includes as exhibits certain publicly-available documents, including pages concerning the Fulton Center and Westfield that were obtained from websites maintained by Unibail-Rodamco-Westfield, which controls Westfield (Nicolich Decl., Exhibits A through C). All capitalized terms not defined in this memorandum have the meanings ascribed to them in the Lease.

A.   **Background**

This case arises out of a long-term written lease agreement for the Fulton Center between MTA and Westfield dated as of May 16, 2014 (Florio Decl., Exhibit B, p. 1).  MTA transferred its interest in Premises at the Fulton Center to NYCTA in a deed dated June 17, 2015 (Florio Decl., Exhibit F).

The New York Times gave a glowing review about the Fulton Center when it first opened in late 2014, reporting that "more than a decade after part of the Lower Manhattan subway complex was destroyed in the Sept. 11, 2001 terrorist attacks, the nine subway lines that converge on Fulton Street and Broadway have been knit together anew.  New Yorkers, accustomed to thinking of transit hubs like Penn Station and Times Square as places to suffer through, will find on Monday morning a kind of Crystal Palace, crowned by a dome that funnels daylight two stories below ground."  Vivian Yee, *Out of Dust and Debris, a New Jewel Rises*, N.Y. TIMES, Nov, 9, 2014 (Nicolich Decl., Exhibit C), also available at https://www.nytimes.com/2014/11/10/nyregion/fulton-center-a-subway-complex-reopens-in-lower-manhattan.html/.  The New York Times article also reported that, as part of the new construction, the builders "encircled the central hub with shops and kiosks" (*id.*).

Unibail-Rodamco-Westfield ("URW"), which controls Westfield, touts that today the Fulton Transit Center "bring[s] 10 subway lines together under one dramatic atrium," serves "a diverse market of commuters, residents, and tourists," "features 60,000 square feet of commercial space and more than 50 LED screens for brand opportunities and live transit information," and is the "6th Busiest NYC transit station," having "30,000 Daily visitors" (Nicolich Decl., Exhibit A).

2

URW also states on its website that the URW "Group" is an "operator of high-quality real estate assets in the most dynamic cities in Europe and the United States and that the URW Group "operates 72 shopping centres … including 38 *which carry the iconic Westfield brand*" (Nicolich Decl., Exhibit B, emphasis added).  URW also proclaims that its centres "provide a unique platform for retailers and brands to connect with consumers," and that URW has an agenda that "strives to make a positive environmental, social and economic impact on the cities and communities where URW operates" (*id.*).

NYCTA commenced this action for declaratory judgment, anticipatory breach of contract, and injunctive relief because, as described in more detail below, a representative of Westfield, Diana Grasso, recently informed MTA personnel that Westfield intends to cease performing its obligations under the Lease, many years before expiration of the Initial Term. Westfield also confirmed its intention to cease its operations and surrender the Premises at Fulton Center in a letter dated February 12, 2024 from Hyura Choi, counsel acting on behalf of Westfield, to Paige Graves, MTA's General Counsel (Florio Decl., Exhibit G).  Westfield therefore effectively seeks to terminate its Lease with NYCTA and the Lease's various provisions described below that require Westfield to manage and operate the Premises, pay for various operating expenses and capital expenditures, and pay portions of its revenues to NYCTA.

Under Section 2.2 of the Lease, the Initial Term was to be at least 20 years "*unless terminated sooner in accordance with the provisions of this Lease*" (Florio Decl., Exhibit D, p. 29, § 2.2, emphasis added).  The Lease is to be governed and construed under New York law (*id.*, Exhibit E, p. 100, § 29.5).

The Lease includes provisions that require Westfield to:

(a)     pay NYCTA Signage Participation Rent resulting from Signage Revenues received by Westfield (*id.*, Exhibit D, pp. 32-34, § 4.1);

(b)     sublet portions of the Premises to Subtenants and pay Participation Rent to NYCTA calculated from Commercial Revenues, as described in Lease Section 4.2 (*id.*, p. 34);

(c)     pay NYCTA Sponsorship Participation Rent resulting from Sponsorship Revenues (*id.*, pp. 34-35, § 4.3);

(d)     pay for Ongoing Capital Expenditures incurred in connection with Westfield's performance of Tenant's obligations and exercising its rights under the Lease at the Fulton Center, including (with certain exclusions) (i) leasing commissions, (ii) allowances paid to Subtenants for Subtenant Improvements or expended by Westfield itself in constructing such Improvements, and (iii) expenditures for capital repairs or replacements of Base Building Equipment or other elements of the Premises, and costs to "keep, repair and maintain" and clean specified improvements or areas at Fulton Center, including Periodic Service, as described in the Lease's definitions of Ongoing Capital Expenditures and provisions of Lease Section 7.1 (*id.*, Exhibit C, pp. 16-17; *id.*, Exhibit E, pp. 49-54);

(e)     pay for certain charges for utility services provided at Fulton Center (*id.*, Exhibit E, p. 57, § 7.3); and

(f)     "except as expressly provided in this Lease, … pay any and all expenses, costs, obligations and charges whatsoever which shall arise, be incurred or become due during the Term with respect to or in connection with the improvement, operation, management, maintenance and repair of the Premises" (*id.*, p. 97, § 27.3).

4

As described below, Westfield effectively acknowledged in the Lease that its unauthorized cessation of operations and termination of the Lease would cause NYCTA irreparable injury for which damages are an inadequate remedy, therefore supporting NYCTA's motion for a preliminary injunction to enjoin Westfield from ceasing its operations and terminating the Lease at Fulton Center.

**B.**      **Westfield's Intent To Cease Operations And Commit A Nonmonetary Default**

In connection with Westfield's Lease for Fulton Center, Mr. Florio of MTA has had dealings with Diana Grasso, a representative of Westfield who is a Vice President of URW (Florio Decl., ¶ 4).

In a telephone conversation in early January, 2024, Ms. Grasso informed Mr. Florio that Westfield wanted out of the Lease because the Fulton Center did not "work for" Westfield any longer.  Mr. Florio told Ms. Grasso that he would get back to her after discussing Westfield's desire to exit the Lease with MTA senior management.  Contrary to a statement in the February 12, 2024 letter from Ms. Choi (who was not a party to Mr. Florio's call with Ms. Grasso), Mr. Florio did not then assure Ms. Grasso that "a proposal regarding a surrender would be promptly conveyed" from MTA (Florio Decl., ¶ 5).

After a series of internal discussions amongst MTA and NYCTA personnel, Mr. Florio advised Ms. Grasso on February 8, 2024 that NYCTA would not agree to a termination of the Lease but that MTA would work with Westfield to address Westfield's operational concerns.  Mr. Florio also indicated to Ms. Grasso that MTA and NYCTA were willing to work with Westfield to address its concerns and amend the Lease, with the prospect of providing Westfield with greater control of the environment to improve the retail center.  Ms. Grasso responded that she would be back to Mr. Florio in a week or two (Florio Decl., ¶ 5).

5

Ms. Grasso, instead, on February 9, 2024, asked Mr. Florio for a call that afternoon.  In that telephone conversation, Ms. Grasso again informed Mr. Florio that Westfield wanted out of the Lease.  Also in that conversation, Ms. Grasso stated that Westfield planned to stop operating Fulton Center, and that there was no circumstance under which Westfield would remain as the Tenant for the remainder of the Term because Westfield did not want to operate Fulton Center for another 13 years (Florio Decl., ¶ 6).

Ms. Choi's letter dated February 12, 2024 states, among other things, that Westfield's "current situation is financially unsustainable, and Westfield is no longer in a position to be able to operate its Premises at Fulton Center," that the "unprecedented global pandemic and macro political and economic environment continue to directly impact the significant financial and operational difficulties Westfield faces," that "we are no longer able to maintain a commercially viable product at Fulton Center," and that "Westfield will be forced to protect its interests by ceasing its operations at Fulton Center" (Florio Decl., Exhibit G).  Ms. Choi's letter also states that, based on the conversation between Mr. Florio and Ms. Grasso on February 9, 2024, Westfield is "expecting a termination proposal from MTA this week" (*id.*).  Contrary to that statement, Mr. Florio had advised Ms. Grasso only that he would advise MTA management of her communications that Westfield desired to exit the Lease.  No promise was made that the MTA would agree to the proposal, nor did Mr. Florio imply as such (Florio Decl., ¶ 7).

In short, Ms. Grasso and Ms. Choi have announced Westfield's intent to cease its operations at Fulton Center and to terminate the Lease many years before the end of the Initial Term.  As described below, such cessation of operations and termination would be a Nonmonetary Default as defined in the Lease.  The Lease also provides that damages would not be an adequate remedy for any Nonmonetary Default, thereby providing NYCTA the right to

6

injunctive relief enjoining Westfield's threatened cessation of operations and termination of the Lease.

Described below are certain Lease provisions and other facts that are relevant to this matter and that provide NYCTA a right to injunctive relief against Westfield.

## C.   <u>Relevant Lease Provisions</u>

Section 15.9 of the Lease provides in full as follows (Florio Decl., Exhibit E, p. 83):

> *Continuation of Lease.  Except as this Lease expressly provides, this Lease shall not terminate*, be forfeited, or be affected in any other manner, and Tenant waives any right to quit or surrender the Premises or any part of the Premises, because of any Loss or any resulting untenantability.  *Unless and until this Lease has been validly terminated, Tenant's obligations under this Lease, including the obligation to pay Rent, shall continue unabated.* (Emphasis added.)

Westfield therefore may terminate the Lease only "as this Lease expressly provides," but Westfield has not identified – and cannot identify – any Lease provision that would allow Westfield to prematurely terminate its Lease obligations.

More specifically, although the Lease provides that Westfield may terminate the Lease concerning matters related to "Offset Eligible Replacements" (*id.*, pp. 54-55, § 7.1.4(d)), "Material Structural Failure" (*id.*, p. 56, § 7.2.1), and "Casualty Termination" (*id.*, p. 81, § 15.2), none of those provisions applies to Westfield's circumstances that were described to Mr. Florio by Ms. Grasso or that were identified in Ms. Choi's letter dated February 12, 2024.  Accordingly, to the extent that Ms. Choi's letter suggests that NYCTA may be in breach of certain of its responsibilities under the Lease, Westfield's remedy would be a claim for damages, not termination of the Lease.

Also, the Lease defines "Nonmonetary Default" to include Tenant's "failure to comply with any affirmative or negative covenant or obligation of this Lease, except a Monetary

Default" (Florio Decl., Exhibit C, p. 16).  Because Westfield has not proposed to terminate the Lease on any ground that "this Lease expressly provides" (*id.*, Exhibit E, p. 83, § 15.9), Westfield's threatened cessation of its operations and termination of the Lease therefore would constitute a Nonmonetary Default, and NYCTA has a likelihood of success on the merits of its claim against Westfield.

Moreover, Lease Section 22.1.14, titled "*Injunction of Breaches*," expressly provides that "Whether or not an Event of Default has occurred, Landlord may obtain a court order enjoining Tenant from continuing any Default *or from committing any threatened breach or Default.* Tenant specifically and expressly acknowledges that *damages would not constitute an adequate remedy* for any Nonmonetary Default" (*id.*, p. 88, emphasis added).

D.   **Westfield's Cessation Of Operations And Termination Of The Lease Would Adversely Affect The Public Interest**

Section 5.1 of the Lease provides for Westfield to operate Fulton Center for "Permitted Retail Use" – i.e., "high quality, lawful retail stores, food service establishments and/or restaurants (selling food and beverages for on and/or off Premises consumption) and for no other purposes" (Florio Decl., Exhibit D, p. 40).  Westfield's cessation of operations therefore would cause NYCTA to lose an established, internationally-experienced operator and manager for the Fulton Center.  Moreover, URW proclaims on its website that it operates 38 centres "which carry the iconic Westfield brand," and that (a) its centres "provide a unique platform for retailers and brands to connect with consumers," and (b) URW has an agenda that "strives to make a positive environmental, social and economic impact on the cities and communities where URW operates" (Nicolich Decl., Exhibit B, p. 1).

Westfield's unauthorized cessation of operations and termination of the Lease not only would adversely affect retail establishments at Fulton Center that currently are Westfield

Subtenants, but the loss of the "iconic Westfield brand" also would impede the subleasing of retail space at Fulton Center that currently is vacant.  Westfield's improper cessation of operations and termination of the Lease similarly would adversely impact members of the transit public who are customers of these retail outlets or otherwise use Fulton Center, and also would impair the goodwill that NYCTA has developed with the public by having made these retail establishments available to transit users.  *See* Nicolich Decl., Exhibit A (Westfield touting that Fulton Center serves "a diverse market of commuters, residents, and tourists," "features 60,000 square feet of commercial space" and more than 50 LED screens for "live transit information," and has 30,000 daily visitors).

## ARGUMENT

### THIS COURT SHOULD GRANT NYCTA A PRELIMINARY INJUNCTION BECAUSE WESTFIELD HAS ANNOUNCED ITS INTENTION TO COMMIT A NONMONETARY DEFAULT BY CEASING OPERATIONS AND TERMINATING THE PARTIES' LEASE AT FULTON CENTER

"A party seeking a preliminary injunction must ordinarily establish (1) 'irreparable harm'; (2) 'either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party'; and (3) 'that a preliminary injunction is in the public interest.'"  *New York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (citation omitted).

### A.    NYCTA Is Likely To Succeed On The Merits

In establishing a likelihood of success on the merits, "[a] movant … need not show that success is an absolute certainty.  He need only make a showing that the probability of his prevailing is better than fifty percent.  There may remain considerable room for doubt." *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985).

NYCTA demonstrates a better than fifty percent likelihood of success on its first, second, and third causes of action for anticipatory repudiation, declaratory judgment, and injunctive relief, which all arise from Westfield's stated intention to cease operations at the Fulton Center and terminate the Lease.

As noted above, Section 15.9 of the Lease prohibits Westfield from terminating the Lease "[e]xcept as this Lease expressly provides" (Florio Decl., Exhibit E, p. 83).  But as described above in the Statement of Facts, none of the three Lease provisions that permit Westfield to terminate the Lease applies to Westfield's circumstances.  And Westfield has not otherwise identified, nor can Westfield identify, any Lease provision that would allow Westfield to prematurely terminate its Lease obligations at this time.

Ms. Choi's February 12, 2024 letter states, among other things, that Westfield's "current situation is financially unsustainable, and Westfield is no longer in a position to be able to operate its Premises at Fulton Center," that the "unprecedented global pandemic and macro political and economic environment continue to directly impact the significant financial and operational difficulties Westfield faces," that "we are no longer able to maintain a commercially viable product at Fulton Center," and that "Westfield will be forced to protect its interests by ceasing its operations at Fulton Center" (Florio Decl., Exhibit G).

As explained above, the Lease provides only a few limited grounds for termination – and does not expressly permit any of the reasons identified by Ms. Grasso or Ms. Choi as a ground for termination.  A contracting party's "buyer's remorse" is not a basis for termination.  Pursuant to Lease Section 15.9, the Lease must "not terminate, be forfeited, or be affected in any other manner" because Westfield has "waive[d] any right to quit or surrender the Premises or any part of the Premises" and its "obligations under this Lease, including the obligation to pay Rent, shall

10

continue unabated" (Florio Decl., Exhibit E, p. 83).  *See Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F.Supp.2d 616, 625 (S.D.N.Y. 2010) (granting preliminary injunction against defendant because agreement "sets out specific conditions under which [defendant] can unilaterally terminate the Agreement" and pursuant to the "familiar rule of contract construction, those reasons are the ONLY reasons why [defendant] can unilaterally terminate the Agreement").

NYCTA therefore is likely to succeed on the merits of its anticipatory repudiation claim under the Lease, which is governed by New York law (Florio Decl., Exhibit E, p. 100, § 29.5). "'An anticipatory breach of contract by a promisor is a repudiation of [a] contractual duty before the time fixed in the contract for ... performance has arrived.'"  *Princes Point LLC v. Muss Dev. L.L.C.*, 30 N.Y.3d 127, 133 (2017) (citations omitted).  The repudiation "'can be either a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach or a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.'" *Id.* (citation omitted).  A "'positive and unequivocal'" expression of intent not to perform is required for the anticipatory repudiation to be determined to have occurred.  *Id.* (citation omitted).

Ms. Choi's February 12, 2024 letter positively and unequivocally expressed Westfield's intent to repudiate its obligations under the Lease.  Such expressions of intent are manifest in statements such as the following (Florio Decl., Exhibit G):

- "Westfield is no longer in a position to be able to operate its Premises at Fulton Center";

- "we are no longer able to maintain a commercially viable project at Fulton Center"; and

- "if a negotiated surrender is not completed as soon as possible, Westfield will be forced to protect its interests by ceasing its operations at Fulton Center."

These statements confirming Westfield's intention to cease operations and terminate the Lease for Fulton Center are unequivocal, which would be a Nonmonetary Default under the Lease – *i.e.*, Tenant's "failure to comply with any affirmative or negative covenant or obligation of this Lease, except a Monetary Default" (Florio Decl., Exhibit C, p. 16).

For these same reasons, NYCTA is likely to succeed on the merits of its declaratory judgment claim.  The matter is ripe for adjudication by a declaratory judgment.  "The standard for ripeness in a declaratory judgment action is that 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"  *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 388 (2d Cir. 2005) (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).  In the Second Circuit, "a court must entertain a declaratory judgment action: (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.  If either prong is met, the action must be entertained." *Continental Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992) (citation omitted).

Here, a substantial controversy exists between the parties over whether Westfield is wrongfully attempting to cease operations at Fulton Center and terminate the Lease more than ten years before its end date.  Moreover, Westfield is not just a single tenant occupying a small portion of the Fulton Center – Westfield is leasing the entire Premises and is subleasing portions

of the Premises to Subtenants, is managing revenue-raising activities at the Fulton Center, and is in charge of repair and maintenance of certain aspects of the Premises.  Westfield's abandonment of its responsibilities at Fulton Center accordingly would lead to drastic consequences for Fulton Center and NYCTA, the Subtenants, and the retail public.  The controversy is sufficiently immediate and real based on Westfield's stated intention of "ceasing its operations at Fulton Center" (Florio Decl., Exhibit G).

A declaratory judgment in this action will clarify and settle the dispute concerning whether Westfield is wrongfully attempting to cease its operations and terminate the Lease.  Alternatively, a declaratory judgment will provide relief from the uncertainty, insecurity, and controversy resulting from Westfield's expressed intention to cease operations and terminate the Lease.

At a minimum, NYCTA has presented sufficiently serious questions going to the merits of its claims to make them a fair ground for litigation.

**B.**    **NYCTA Is Likely To Suffer Irreparable Harm**

Irreparable harm is "'the single most important prerequisite for the issuance of a preliminary injunction.'"  *Reuters, Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) (citation omitted).  "Irreparable harm is 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'"  *New York v. Actavis*, 787 F.3d at 660  (citation omitted).

As URW touts on its website, "Fulton Center features 60,000 square feet of commercial space and more than 50 LED screens for brand opportunities and live transit information" (Nicolich Decl., Exhibit A).  Fulton Center is a "transit and retail hub in Lower Manhattan bringing 10 subway lines together" and is the "6th Busiest NYC transit station" with "30,000

13

daily visitors" (*id*.).  And the Lease obligates Westfield to attract "high quality, lawful retail stores, food service establishments and/or restaurants" at such hub in accordance with a "Retail Standard" that is of a "quality commensurate with the standards of the retail portions of other high quality transportation-oriented retail facilities in Manhattan, such as the retail portions of Rockefeller Center, Grand Central Terminal, and JFK International Airport Terminal 8" (*id.*, Exhibit D, p. 40, § 5.1).  Westfield also is uniquely positioned to attract and retain such high quality retail establishments by virtue of its "iconic Westfield brand" (Nicolich Decl., Exhibit B).

Westfield's premature departure and the ensuing confusion in the rental market at Fulton Center will make it difficult to keep or attract such high quality Subtenants.  *See Citibank, N.A. v. Nyland (CF8), Ltd*., 839 F.2d 93, 97 (2d Cir. 1988)* (finding irreparable harm to property's marketability and value where confusion in rental market created by having two leasing agents would cause "both current and prospective tenants [to] be negatively influenced in their decisions concerning whether to begin or renew tenancies").  Westfield's proposed cessation of its operations under the "iconic Westfield brand" also devalues the Fulton Center in the eyes of the public, destroying goodwill that NYCTA has developed by making retail spaces at Fulton Cetner available to the public.  *Brook Bev., Inc. v. Pepsi-Cola Bottling Co. of N.Y.*, No. 20-cv-9275 (VSB), 2021 U.S. Dist. LEXIS 28558, at *20 (S.D.N.Y. Feb. 16, 2021) (Appendix A hereto) (granting preliminary injunction where defendant's termination of distributorship agreement would cause plaintiff to "lose its professional relationships with its customers and its standing in the beverage distribution community" which threatened "'the very viability of the plaintiff's business'"); *Rex Med. L.P.,* 754 F.Supp.2d at 625 (finding irreparable harm if defendant terminated exclusive license and distributorship agreement even if plaintiff "will eventually find an alternative distributor" because "customers will resort to competing products

to fill their needs" and may "refuse to return to [plaintiff], because of [plaintiff's] lack of dependability").

Moreover, in recognition of such irreparable harm resulting from its cessation of operations and unauthorized termination of the Lease, Westfield "specifically and expressly acknowledge[d]" in Section 22.1.14 of the Lease "that damages would not constitute an adequate remedy for any Nonmonetary Default" and that "[w]hether or not an Event of Default has occurred, Landlord may obtain a court order enjoining Tenant from continuing any Default or from committing any threatened breach of Default" (Florio Decl., Exhibit E, p. 91).   Under Second Circuit precedent, "an 'irreparable harm' provision in the parties' agreement, while not controlling, is 'relevant evidence that can help support a finding of irreparable injury.'" *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 896 (2d Cir. 2015) (citation omitted); *North Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (finding irreparable injury where defendant acknowledged in agreement that breach of confidentiality clause would cause plaintiff "irreparable injury").

## C.     **The Balance Of Hardships Tips Decidedly In NYCTA's Favor**

The balance of hardships tips in NYCTA's favor.  All that NYCTA is now requesting is the issuance of a preliminary injunction to preserve the status quo and to require Westfield to abide by its contractual obligations.  *Reuters*, 903 F.2d at 909 (finding balance of hardships in favor of plaintiff because "Reuters need do only what it has done for the past five years – provide UPI with newspictures").  Westfield, which voluntarily entered into the Lease, is asking to be released from its obligations under the Lease because it contends that Fulton Center is "no longer … a commercially viable project" (Florio Decl., Exhibit G).  Although Westfield may realize with the benefit of hindsight that the Lease is not as profitable as Westfield may have

anticipated, "that realization does not relieve [Westfield] of its obligations under the [Lease]."

*Rex Med. L.P.*, 754 F.Supp.2d at 625.

    *Rex Med. L.P.* concerned defendant's attempt to terminate an agreement that granted defendant the exclusive license and right to distribute plaintiff's medical device, known as "Option."  Two years into the contract, defendant communicated to plaintiff that defendant was terminating the agreement on grounds not expressly permitted under the agreement, but citing as reasons that it could "'see no pathway for [defendant] to derive any meaningful economic return on Option'" and that "'the product is not financially viable … under the current contractual relationship.'"  *Id.* at 618.  In a decision granting plaintiff's motion for a preliminary injunction, the Court found the balance of hardships favored plaintiff and stated (*id.* at 625):

> The Agreement's unprofitability for [defendant] does not mean that [plaintiff] should suffer irreparable harm to reduce [defendant]'s losses from performance of its contractual obligations.  In essence, by entering into the Agreement, in exchange for the intended benefits of distributing Option, [defendant] assumed the risk that the distribution of Option would be unprofitable and expressly agreed that [plaintiff] would be entitled to seek "injunctive relief so as to maintain the status quo."

    Similarly, Westfield not only assumed the risks of the matters that now lead Westfield to want to cease its operations at Fulton Center, but also expressly agreed that NYCTA would be entitled to injunctive relief in the event of such a Nonmonetary Default (Florio Decl., Exhibit E, p. 91, § 22.1.14).

**D.**    **A Preliminary Injunction Will Serve The Public Interest**

    The public interest also favors entry of a preliminary injunction against Westfield's cessation of its operations at Fulton Center and termination of the Lease.  "If anything, the public interest weighs in favor of ensuring that [Westfield] does not terminate or breach the valid [Lease]."  *Brook Bev., Inc.*, 2021 U.S. Dist. LEXIS 28558, at *22 (Appendix A hereto).  "[T]he

public interest here is served by the enforcement of the parties' lawful agreement." *Benihana, Inc*., 784 F.3d at 897; *General Mills, Inc. v. Champion Petfoods USA, Inc*., No. 20-CV-181 (KMK), 2020 U.S. Dist. LEXIS 32924, at *12 (S.D.N.Y. Feb. 26, 2020)* (Appendix B hereto) ("Courts routinely hold there is undoubtedly a public interest in enforcing valid contracts").

Here, the interest of Subtenants and transit users are also served by ensuring that Westfield does not abandon its contractual obligations to operate and manage the Fulton Center. Westfield's decision to cease operations and terminate the Lease affects not only the Lease with NYCTA, but also Subtenants who have Subleases with Westfield and transit users who may lose the quality of retail experience to which they have become accustomed at the Fulton Center.

**E.    The Court Should Not Require NYCTA To Give Security Because
        Westfield Will Not Be Harmed By The Issuance Of A Preliminary Injunction**

Fed. R. Civ. P. 65(c) provides for the movant to give security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Rule 65(c) gives the district court "'wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm ....'" *Doctor's Assocs. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (citation omitted).  "[T]he burden is on the party seeking security to establish a rational basis for the amount of the proposed bond." *Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd*., 441 F.Supp.2d 552, 566 (S.D.N.Y. 2006).

Westfield is unlikely to suffer harm absent NYCTA's posting of a bond.  A preliminary injunction will require only that Westfield abide by its contract and perform the same obligations Westfield has been performing for the past decade.  Because Westfield will suffer no harm by preserving the status quo, the Court should not require a bond from NYCTA.

17

## CONCLUSION

For the foregoing reasons, NYCTA respectfully requests that this Court grant its motion

for a preliminary injunction enjoining Westfield from ceasing its operations and terminating the

Lease for Fulton Center.

Dated: New York, New York
       February 28, 2024

                    **INGRAM LLP**
                    *Attorneys for Plaintiff*
                    *New York City Transit Authority*

By:                              
                  John G. Nicolich
                  Daniel L. Carroll
                  Mioko C. Tajika
          150 East 42nd Street, 19th Floor
          New York, NY  10017
          Tel: (212) 907-9600
          jnicolich@ingramllp.com
          dcarroll@ingramllp.com
          mtajika@ingramllp.com