**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NEW YORK CITY TRANSIT AUTHORITY,

                     Plaintiff,

          v.

WESTFIELD FULTON CENTER LLC,

                     Defendant.

Civil Case No. 24-cv-1123 (LGS)

**WESTFIELD FULTON CENTER LLC'S**
**COUNTERCLAIMS AND ANSWER**

       Defendant Westfield Fulton Center, LLC ("Westfield"), by and through its attorneys Blank Rome LLP, hereby brings its counterclaims against Plaintiff New York City Transit Authority ("NYCTA") and answers the Complaint, dated February 16, 2024 (the "Complaint"), as follows:

<strong>NATURE OF THE COUNTERCLAIMS</strong>

       1.     This dispute arises from an irreconcilable breakdown of the relationship between Metropolitan Transportation Authority ("MTA") and NYCTA[1] as the landlord and Westfield as the tenant, caused by MTA's decade-long refusal to work cooperatively with Westfield concerning the Fulton Transit Center.[2]

       2.     Underscoring the chasm between the parties is MTA's defective construction of the Fulton Transit Center at the very outset and refusal to compensate Westfield for remediating MTA's faulty work. MTA initially ran to the courthouse, forcing Westfield to compel an arbitration to resolve the construction issues, as required by their Lease. Six years later and following confirmation of the arbitrator's award of $13,267,186 (and attorneys' fees) to a judgment

---

[1] For purposes of this pleading, Westfield uses the terms, "MTA" and "NYCTA" interchangeably as NYCTA is the successor-in-interest to MTA, which was the original entity under the Lease.

[2] All capitalized terms not otherwise defined herein have the meaning ascribed to them in the parties' lease dated on or about May 16, 2014 (the "Lease"). (*See* ECF No. 1-1).

for Westfield and against MTA and NYCTA, jointly and severally ("Judgment"), Westfield continued to reach out to NYCTA to negotiate a mutually agreeable resolution.

3.      Rather than engaging with Westfield for alternative resolutions or paying the Judgment and correcting the construction defects that it has been ordered to correct, NYCTA has once again rushed to the courthouse.

4.      This time, the action against Westfield is a veiled attempt to detract from NYCTA's own persistent refusal to address the ongoing and continuous incidents of theft, assaults, and fire that plague the Fulton Transit Center. As a result of total disengagement by NYCTA to address these safety and security issues, the conditions at the Fulton Transit Center have deteriorated.

5.      The rate of subtenant vacancies is at an all-time high. Few businesses want to open and operate a store where their employees and customers regularly would experience theft, property damage, bodily harm, or threats thereof.

6.      Despite hundreds of emails, letters, and reports from Westfield, as well as meetings between NYCTA and Westfield that included other stakeholders, including the NYPD, the Mayor's office, and other New York City authorities, NYCTA refused to take responsibility or work with Westfield to remedy NYCTA's breach. As a result of this complete breakdown in the parties' relationship and NYCTA shirking its contractual obligations, Westfield was forced to begin discussions regarding a surrender and assignment of its management obligations.

7.      After discussing a specific third-party operator that NYCTA believed could seamlessly step into Westfield's role at Fulton Transit Center, and therefore, appearing receptive to Westfield's request, NYCTA instead filed this premature lawsuit.

8.      The status quo is a far cry from the commercial and civic partnership that Westfield envisioned when it first entered into its agreement with NYCTA to manage and operate the

subtenant retail component of Fulton Transit Center. Westfield had believed they shared the same goal: to create a "high quality" retail and transportation center befitting a great civic space. However, as detailed here, MTA and NYCTA were never interested in meeting their end of that 'partnership.' NYCTA and Westfield's relationship has deteriorated beyond repair.

9.      NYCTA's retaliatory tactics and outright breach of the Lease has damaged and continues to damage Westfield.

## PARTIES

10.      Defendant and Counterclaim-Plaintiff Westfield Fulton Center, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 2049 Century Park East, 42nd Floor, Los Angeles, California 90067.

11.      Upon information and belief, Plaintiff and Counterclaim-Defendant NYCTA is a public benefit corporation organized under the laws of the State of New York, with its principal place of business at 2 Broadway, New York, New York 10004.

## JURISDICTION

12.      The amount in controversy on Westfield's counterclaims, exclusive of interest and costs, exceeds the sum of $75,000.

13.      Upon information and belief, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

14.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because NYCTA resides in the State of New York and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

**I.      The Construction Deficiencies at Fulton Transit Center**

15.      MTA, NYCTA's predecessor-in-interest, was responsible for constructing the building known as Fulton Transit Center before delivering certain retail portions of the same ("Premises") to Westfield.

16.      Once Westfield came into possession of the Premises, it realized that much of the work that was required to be performed by MTA/NYCTA prior to the delivery of the Commercial Usage Areas was incomplete and/or defective.

17.      These construction deficiencies at Fulton Transit Center included, *inter alia*, (i) the failure to install employee restrooms for Fulton Transit Center's food service subtenants, (ii) doorways and subtenant spaces that did not comply with fire code, (iii) misrepresented floor plans, (iv) failure to pour over a foot of concrete floor fill, (v) a deteriorating building facade, and (vi) failure to install a subtenant service elevator.

18.      Despite the "Target Opening Date" in 2014, NYCTA continued its construction work at Fulton Transit Center well into 2016. NYCTA strung Westfield along in a multi-year process of weekly or bi-weekly work inspections without any identifiable completion date.

19.      In order to meet Westfield's occupancy deadlines with its subtenants, and in order to prevent a further delay of the opening of Fulton Transit Center, which included a transportation hub that was much needed by Lower Manhattan, Westfield was forced to complete the construction work that should have been performed properly by NYCTA.

**II.     NYCTA's First Litigation Against Westfield as an Attempt to Avoid Its Responsibilities at Fulton Transit Center**

20.      On May 8, 2018, Westfield sent notice to NYCTA, pursuant to Lease section 20.2, setting forth several issues at Fulton Transit Center, including: (i) Westfield's construction-based

claims, (ii) Westfield's demand for a reduction of the Participation Rent otherwise payable to NYCTA, and (iii) Westfield's safety and security concerns at Fulton Transit Center. (A copy of Westfield's May 8, 2018 letter is attached hereto as **Exhibit A**.)

21.     Rather than engage with Westfield to resolve the issues raised in Westfield's letter, NYCTA rushed to court and initiated an action in the United States District Court for the Southern District of New York (the "First SDNY Action"). *See* Case No. 1:18-cv-11898 (VSB). Ignoring Westfield's construction, safety, and security concerns, the First SDNY Action only addressed the issue of Participation Rent.

22.     In response to NYCTA's filing, Westfield informed NYCTA that it intended to file a motion to dismiss the First SDNY Action based on the Lease's arbitration provision, which requires arbitration of disputes concerning "Substantial Completion" and "Final Completion" of the Premises. Ultimately, NYCTA stipulated to dismiss the First SDNY Action on January 29, 2021.

23.     On February 16, 2021, Westfield initiated an arbitration against NYCTA and MTA with the American Arbitration Association (the "Arbitration"), seeking damages for the construction deficiencies at Fulton Transit Center and NYCTA and MTA's breach of the Lease.

24.     Despite multiple motions by NYCTA and MTA to stay the Arbitration and, thereafter, to renew and reargue and appeal each denial to stay, the New York State courts confirmed that Westfield's claims were properly raised in the Arbitration.

**III.    Westfield Prevails in Arbitration and Obtains $13,267,186.53 Judgment and Attorneys' Fees Against NYCTA and MTA**

25.     After seven days of arbitration and voluminous post-hearing briefs, the arbitrator issued a 51-page decision on August 2, 2022 (the "Partial Final Award"). (A copy of the Partial Final Award is attached hereto as **Exhibit B**.)

26.     In the Partial Final Award, the arbitrator granted Westfield relief on each of the nine construction related claims and found, *inter alia*:

- "MTA did not diligently pursue Substantial Completion and Final Completion of Landlord's Work;"

- "[T]he construction carried out by MTA was defective and incomplete in several material respects, with the result that the Premises, as turned over to Westfield, were rife with defects rendering the large portions of the Premises unfit for use and occupancy in accordance with the Retail Standard specified in Section 5.1 of the Lease";

- "Westfield sustained substantial losses as result of MTA's breaches of its construction-related obligations;"

- "MTA breached the implied covenant of good faith and fair dealing by failing and refusing to take prompt and effective remedial action with respect to the construction and design defects that are the subject of Westfield's claims;"

- "[Westfield's] understanding [that MTA would remediate the construction issues] would be all the more reasonable in light of the parties' mutual interest in generating revenue which they might share pursuant to the Participation Rent provisions set forth in Article 4 of the Lease."

(*See* Partial Final Award, Ex. B, pgs. 8, 27-29).

27.     Thereafter, the arbitrator issued a decision, granting Westfield its attorneys' fees in the Arbitration (the "Final Award" and together with the Partial Final Award, the "Arbitration Award").

28.     On February 17, 2023, Justice Joel M. Cohen of the Supreme Court of the State of New York, New York County, denied MTA and NYCTA's motion to vacate the Arbitration Award and granted Westfield's cross-motion to confirm.

29.     On August 4, 2023, the Clerk of Court for the Supreme Court of the State of New York, New York County, entered judgment against NYCTA and MTA, jointly and severally, and

in favor of Westfield for $13,267,186.58, plus post-judgment interest accruing at 3% per annum. (A copy of the Judgment is attached hereto as **Exhibit C**.)

30.     NYCTA and MTA appealed the Judgment and have yet to perfect their appeal in the Appellate Division, First Department, having sought several extensions within which to perfect. Rather than satisfying its obligations under the Lease and working with Westfield to resolve the dispute amicably, NYCTA spent six years (and counting) and millions of tax dollars and public resources to prolong an unnecessary litigation.

31.     By avoiding and delaying payment of the Judgment, NYCTA and MTA also prolong several construction and accessibility issues for which they were adjudged responsible at Fulton Transit Center.

32.     The Judgment provides that NYCTA and MTA are obligated to remedy the "terracotta and brownstone cracks, terracotta spalls, brownstone delamination, cracked brownstone transom bars, open joints between terracotta/brownstone units, and cracked brick units" at the historic Corbin Building adjoining Fulton Transit Center. *See* Ex. B pg. 50. To date, NYCTA has done nothing to repair these structural issues.

33.     Additionally, the Judgment includes damages as a result of NYCTA and MTA's failure to install a service elevator providing access to Fulton Transit Center's concourse level, which would allow Westfield to install the necessary lift. Ever since Fulton Transit Center's opening, NYCTA has refused to allow the subtenants on the Concourse level to access either the elevator or escalator that would allow them to load inventory into their stores. Therefore, food service subtenants on this level, who restock fresh inventory daily, currently are forced to bring heavy crates of product up a staircase. By prolonging their appeal, NYCTA and MTA continue to

make operations in the Fulton Transit Center unnecessarily difficult for these subtenants and, in turn, for Westfield.

## IV.    NYCTA's Contractual Obligation to Maintain Safety and Security at Fulton Transit Center

34.    Throughout the Arbitration, NYCTA argued that its responsibilities with respect to its construction obligations at Fulton Transit Center essentially terminated the day Westfield obtained possession of the Premises. The Arbitration Award clearly found otherwise, and that argument certainly has no validity with regard to NYCTA's ongoing contractual obligation as Landlord to provide security at Fulton Transit Center.

35.    Section 7.4 of the Lease, titled "Center Security" provides:

Landlord shall (without thereby assuming liability for any injury or loss resulting from wrongful acts of persons not employed by Landlord or by any agent or contractor of Landlord) retain primary responsibility for endeavoring to maintain public safety and security at the Fulton Center. In furtherance thereof, **Landlord shall arrange for the provision of security services for the entire Premises, excluding only the Commercial Usage Areas**, which service will provide both patrol and monitoring by security cameras in Landlord's reasonable discretion. Subject to Landlord's legal obligations, **Landlord shall hire a private contractor, at Landlord's own cost and expense, to provide such security services; and Landlord shall, at Landlord's own cost and expense, also install and maintain such security cameras as it deems necessary for such purpose in the Public Circulation Areas and the Back of House Areas (with the express exclusion of Commercial Usage Areas of the Corbin Building)**. Tenant shall have no responsibility for maintaining, repairing or operating such cameras or related equipment. Tenant may, at any time, request the addition of security cameras within the Public Circulation and Back of House areas. Landlord agrees that it will review and consider Tenant's request(s), but the determination as to whether to approve such request(s) shall be in the sole discretion of the Landlord.

(Emphasis added).

36.    Section 21.1 of the Lease, titled Quiet Enjoyment, further provides that "Landlord covenants that Tenant shall and may peaceably and quietly have, hold, and enjoy the Premises for the Term, subject to the terms of this Lease, without molestation, hindrance, or disturbance by or

from Landlord or by anyone claiming by or through Landlord and free of any encumbrance created or suffered by Landlord and not referenced elsewhere in this Lease."

37.     Lease Ex. K, the "Concept of Operations" also provides that "***Visibility and security are of paramount concern***" at the center and that "NYCTA will be required to provide a Security Plan detailing procedures for the safe and secure operation of the Fulton Transit Center, as contemplated by Section 7.4 of the [Lease]. The Security Plan shall be put in place prior to the Opening Date and updated as appropriate at least annually. The Security Plan shall be subject to [Westfield's] review and approval to the extent set forth in such 7.4." (*See* Lease Ex. K §§ 3.2.4, 7.1).

## V.     NYCTA's Failure to Provide Adequate Security at Fulton Transit Center

38.     After construction was finally complete, and Westfield began leasing the subtenant retail spaces throughout Fulton Transit Center, NYCTA's dereliction of its duties continued.

39.     Subway crime was up 30% in 2022 from the year before, and in 2023 was determined to be up more than 53% from pre-pandemic levels.

40.     NYCTA has not properly maintained public safety and security at Fulton Transit Center, which connects nine subway lines and brings together five underground stations.

41.     Homeless encampments, unauthorized vendors, assaults, vandalism, employee intimidation and harassment, and other dangerous incidents became normal occurrence in what the Lease deemed a "high quality transportation-oriented retail facilit[y]" commensurate with Rockefeller Center, Grand Central Station, and the retail facilities at JFK International Airport.

42.     There are dozens of photographs, videos, and gruesome incident reports evidencing the shocking events that occurred and continue to take place at Fulton Transit Center on a daily

basis. (Attached as **Exhibit D** are photographs provided to NYCTA showing just a small portion of the property damage and disarray NYCTA allowed to take place under its "Security Plan.")

43.     As the safety and security of Fulton Transit Center continued to degrade, it became nearly impossible to attract "high quality" subtenants, existing ones declined to renew their leases and some surrendered their leases early, and the remaining existing subtenants have begged Westfield for help. Many of the subtenants confirmed that Fulton Transit Center's security issues were the sole reason they left the space.

44.     One subtenant said in an email to Westfield that was shared with NYCTA:

Unfortunately we left this location because of security reasons[.] [A]lmost every day our employees get into violence incident with local homeless, two of them also got hit and injured by homeless[.] St[ea]ling the tips and taking merchandise by homeless people is a daily routine in this location[.] You guys promise us prior the lease sign that the place is safe and secure[.] Our employees doesn't want[] to work in this location [for] the above reasons[.] You gave us misrepresentation and base on that we did our investment[.] Also as you know we are not the only kiosk that close his business from the same reason

45.     During the COVID-19 Pandemic, Westfield was forced to close the public restrooms throughout Fulton Transit Center due to the homeless taking up residence in the restrooms.

46.     On February 3, 2022, while NYCTA and Westfield proceeded through the Arbitration, NYCTA demanded that Westfield re-open the Fulton Transit Center restrooms "as soon as possible."

47.     On February 8, 2022, Westfield informed NYCTA that Westfield's "number one priority is to ensure the safety of [Westfield's] staff, tenants, and guests. For [Westfield] to consider re-opening the restrooms, there needs to be a security plan in place that addresses the safety and security issues at Fulton [Transit] Center."

48.     Westfield also informed NYCTA that "[p]rior to closing the restrooms due to the pandemic, there were reoccurring incidents with drug usage inside the restrooms, physical and verbal threats to our Housekeeping and Engineering teams, loitering & disorderly conduct, and vandalism acts. Both our Housekeeping and Engineering vendors have expressed safety concerns for their team members servicing these restrooms."

49.     Only then did NYCTA agree to limit the operating hours of the restrooms and to provide security guards in the restrooms during Westfield's scheduled cleaning.

50.     However, in **bold** language, NYCTA stressed that its negligible attempts to address the security issues at Fulton Transit Center were only temporary: "**As with the temporary reduction of operating hours for the Restrooms detailed above, the additional security measures outlined in this letter should also be considered temporary and subject to changing conditions at Fulton Center.**" (Emphasis in original). (A copy of NYCTA's March 2, 2022 correspondence is attached as **Exhibit E**.)

51.     Just as was done with the construction issues for which they are being held legally responsible, NYCTA also attempted to shirk that responsibility and impose the burden on Westfield.

52.     NYCTA recommended in its March 2, 2022 letter that:

Tenant explore the following options for additional security, with a **potential** credit for actual costs incurred in the form of an offset against funds due to Landlord from Tenant Signage Revenues and Participation Rent pursuant to Sections 4.1 and 4.2 of the Agreement, respectively, **subject to advanced review and approval by Landlord** and submission of invoices verifying the cost of any additional security measures:

• Tenant may hire additional private security at the Center to provide assistance to housekeeping staff assigned by Tenant to clean and maintain the Restrooms; and

• Tenant may contract an NYPD Paid Detail Unit to augment security presence at the Center, including the areas where the Restrooms are located.

(Exhibit E) (Emphasis added).

53.     On March 10, 2022, Westfield reminded NYCTA that it was NYCTA's obligation to provide security at Fulton Transit Center pursuant to Lease section 7.4.  (A copy of Westfield's March 10, 2022 correspondence is attached as **Exhibit F**.)

54.     Westfield's March 10, 2022 letter also outlined a series of security incidents that took place at Fulton Transit Center between 2020 and December 2022, including vandalism, a stabbing, an assault, and one altercation that sent one of NYCTA's security guards to the hospital.

55.     Over the next two years, the security and safety conditions at Fulton Transit Center worsened, and NYCTA continued to refuse to take responsibility.

56.     Westfield scheduled meetings with the Mayor's office and sought assistance from the NYPD to address the security issues at Fulton Transit Center.

57.     Because NYCTA failed to meet its contractual obligation to create and enforce a Security Plan for the Center, Westfield submitted its own security plan to NYCTA in April 2023, with the safety measures it believed necessary to address the ongoing threats to safety.

58.     Only after Westfield initiated discussions about a transfer of their management operations to NYCTA or another operator did NYCTA add three night security guards, while continuing to ignore all other aspects of Westfield's security plan.

59.     This minimal measure has done nothing to remediate the ongoing safety and operational issues which continue to plague Fulton Transit Center at all hours and continue to endanger Westfield's subtenants and customers visiting the transportation hub.

60.     Westfield continues to lose subtenants and prospective subtenants. In the past four years, nine permanent subtenants have exited Fulton Transit Center because of security concerns

and the resulting decline in business. Moreover, Westfield has been forced to subsidize subtenants in an attempt to maintain occupancy at the center.

61.     Westfield and its subtenants continue to incur costs remedying the property damage caused by these security incidents, including over $690,000 in repair costs resulting from vandalism and arson at Fulton Transit Center.

62.     Despite Westfield's investment of significant capital and resources to address the safety and security conditions in order to effectively operate the Fulton Transit Center, NYCTA's refusal to meet its contractual obligations and work cooperatively with Westfield has destroyed any potential for a workable relationship.

63.     Westfield can no longer continue to unilaterally subsidize such deficiencies caused by NYCTA.

**VI.     NYCTA Slows Subtenant Approval Process to a Halt**

64.     In the last few years, for those subtenants that Westfield has been able to convince to lease space in Fulton Transit Center, NYCTA's inaction and retaliation still stand in the way.

65.     NYCTA's approval process for subtenant construction takes an inordinate amount of time and results in consistent hurdles.

66.     When NYCTA sits on its obligation to review and approve subtenant construction for months or requires unnecessary additional conditions to subtenants' plans, often on the eleventh hour, Westfield ultimately pays the price.

67.     Meaningful collaboration between the parties has ceased.

**VII.    Westfield's Final Attempt to Find a Solution at Fulton Transit Center**

68.     After obtaining the Judgment in August 2023, Westfield hoped that NYCTA would revise its approach to the ongoing disputes and find a commercially reasonable solution to the

various issues affecting Fulton Transit Center.

69.     Instead, Westfield's pleas for help went unanswered and NYCTA's delaying tactics continued, apparently in retaliation for the Judgment Westfield obtained.

70.     To date, neither NYCTA nor MTA have paid a penny of the Judgment.

71.     Because NYCTA and MTA are political subdivisions of the State of New York, Westfield cannot enforce the Judgment while an appeal is pending pursuant to CPLR § 5519.

72.     NYCTA and MTA continue to adjourn their deadline to perfect the appeal, recently obtaining an extension to April 8, 2024.

73.     In December 2023, Westfield reached out to NYCTA and MTA in hopes of reaching some resolution, and, if a resolution could not be reached, a possible surrender and assignment of Westfield's obligations under the Lease.

74.     Contrary to what NYCTA implies in its Complaint, a surrender of Westfield's management responsibilities would not create irreparable harm to NYCTA and will not result in a cessation of operations at Fulton Transit Center or any of the retail establishments 'going dark.' NYCTA or a replacement operator could easily step into Westfield's shoes and would be entitled to receive the commercial revenue from subtenants. Westfield made clear to NYCTA of its willingness to assist with a seamless transition.

75.     Westfield and NYCTA then discussed the possibility of another specific third-party operator, who already manages and operates several NYCTA retail locations, stepping into Westfield's shoes and managing Fulton Transit Center.

76.     Again, rather than responding to Westfield's invitation for a dialogue, NYCTA initiated this action, further highlighting the parties' broken relationship. Meanwhile, the ongoing concerns about the security and safety of Fulton Transit Center and the $13,267,186.53 Judgment

remain ignored.

## FIRST CAUSE OF ACTION
### (Breach of the Lease)

77.     Westfield repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

78.     The Lease is a valid and binding agreement.

79.     The Lease required certain performance of Westfield and NYCTA.

80.     Westfield performed its obligations under the Lease.

81.     NYCTA failed to perform its obligations under the Lease, including, but not limited to its obligations to: (i) maintain public safety and security at the Fulton Transit Center pursuant to Lease section 7.4, (ii) protect Westfield's quiet enjoyment of the Premises pursuant to Lease section 21.1, and (iii) appropriately update the Security Plan pursuant to Concept of Operations section 7.1.

82.     As a direct and proximate result of NYCTA's breaches, Westfield has suffered damages in an amount to be determined at trial in excess of $5,000,000, plus Westfield's attorneys' fees and costs in this action, with interest, pursuant to Lease section 28.1.

## SECOND CAUSE OF ACTION
### (*Alternatively*, Unjust Enrichment)

83.     Westfield repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

84.     Westfield made efforts to maintain security and safety at Fulton Transit Center, provided updated security plans, collaborated with City officials, and undertook performance not required under the Lease, but for which Westfield engaged at the insistence and direction of NYCTA.

85.     Westfield has also been forced to make subtenant concessions as a result of NYCTA's inaction and retaliation.

86.     NYCTA benefits from the work undertaken by Westfield and the concessions Westfield undertook in order to attract subtenants to Fulton Transit Center.

87.     NYCTA has been enriched by these necessary and beneficial attempts by Westfield at maintaining Fulton Transit Center.

88.     In equity and good conscience, NYCTA should make restitution to Westfield for its work and losses in an amount to be determined at trial in excess of $5,000,000, plus Westfield's attorneys' fees and costs in this action, with interest, pursuant to Lease section 28.1.

## THIRD CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing)

89.     Westfield repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

90.     NYCTA breached the implied covenant of good faith and fair dealing by stalling and delaying subtenant approvals and construction at Fulton Transit Center.

91.     NYCTA also breached the implied covenant of good faith and fair dealing by failing to adequately address the safety and security concerns and implement its Security Plan and that recommended by Westfield at Fulton Transit Center.

92.     NYCTA further breached the implied covenant of good faith and fair dealing by recommending that Westfield, rather than NYCTA, increase security and provide its own Security Plan for Fulton Transit Center.

93.     As a direct and proximate result of NYCTA's conduct, Westfield has suffered damages in an amount to be determined at trial in excess of $5,000,000, plus Westfield's attorneys' fees and costs in this action, with interest, pursuant to Lease section 28.1.

## DEMAND FOR RELIEF

**WHEREFORE**, Westfield respectfully requests that this Court enter a judgment in favor

of Westfield and against NYCTA as follows:

(i)      On Westfield's first cause of action for breach of the Lease, damages against NYCTA in an amount to be determined at trial, in excess of $5,000,000;

(ii)     On Westfield's second cause of action for unjust enrichment, damages against NYCTA in an amount to be determined at trial in excess of $5,000,000;

(iii)    On Westfield's third cause of action for breach of the covenant of good faith and fair dealing, damages against NYCTA in an amount to be determined at trial in excess of $5,000,000;

(iv)    On all of Westfield's causes of action, attorneys' fees and costs, interest, and statutory interest under New York law applicable at the time of trial; and

(v)     Granting such other and further relief as may be just and proper.

## WESTFIELD'S ANSWER TO NYCTA'S COMPLAINT

Westfield, by its attorneys Blank Rome LLP, answers NYCTA's Complaint as follows:

## AS TO THE OVERVIEW

1.     Westfield admits to the existence of the Lease, and, upon information and belief, admits that MTA assigned the Lease to NYCTA, but Westfield otherwise denies the allegations in paragraph 1 and refers the Court to the document referenced therein for its true content and meaning.

2.     Westfield admits to the existence of the February 12, 2024 letter from Westfield, but otherwise denies the allegations in paragraph 2 and refers the Court to the document referenced therein for its true content and meaning.

3. Westfield admits that the Initial Term under the Lease was to be at least twenty (20) years, but otherwise denies the allegations in paragraph 3 and refers the Court to the document referenced therein for its true content and meaning.

4. The allegations in paragraph 4 purport to state a legal conclusion, as to which no response is required. To the extent the allegations in paragraph 4 are deemed to be factual, Westfield denies the allegations in paragraph 4.

5. The allegations in paragraph 5 purport to state a legal conclusion, as to which no response is required. To the extent the allegations in paragraph 5 are deemed to be factual, Westfield denies the allegations in paragraph 5.

6. Westfield admits that a portion of the Lease is attached to NYCTA's Complaint as Exhibit A; however, the exhibit does not include the full terms of the Lease including the exhibits and, therefore, Westfield otherwise denies the allegations in paragraph 6.

## AS TO JURISDICTION

7. Westfield denies that NYCTA's damages alone exceed the sum or value of $75,000, but otherwise admits the allegations in paragraph 7.

8. Westfield admits the allegations in paragraph 8.

## AS TO THE PARTIES

9. Westfield admits the allegations in paragraph 9, upon information and belief.

10. Westfield admits the allegations in paragraph 10.

11. Westfield admits the allegations in paragraph 11.

12. Westfield admits the allegations in paragraph 12.

13. Westfield denies the allegations in paragraph 13.

## AS TO THE FACTUAL BACKGROUND

14.     Westfield admits to the tragedy of the attacks of September 11, 2001, but otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14.

15.     Westfield lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15.

16.     Westfield admits that MTA chose Westfield to operate Fulton Transit Center and that Westfield invested heavily in the World Trade Center, but otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16.

17.     Westfield admits to the existence of the Lease and the general description of the Premises, but otherwise denies the allegations in paragraph 17 and refers the Court to the document referenced therein for its true content and meaning.

18.     Westfield admits the allegations in paragraph 18.

19.     Westfield, upon information and belief, admits that MTA assigned the Lease to NYCTA, but otherwise denies the allegations in paragraph 19.

20.     Westfield admits to the existence of the Lease, but otherwise denies the allegations in paragraph 20 and refers the Court to the document referenced therein for its true content and meaning.

21.     Westfield admits to the existence of the Lease, but otherwise denies the allegations in paragraph 21 and refers the Court to the document referenced therein for its true content and meaning.

22.     Westfield admits to the existence of the Lease, but otherwise denies the allegations in paragraph 22 and refers the Court to the document referenced therein for its true content and

meaning.

23.     Westfield admits to the existence of the Lease, but otherwise denies the allegations in paragraph 23 and refers the Court to the document referenced therein for its true content and meaning.

24.     Westfield admits to the existence of the Lease, but otherwise denies the allegations in paragraph 24 and refers the Court to the document referenced therein for its true content and meaning.

25.     Westfield admits to the existence of the Lease, but otherwise denies the allegations in paragraph 25 and refers the Court to the document referenced therein for its true content and meaning.

26.     Westfield admits to the existence of the Lease, but otherwise denies the allegations in paragraph 26 and refers the Court to the document referenced therein for its true content and meaning.

27.     Westfield admits to the existence of the Lease, but otherwise denies the allegations in paragraph 27 and refers the Court to the document referenced therein for its true content and meaning.

28.     Westfield admits to the existence of the Lease, but otherwise denies the allegations in paragraph 28 and refers the Court to the document referenced therein for its true content and meaning.

29.     Westfield admits to the existence of the Lease, but otherwise denies the allegations in paragraph 29 and refers the Court to the document referenced therein for its true content and meaning.

30.     Westfield admits to the existence of the Lease, but otherwise denies the allegations in paragraph 30 and refers the Court to the document referenced therein for its true content and meaning.

31.     Westfield admits that a call took place in January 2024 between Ms. Diana Grasso and Mr. David Florio and that during that call, Westfield expressed that the situation at Fulton Transit Center was unworkable, and that Mr. Florio said he would get back to Westfield regarding Westfield's concerns, but Westfield otherwise denies the allegations in paragraph 31.

32.     Westfield admits that a call took place between Ms. Diana Grasso and Mr. David Florio on February 7, 2024 and that NYCTA would not agree to a termination of the Lease, but Westfield otherwise denies the allegations in paragraph 32.

33.     Westfield admits that a call took place between Ms. Diana Grasso and Mr. David Florio on February 9, 2024 and that Westfield would not once again accept NYCTA's empty promises and instead sought to terminate the Lease, but Westfield otherwise denies the allegations in paragraph 33.

34.     Westfield admits to the existence of the February 12, 2024 letter, but otherwise denies the allegations in paragraph 34 and refers the Court to the document referenced therein for its true content and meaning.

35.     Westfield admits that NYCTA ultimately informed Westfield that it would not agree to terminate the Lease, but otherwise denies the allegations in paragraph 35.

36.     Westfield admits to the existence of the February 12, 2024 letter, but otherwise denies the allegations in paragraph 36 and refers the Court to the document referenced therein for its true content and meaning.

37.     Westfield denies the allegations in paragraph 37.

38.     Westfield admits to the existence of the Lease, but otherwise denies the allegations in paragraph 38 and refers the Court to the document referenced therein for its true content and meaning.

39.     Westfield admits to the existence of the Lease, but otherwise denies the allegations in paragraph 39 and refers the Court to the document referenced therein for its true content and meaning.

40.     Westfield admits to the existence of the Lease, but otherwise denies the allegations in paragraph 40 and refers the Court to the document referenced therein for its true content and meaning.

41.     Westfield admits to the existence of the Lease, but otherwise denies the allegations in paragraph 41 and refers the Court to the documents referenced therein for its true content and meaning.

42.     Westfield admits to the existence of the Lease, but otherwise denies the allegations in paragraph 42 and refers the Court to the document referenced therein for its true content and meaning.

43.     Westfield admits to the existence of the Lease, but otherwise denies the allegations in paragraph 43 and refers the Court to the document referenced therein for its true content and meaning.

44.     Westfield admits to the existence of the Lease, but otherwise denies the allegations in paragraph 44 and refers the Court to the document referenced therein for its true content and meaning.

45.     Westfield admits to the existence of the Lease, but otherwise denies the allegations in paragraph 45 and refers the Court to the document referenced therein for its true content and meaning.

46.     Westfield admits to the existence of the Lease, but otherwise denies the allegations in paragraph 46 and refers the Court to the document referenced therein for its true content and meaning.

**AS TO THE FIRST CAUSE OF ACTION**
**(Anticipatory Repudiation of the Lease)**

47.     Westfield repeats and realleges each and every response set forth in the foregoing paragraphs as if fully set forth herein.

48.     Westfield denies the allegations in paragraph 48.

49.     Westfield admits to the existence of the Lease, but otherwise denies the allegations in paragraph 49 and refers the Court to the document referenced therein for its true content and meaning.

50.     Westfield denies the allegations in paragraph 50.

51.     Westfield admits to the existence of the Lease, but otherwise denies the allegations in paragraph 51 and refers the Court to the document referenced therein for its true content and meaning.

52.     Westfield denies the allegations in paragraph 52.

53.     Westfield denies the allegations in paragraph 53.

**AS TO THE SECOND CAUSE OF ACTION**
**(Declaratory Judgment)**

54.     Westfield repeats and realleges each and every response set forth in the foregoing paragraphs as if fully set forth herein.

55.     Westfield admits to the existence of the Lease, but otherwise denies the allegations in paragraph 55 and refers the Court to the document referenced therein for its true content and meaning.

56.     Westfield denies the allegations in paragraph 56.

57.     Westfield denies the allegations in paragraph 57.

58.     Westfield denies the allegations in paragraph 58.

### AS TO THE THIRD CAUSE OF ACTION
**(Injunctive Relief)**

59.     Westfield repeats and realleges each and every response set forth in the foregoing paragraphs as if fully set forth herein.

60.     Westfield denies the allegations in paragraph 60.

61.     Westfield denies the allegations in paragraph 61.

62.     Westfield denies the allegations in paragraph 62.

63.     Westfield denies the allegations in paragraph 63.

64.     Westfield denies the allegations in paragraph 64.

65.     Westfield denies the allegations in paragraph 65.

66.     Westfield denies the allegations in paragraph 66.

### AS TO THE FOURTH CAUSE OF ACTION
**(Attorneys' Fees)**

67.     Westfield repeats and realleges each and every response set forth in the foregoing paragraphs as if fully set forth herein.

68.     Westfield admits to the existence of the Lease but otherwise denies the allegations in paragraph 68 and refers the Court to the document referenced therein for its true content and meaning.

69.     Westfield admits to the existence of the Lease but otherwise denies the allegations in paragraph 69 and refers the Court to the document referenced therein for its true content and meaning.

70.     Westfield denies the allegations in paragraph 70.

## AS TO THE DEMAND FOR JUDGMENT

Westfield denies that NYCTA is entitled to any of the relief requested in its demand for judgment.

## DEFENSES

Subject to, and without waiving its responses and denials to the allegations in paragraphs 1 through 70 of the Complaint, by way of further defense to the claims of the Complaint, Westfield asserts the following defenses:

## FIRST DEFENSE

NYCTA's Complaint is barred, in whole or in part, because the Complaint fails to state a claim upon which relief can be granted.

## SECOND DEFENSE

NYCTA's Complaint is barred under the doctrine of anticipatory breach, which excused Westfield from further performance.

## THIRD DEFENSE

NYCTA's Complaint is barred due to NYCTA's prior material breaches of the Lease, including, but not limited to, its failure to maintain security and safety at Fulton Transit Center, its failure to appropriately update the Security Plan, and its covenant of Westfield's quiet enjoyment.

## FOURTH DEFENSE

NYCTA's Complaint is barred under the doctrines of acquiescence, equitable estoppel, waiver, release, and NYCTA's unclean hands.

## FIFTH DEFENSE

NYCTA's Complaint is barred, in whole or in part, because NYCTA has not suffered any cognizable damages, any damages NYCTA did suffer were a proximate result of NYCTA's own actions, and NYCTA failed to mitigate any alleged damages. To the extent that NYCTA does incur any damages, those damages are monetary and do not constitute irreparable harm.

## SIXTH DEFENSE

NYCTA's claim for attorneys' fees and costs in association with this litigation has no basis in law or fact.

## SEVENTH DEFENSE

NYCTA's Complaint is barred by the doctrine of accord and satisfaction.

## EIGHTH DEFENSE

NYCTA's Complaint is barred by the doctrines of setoff and recoupment.

## NINTH DEFENSE

NYCTA's Complaint is barred by the doctrine of laches and/or the applicable statute of limitations.

## <u>TENTH DEFENSE</u>

Westfield presently lacks sufficient knowledge or information upon which to form a belief as to whether there may be, as yet unstated, additional defenses available to Westfield, and therefore expressly (i) reserves the right to amend or supplement this Answer, defenses, and all other pleadings, and (ii) reserves the right to (a) assert any and all additional defenses under any applicable federal and state law in the event that discovery indicates such defenses would be appropriate, and (b) assert any cross-claims, counterclaims, and third-party claims when and if they become appropriate in this action.

Dated: March 8, 2024
     New York, New York

                **BLANK ROME LLP**

                By: <u>*s/ Mara B. Levin*</u>
                Mara B. Levin
                Harris N. Cogan
                Gregory P. Cronin
                1271 Avenue of the Americas
                New York, New York 10020
                (212) 885-5000

                *Attorneys for Westfield Fulton Center LLC*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on March 8, 2024, a true and correct copy of the foregoing Answer and Counterclaims was served on all counsel of record via the CM/ECF System of the Southern District of New York.


Dated: March 8, 2024
        New York, New York

*s/ Mara B. Levin*
Mara B. Levin
