

**VIA FEDERAL EXPRESS**

May 8, 2018

MTA Real Estate
2 Broadway, A4.25
New York, New York 10004
Attention: David Florio

**Fulton Center – Lease**

Ladies and Gentlemen:

      Reference is hereby made to that certain Lease dated May 16, 2014 (the "Lease"), between the Metropolitan Transportation Authority ("MTA") and Westfield Fulton Center LLC ("Westfield") for the Fulton Center (the "Premises"). Capitalized terms not defined in this letter (the "Letter") shall have the meanings ascribed to them in the Lease.

      As you are aware, the handover of the retail portion of the Premises from MTA to Westfield was a fast paced and challenging process for both parties. Unfortunately, much of the work that was required to be performed by MTA prior to the handover was incomplete. Westfield accepted the handover in good faith with an understanding that MTA would diligently pursue the completion of such incomplete works. However, Westfield's good faith was not reciprocated by MTA, which failed to perform such works and furthermore has failed to perform certain of its other material obligations under the Lease. These failures have required Westfield to spend a significant amount of funds beyond those required or contemplated under the Lease, which has resulted in a reduction in Westfield's revenues and, accordingly, a reduction in the amount of Participation Rent payable to MTA. Listed below are a number of items that are currently of concern to Westfield. We believe that if the parties work in good faith, we can reach a resolution on all these issues and formulate a mutually beneficial path forward. In the absence of such resolution, Westfield will have no alternative but to pursue its remedies under the Lease, including self-help under Section 20.2. This Letter shall serve as notice pursuant to Section 20.2 of the Lease. In addition to the foregoing, Westfield reserves all rights and remedies at law or in equity under the Lease.

**I.   Stabilization**

      Under Section 2.1 of the Lease, "stabilization" occurs (or is deemed to occur) after the later of (a) the Opening Date, (b) the date on which all of the Stabilization Conditions have been satisfied and (c) the Interim Delivery Date. MTA has stated that the

Stabilization Period commenced on November 9, 2014 and concluded on November 30, 2016. The stated commencement date of such period was premature. In addition to the items set forth in this Letter, many of the works required to accommodate full retail tenancy were incomplete at that time and many areas within the Premises were inaccessible and unable to be turned over. As a result, there were significant delays in Westfield's ability to deliver spaces to Subtenants, which prolonged the turnover process and Westfield's ability to ramp up to stabilized revenue. Accordingly, Westfield believes that the Stabilization Period concluded on April 30, 2017.

## II.     Design Quality – Ambience, Security & Signage

One of the foundational principles of the Lease is that the Premises would be designed and operated in a first-class manner and that MTA would deliver the retail portion of the Premises to Westfield in a quality commensurate with the standards of other high quality transportation-oriented retail facilities in Manhattan, such as the retail portions of Rockefeller Center, Grand Central Terminal and JFK International Airport Terminal 8. It should also be noted that the concept of designing and operating the Premises as a first-class facility is discussed throughout the Lease, the Design Guidelines and the Concept of Operations which are applicable to the Premises.

Westfield has operated in the retail industry for more than fifty-years and owns more than thirty retail shopping centers. While Westfield continues to operate and maintain the Premises in a first-class manner, customers and Subtenants have complained that the design and workmanship of the Fulton Center in its present construct is not conducive to a high quality, first-class retail facility in a number of areas, the most pressing of which are listed below.

### 1.     Lighting

Lighting is integral to creating a positive and safe retail experience. At the time the Lease was negotiated, as stated in the Concept of Operations, the parties understood that the lighting would be uniform throughout the Premises, as any disparity in lighting discourages foot traffic and leads to a sub-first class retail experience. As such, MTA had the obligation to install lighting fixtures and hardware prior to the handover that would create uniformity throughout the Premises. However, some of the lighting fixtures and hardware, particularly, those near and throughout the Commercial Usage Areas is severely inadequate as compared to significantly better-lit transit traffic areas. For example, field testing has determined that lighting near the public restrooms and staircases in the Commercial Usage Areas ranges between the equivalent of four and six candles. As a point of reference, a typical car-park garage has the lighting equivalent of approximately eight candles. In comparison, the concourse between the Oculus and Fulton Center is equivalent to approximately forty candles. This condition directly results in an unsafe and negative retail experience. Potential tenants have refused to negotiate leases because of the dim lighting in and around the Commercial Usage Areas,

resulting in lost revenues and increased costs for Westfield. The dim lighting also increases liability with respect to workplace safety, as Westfield and Subtenant employees and agents are more likely to suffer injury as a result of poor illumination. There is a significant need for the installation of additional lighting in certain Commercial Usage Areas to ensure uniform lighting throughout the Premises to help safeguard and improve the overall Fulton Center experience. Westfield is prepared to work with MTA to improve the lighting and can offer some proposals for consideration pursuant to a formal agreement.

  2. <u>Design Issues</u>

Since overtaking operations, Westfield has discovered design and construction defects that are inconsistent with the specifications shown on the architectural drawings and Usage Plans. There are a number of these design and construction defects that we wanted to bring to your attention.

  (a) *Store Entry Doors.* Despite specifications to the contrary in the Design Guidelines, a number of Subtenants are not permitted to keep their entry glass double-doors open during their hours of operation due to MTA's failure to design and construct such doors in accordance with the first-class retail facility standard and with New York City Transit Authority ("<u>NYCTA</u>") rules and regulations applicable to the known intended use of the Premises. As a result, there has been confusion for customers, reduced foot traffic, and foregone customer sales.

  (b) *HVAC System Access.* As another example, MTA failed to install catwalks around the roof HVAC system in violation of Occupational Safety and Health Administration requirements. As a result, in order to access the roof HVAC system, Westfield, rather than MTA, and as instructed by MTA, must now install roof catwalks. Westfield estimates the cost of such installation to be appropriately $120,000.

  (c) *Restrooms.* Westfield and Subtenant staff employees are not permitted to use the public restrooms, despite specifications to the contrary in the Concept of Operations. Accordingly, as instructed by MTA, Westfield designed and constructed restrooms in Subtenant spaces, which resulted in one-time unexpected capital expenditures amounting to approximately $592,000 and lost gross leasable square footage amounting to approximately $41,000 in foregone annual revenue.

  (d) *Additional Fire Egress Pathways.* Although the Level 2 Subtenant fire-rating specifications were previously approved and the space was built accordingly, MTA and NYCTA have, in a reversal of its prior approval, advised Westfield that the Subtenant spaces on Level 2 must now incorporate additional fire egress pathways, fire-rated walls and fire-rated doorways, as well as additional fire alarm requirements, including additional panels and transponders, in order to continue operations. Consequently, Westfield has been unreasonably forced to spend additional funds to build-

3

out such spaces in an amount of approximately $294,000. Further, the additional pathways, which must remain unobstructed at all times, along with the other additional requirements, have led to a permanent loss of effective leasable space and have resulted in a detrimental impact on leasing, which has negatively impacted Westfield's cash flow and resulted in a permanent loss of financial income estimated to amount to approximately $75,000 per year.

(e)  *Elevator in Retail Usage Area.* Thank you for agreeing to Westfield's use of the elevator located in the Retail Usage Areas ("Elevator PE-52") in connection with its operations, including maintenance and repairs. As discussed, we expect to work together to identify the appropriate equipment to be purchased and enter into mutually acceptable operational guidelines. However, we note that the NYCTA guidelines enacted after execution of the Lease continue to prohibit Subtenants from using Elevator PE-52, which is the only elevator located in the Retail Usage Areas, while non-Subtenant vendors (who frequently make deliveries to the Premises) are permitted to use Elevator PE-52. Westfield and our Level 2 Subtenants have expected that such Subtenants would be permitted to use Elevator PE-52. This unusual and unexpected prohibition frustrates Subtenant operations and has resulted in severely strained relationships. Consequently, Westfield requests that NYCTA grant a variance permitting Westfield's Level 2 Subtenants to use Elevator PE-52, subject to reasonable rules, regulations and indemnifications required by MTA and/or NYCTA.

(f)  *Other Design Issues.* In accordance with customary practice, Westfield expected that MTA would provide utility lines for electrical power up to each RMU other than the retail space DS-01, located in the Dey Street Headhouse, as indicated in the Concept of Operations and Design Guidelines. However, MTA has failed to provide such utility lines for all the RMUs on the Premises. As a result, to ensure that its Subtenants could lawfully conduct operations, Westfield has installed the necessary utility lines at a cost of approximately $1,894,000, which should be promptly reimbursed by MTA.

3.  Internal Way-finding and External Signage

Instructive way-finding signage is a base-level requirement in a first-class retail facility in order for customers to navigate such facility. In addition, such signage undoubtedly helps persons simply using the transportation facilities. The current overall way-finding signage is not sufficient and is not consistent with a first-class retail facility. In accordance with the Lease and Concept of Operations and based on the experience of Westfield in operating the Premises, additional internal way-finding signage, for both the retail and transportation portions, should be installed on the Premises in order to better assist customers.

Related to the internal way-finding signage, current external signage at the street level does not adequately identify the Fulton Center and the presence of a subterranean retail shopping center to non-commuter customers. Any competitive advantage derived

4

from the Fulton Center's premier location in downtown Manhattan is neutralized without robust external signage identifying the Retail Usage Areas.

It would be in both parties interest to improve the internal way-finding signage and external way-finding signage in an effort to increase the visibility of the Fulton Center and its retail portions to pedestrians. Westfield believes there are a number of ways this can be accomplished and would like to work with MTA to achieve a mutually beneficial signage system and can offer some proposals for consideration pursuant to a formal agreement.

4.   Security

As a public agency, the security of the Premises should be of paramount concern to MTA. Pursuant to the Lease, MTA retains primary responsibility for maintaining public safety and security at the Fulton Center, including arranging for the provision of security services for the Premises. Under the Lease, NYCTA must also implement a separate security plan and provide annual updates, as necessary.

There are often non-retail, non-commuter persons who loiter near or on the street level perimeter seating bordering the Commercial Usage Areas and routinely, amongst other things, litter, sleep in areas that interfere with the comfort of commuters, and create unsanitary conditions. Such behavior engenders an unsafe and unsanitary feeling throughout the subject and surrounding area, which feeling is augmented by the inadequate lighting (discussed above). It also discourages foot traffic in the Commercial Usage Areas, resulting in a detrimental impact on the retail environment and revenues.

We note that MTA Rules of Conduct & Fines (the "Rules of Conduct"), which governs the conduct and safety of the public in MTA facilities, stipulates that no person shall (i) "litter, dump garbage, liquids or other matter, create a nuisance, hazard or unsanitary condition (including, but not limited to, spitting, or urinating)", (ii) "sleep or doze where such activity may interfere with the operation of MTA's transit system or the comfort of its passengers", or (iii) "conduct himself or herself in any manner which may cause or tend to cause annoyance, alarm or inconvenience to a reasonable person or create a breach of the peace". Any person engaged in any of the foregoing activities is subject to ejection, which we understand MTA routinely undertakes in its other facilities, and such persons may be subject to other penalties.

Westfield has always expected and has relied on the fact that MTA would enforce its own Rules of Conduct in a first-class facility like Fulton Center, and has based its plans, operations and agreements with MTA on such reliance. Westfield continues to expect the same and underlines that adherence to well established rules is in the best interest of the parties and the public. Failure of MTA to do so, as has been the case here, is not acceptable to Westfield and we request that MTA take measures to remedy the situation in accordance with its Rules of Conduct. Westfield recommends that MTA

5

redesign the seating in this area and is willing to work with MTA to formulate a solution to this issue pursuant to a formal agreement.

## III. Level 1 Street Level Commercial Usage Areas (Kiosks); Dey Street Headhouse

Under the Lease, the main Commercial Usage Areas adjacent to street entryways ("Street Entry Retail") are to be located on the street level of Level 1 within a pre-determined area limited to 4,194 net square feet. However, since the execution of the Lease, MTA has significantly restricted Westfield's ability to install the intended Street Entry Retail with its capricious application of MTA egress requirements and design constraints, which were not clearly communicated before the Lease execution. The area in which Street Entry Retail may be built has been progressively limited to approximately 2,000 net square feet and the height of the retail merchandise display has been restricted to less than 4 feet. The foregoing space and height restrictions have (i) resulted in a significant reduction in the usable retail space in the this area, (ii) have reduced the rental income that was expected to be generated by the Street Entry Retail, which Westfield estimates is approximately $1,036,500 per year, and (iii) have increased the expenses incurred by Westfield in maintaining additional common egress areas. Westfield requests that MTA indemnify Westfield for lost revenues and additional costs incurred due to these unexpected and new restrictions.

In addition, prior the execution of the Lease, one wall in tenant space 1200 / DS-01, located in the Dey Street Headhouse, was comprised of glass. This transparent wall, with direct sightlines to Broadway and the public transportation areas, provided the space with excellent public-facing visibility. After handing over the Premises, MTA required additional fire rating to partition the space contrary to the specifications set forth in the base building drawings, which removed all visible sightlines. Consequently, potential street-level customers and transit commuters can no longer see the space without entering the store. MTA failed to provide Westfield an opportunity to contest such change and the opaque wall is not contemplated in the Design Guidelines. Accordingly, MTA and should reimburse Westfield for costs it has incurred to better frame the visibility of the space in an amount of approximately $488,000, along with foregone annual revenue from potential customers who would be aware of the retail offering but for MTA's design change in an amount of approximately $250,000 annually.

## IV. Corbin Building Façade – Landmark Status

The façade of the Corbin Building was repaired and cleaned as part of a restoration project prior to Westfield's participation in the Fulton Center project. Westfield entered into the Lease with the understanding that additional repairs and cleanings were not expected to be required for at least thirty years, with inspections every five years, as set forth in the Concept of Operations. Based on the foregoing, Westfield agreed to undertake the responsibility for cleaning the skylights, perimeter windows and

6

façade of the Corbin Building. Moreover, because of its concern over increased maintenance expenses, Westfield negotiated certain protections under the Lease which restricted MTA's rights to designate the Corbin Building as a "landmark." Nevertheless, on June 23, 2015, approximately 13 months after the Lease was executed, the Corbin Building was designated as a "landmark" by the New York City Landmarks Preservation Commission ("LPC") with express approval of MTA (pursuant to its public testimony on May 12, 2015).

The Lease restricts MTA from allowing the LPC to designate the façade of the Corbin Building as a "landmark". The only limited exception to such restriction is that such designation be undertaken with the sole purpose of "facilitate[ing] any transfer of development rights from the land under the Fulton Building and Corbin Building to the block that includes the Dey Street Headhouse," provided that even then such designation may not result in (a) "material restrictions" on Westfield's use of the Corbin Building or (b) "material requirements for inspecting or maintaining the façade of the Corbin Building" to which the Corbin Building was not already subject pursuant to the requirements of the State Historic Preservation Office ("SHPO"), and provided further, such designation requires that (A) MTA compensate Westfield for "any incremental cost or expense resulting from such designation" and (B) MTA demonstrate to Westfield, through a review of applicable LPC and SHPO Law and regulations, that the foregoing clauses (a) and (b) were satisfied.

Prior to the "landmark" designation, MTA did not share with Westfield any review or report demonstrating that the foregoing clauses (a) and (b) were satisfied. Since such designation, Westfield has expended significant resources for inspecting and maintaining the façade of the Corbin Building in accordance with the LPC regulations. Westfield's obligations with respect to the maintenance of the Corbin Building have materially increased without any corresponding compensation from MTA and are expected to increase further in the forthcoming years. MTA must reimburse Westfield for any such incurred costs and for all future costs it will incur to maintain, repair and clean the façade of the Corbin Building in an initial amount of approximately $1,509,000.

Relatedly, in accordance with the Lease, Westfield has obtained and issued to MTA the five-year Chapter 11 Report. Pursuant to such report, certain works have been requested which are outside of Westfield's operational scope of responsibilities. Westfield will discuss such works separately with MTA.

## V.  **Unapproved Advertising Content**

Under the Lease, Westfield has exclusive rights to any signage or displays for commercial purposes in, at and on the Premises, subject only to certain limitations on controversial content. MTA's rights with respect to signage, on the other hand, are limited to signage and display for public arts programming and any and all MTA programming must "exclude any commercial or revenue-generating activity."

7

Nonetheless, as shown on Exhibit A, attached hereto and made a part hereof, MTA has sold and broadcast unapproved commercial and revenue-generated content in the Premises in violation of the Lease. Such activities are prohibited under the Lease and have resulted in a detrimental financial impact on Westfield's advertising ability and have negatively impacted Westfield's relationship with its partners, Subtenants and customers. MTA must immediately cease and desist any unapproved content not in accordance with the Lease and promptly reimburse Westfield for all foregone advertising revenue in connection with such unapproved content.

## VI. Christian Science Reading Room

After the handover of the Premises, Westfield, as operator of the Fulton Center, assumed a lease between MTA, as landlord, and a tenant previously leasing space located in the Christian Science Reading Room (the "CSRR Lease"). The Lease between Westfield and MTA does not require Westfield to undertake any structural or tenant improvements in connection with the CSRR Lease. Nonetheless, under the CSRR Lease, the landlord is obligated to perform certain structural and tenant improvements to ensure the leasable space is suitable. Unbeknownst to Westfield, MTA failed to perform such improvements before assigning the CSRR Lease to Westfield. As a result, to avoid a default under the CSRR lease, Westfield undertook such obligations on behalf of MTA and at a cost of approximately $384,000, which should be promptly reimbursed by the MTA.

## VII. Chargeback Items

As previously discussed, the handover of the Fulton Center was a challenging process. There were several instances for which Westfield was required to undertake additional work or for which MTA failed to deliver work on time. Such instances resulted in additional costs, delayed opening of the revenue generating areas and in some cases a complete loss of portions of the Retail Usage Area (and therefore a complete loss of revenue). Please note that Westfield continues to review the financial impact of such chargeback items.

We also note that we are in receipt of the letter from Greystone Management Solutions, dated May 3, 2018, which asserts that Westfield has committed to providing Greystone Management Solutions certain information by April 30, 2018. We respectfully disagree with such assertion. Westfield had agreed to use diligent efforts to deliver such information and continues to diligently review the back-up information and calculations in connection with unpaid utility bills, and the Signage Participation Rent and Sponsorship Participation Rent. However, with respect to the unpaid utility bills, as a gesture of good will and as communicated during our meeting on May 8, 2018, Westfield is prepared to pay a portion of the unpaid utility bills in an amount equal to $325,615. (i.e., the amount collected from Subtenants with respect to utilities) while Westfield verifies the outstanding balance requested by MTA.

As set forth above, and as further set forth on Exhibit B attached hereto and made a part hereof, there exists a number of design, maintenance and operations related issues in the Fulton Center, which we believe the parties can resolve by cooperating in good faith. To that end, we would propose to discuss all of these items and the path forward, including cost allocation for the preliminary analysis and proposals, at our bi-weekly meetings, beginning with the meeting scheduled for May 22, 2018, and to set-up any additional meetings as may be required. In our meetings, we would also like to discuss how MTA plans to drastically increase transit ridership, which is very short of the approximately 330,000 daily transit riders initially projected by MTA, as set forth in the Concept of Operations. This item is of critical concern to Westfield, as the customer flow is strongly correlated to both digital media income and retail revenues.

Please call or e-mail John Marshall at (212) 882-1114 or jmarshall@westfield.com at your earliest convenience to discuss. We look forward to hearing from you and working together on the matters outlined in this Letter.

*Sincerely,*

**WESTFIELD FULTON CENTER LLC**
a Delaware limited liability company

By: Westfield Property Management LLC, its managing member

By: _____/s/ Marshall_____
Name: JOHN MARSHALL
Title: SVP DEVELOPMENTS

Enclosures

cc:

Metropolitan Transportation Authority
c/o 347 Madison Avenue
New York, NY 10017
Attention: Director of Real Estate

Metropolitan Transportation Authority
c/o 347 Madison Avenue

New York, NY 10017
Attention: General Counsel

New York City Transit Authority
2 Broadway
New York, NY 10004
Attention: General Counsel

Exhibit A

**Digital Content**











<u>Exhibit B</u>

**Costs Incurred**

WESTFIELD FULTON CENTER
4/25/2018
Summary of Back Charge Claim

Claim:

| C# | Description | Trade Costs | Markup | Other Costs | Total Costs | Annualized Rent Impact |
|---|---|---|---|---|---|---|
| C1 | Master Lease Kiosk and RMU infrastructure not provided | $ 1,288,585 | $ 605,635 | $ - | $ 1,894,220 | |
| C2 | Staff toilet rooms requirement contrary to Exhibit K | $ 402,875 | $ 189,351 | $ - | $ 592,226 | $ (41,412) |
| C3 | Tenant storefront fire rating requirement | $ 659,278 | $ 309,861 | $ - | $ 969,139 | |
| C4 | Additional fire alarm requirements (panel & transponder requested by MTA) | $ 102,949 | $ 48,386 | $ - | $ 151,335 | |
| C5 | MTA's Level 2 egress variance requirement through adjacent spaces | $ 200,263 | $ 94,124 | $ - | $ 294,387 | $ (75,000) |
| C6 | Christian Science Reading Room (CSRR) Additional Westfield and Tenant Work | $ 261,253 | $ 122,789 | $ - | $ 384,042 | |
| C7 | Dey Street Headhouse (DSHH) Additional Work & Base Building Design Change | $ 118,961 | $ 55,912 | $ 314,071 | $ 488,944 | $ (250,000) |
| C8 | Fulton Center delayed and incomplete handover | $ - | $ - | $ 1,564,530 | $ 1,564,530 | |
| C9 | Reduced Commuter Flow & Building Design/Security Defficiencies | $ - | $ - | $ - | $ - | $ (1,000,000.00) + |
| C10 | Street Level Change to Egress & Design | $ - | $ - | $ - | $ - | $ (1,036,500) |
| C11 | Corbin Façade Works | $ 1,027,000 | $ 482,690 | | $ 1,509,690 | |
| C12 | Roof HVAC Systems Access | $ - | $ - | $ 120,000 | $ 120,000 | |
| | Total Claim | $ 4,061,164 | $ 1,908,747 | $ 1,878,601 | $ 7,848,512 | $ (2,402,912) |