UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NEW YORK CITY TRANSIT AUTHORITY,

Plaintiff,

v.

WESTFIELD FULTON CENTER LLC,

Defendant.

Civ. No. 24-cv-1123 (LGS)

---

**DECLARATION OF DAVID FLORIO IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

I, DAVID FLORIO, hereby declare under penalty of perjury that the following is true and correct:

1. As detailed in my declaration in support of the NYCTA[1] Motion for a Preliminary Injunction (ECF No. 11), I am the Chief Real Estate Transactions and Operations Officer of the MTA and oversee real estate transactions involving NYCTA (MTA's affiliate). I am submitting this declaration in support of the NYCTA's Reply in Support of its Motion for a Preliminary Injunction and to respond to the statements contained in the Declaration of Diana Grasso.

2. I am familiar with the facts and opinion stated in this declaration.

**Westfield Was Selected to Play a
Leading and Instrumental Role at Fulton Center**

3. Fulton Center (or the "Center") is the busiest transportation hub in Lower Manhattan. Located at the intersection of Fulton St. and Broadway, it connects nine subway lines

---

[1] Undefined capitalized terms have the same meaning as in my prior declaration. (ECF No. 11.)

1

serving Brooklyn, Queens, the Bronx, and the rest of Manhattan. The Center opened in November 2014 after years of construction and was a major Lower Manhattan public transportation project intended to repair, replace, or enhance facilities damaged or destroyed on September 11, 2001. I understand that the center benefited from $847 million of FTA funding and $423.3 million in American Recovery and Reinvestment Act of 2009 funds.

4. In August 2012, two years before Fulton Center opened, the MTA issued an RFP to find a master lessee. (**Exhibit A** is excerpts from the MTA's RFP and Westfield's response.) My understanding is that the RFP invited developers to submit proposals for a long-term master lease. The master lessee would (i) sublet and manage subtenants; (ii) operate and maintain the premises; and (iii) operate signage. (Ex. A at 2.)

5. The main activity of NYCTA—a public-benefit corporation—is to operate and manage public transportation in New York City. NYCTA generally does not directly operate commercial spaces and relies on either the expertise and experience of master lessees for unique civic spaces like the Fulton Center, or on lessees and licensees in smaller retail units to perform such activities.

6. Finding the appropriate master lessee for an undertaking such as Fulton Center is a lengthy process. Even when there are interested and qualified master lessees available, it generally takes approximately a year to select one and two years, in total, for the lessee's management responsibilities to take hold. (*Id*. at 3.) As to the Center in particular, the MTA had to carefully assess whether a proposed master lessee had "a proven track record of quality in maintaining active public spaces and will demonstrate the capacity and inclination to ensure that [the Center is] maintained . . . in keeping with the long-term preservation of the MTA's asset." (*Id.* at 2.) The master lessee also had to prove it can meet various technical requirements specifically tailored to

the Center and negotiated as part of MTA's request for proposals.

7.  The MTA received Westfield's formal proposal for the Center in November 2012. (*Id*. at 4.) In it, Westfield confirmed it had the "expertise, experience and capacity to fulfill all of the MTA's Project Goals," and that its "combination of skills and experience" "will enable" Westfield "to deliver the finest possible execution of the initial and long term leasing, operation and management of Fulton Center, generating the greatest financial potential of the Center, and providing an exceptional, world class customer experience as befits this iconic flagship development of the MTA." (*Id*. at 4.)

8.  I understand that, in an effort to persuade the MTA to accept its proposal, Westfield submitted numerous documents underscoring its unique qualifications, including its longstanding experience in partnering with the public sector and its unique position as the Managing Partner of Westfield WTC development—a facility now directly connected to the Center. (*Id*. at 5.)

9.  Westfield also explicitly promoted its "**17+ years of continuous experience** in development, marketing, leasing and management of retail and food service concessions" in partnership with the public sector. (*Id.* at 7 (emphasis in original).) It also acknowledged that Fulton Center was not just a subway station but a "hub of connectivity" that would "create a truly unique travel experience." (*Id*. at 8.) Westfield claimed at the time to share the MTA's vision of "present[ing]" "commuters, residents and tourists alike" "with an array of outstanding specialty retail and dining options," as well as access to WTC. (*Id.*)

10. In support of its bid, Westfield submitted a "Business Proposal Form" offering an initial term of 20 years, twice renewable for additional periods of 10 years. (*Id*. at 9.) Westfield underscored that it had a "vested interest in the success and the passenger experience at Fulton Center" (*id.* at 4) and offered efficiencies through the staff Westfield deployed for Westfield WTC.

3

11. In May 2014, 21 months after the MTA's request for proposals, the MTA and Westfield executed the Lease and agreed to a 20-year initial term. (ECF No. 6-1 at 36, § 2.2.)

12. Ms. Grasso's declaration ignores the context, purpose, and nature of the Lease as set out above. Preferring to minimize Westfield's commitment, her declaration draws on irrelevant facts. For instance, the number of Westfield employees on the ground at Fulton Center has no bearing on whether Westfield provides services that are essential to the Center's operations.

13. In addition, Ms. Grasso inaccurately diminishes the partnership between NYCTA and Westfield and mischaracterizes Westfield's role at the Center, claiming that, "unlike the shopping malls that" Westfield "typically owns and manages," the Center "is not a Westfield 'branded' property." (ECF No. 38 ¶ 5.) My understanding is that Westfield specifically advertises stores, restaurants, and office spaces at the Center as part of Westfield WTC. (**Exhibit B** is excerpts of the Westfield WTC's website and Instagram account, which show the close relationship between the Center and Westfield WTC.)

14. In fact, Westfield has played a critical role in the successful day-to-day operation of Fulton Center. NYCTA continues to work with and rely on Westfield to leverage its portfolio of retail stores and operate the Center. Indeed, just a few days ago, Westfield requested permission to sublet to a new kiosk tenant in the Dey Street corridor of the Center.

**Westfield's Role Cannot Feasibly be Transitioned to Another Operator**

15. Ms. Grasso also claims that "Westfield's [r]ole [c]an [e]asily be [t]ransitioned to [a]nother [o]perator" (ECF No. 38 at 2, § II), and that NYCTA could "issue [RFPs] to change and obtain new third-party operators." (*Id.* ¶ 8.) I honestly do not know what basis, if any, Ms. Grasso could have for saying that, but she is incorrect, and has totally overlooked the complexity, difficulty, and feasibility of replacing Westfield and all the responsibilities that come with it.

16. Westfield is the *only* operator with synergies between Westfield WTC and Fulton Center. In fact, Westfield touted those synergies as a principal reason why the MTA should choose Westfield as the master lessee during the MTA's RFP process. (*See supra* ¶¶ 7-10.) Moreover, even if a new operator could at some point step into Westfield's shoes, that new operator would have to perform Westfield's service *without* the significant efficiencies that come with Westfield pooling its resources between Westfield WTC and the Center. And, I expect such an operator would face stiff competition from Westfield WTC, further complicating any hypothetical transition.

17. In addition, NYCTA cannot find a master tenant with Westfield's mall-operator expertise and network that is willing to take over Westfield's contractual obligations in a short time frame. Absent an injunction, NYCTA's only recourse in the short term would be to retain a real estate property manager as a band aid to try to stop the Center from effectively shutting down. NYCTA would also have to attempt to take over Westfield's various subleases, transition all of Westfield's accounting measures and set up systems so NYCTA obtains receivables for each subtenant, and take on all other responsibilities that were meticulously negotiated and commemorated in the Lease with Westfield. NYCTA would also have to engage its consultant/broker to market any vacant spaces at the Center. Even these short-term measures would require an immense effort from staff—legal, operational, financial, and others—across NYCTA and distract from operational priorities at the core of NYCTA's mandate, *i.e.*, operating the transit system.

18. Any attempt to recreate the current model would require a full-blown RFP process to select for a new master lessee. Ms. Grasso says NYCTA conducts RFPs "during the normal course of business" (ECF No. 38 ¶ 8), but that is not true. Preparing and managing an RFP is a

major event, especially for a facility like Fulton Center, and an arduous and time-consuming process. A new RFP would involve pre-marketing, appraisal of the Center, and the commencement of a new selection process, followed by lease negotiations and the transition of the new master tenant. In my experience, it would take approximately two years or so after Westfield's departure before the Center could potentially find and operationalize a substitute master lessee.

19. In addition, subtenants are attracted to the Center thanks to their relationship with Westfield. That, in fact, is what Westfield told the MTA, stating that "retailers know from past experience [Westfield] will deliver a world class project." (Ex. A at 14.) And Westfield insisted during the RFP that subtenants value their close partnership with Westfield. (*See*, *e.g.*, Ex. A at 15-16.) Westfield's departure would end the benefits these relationships bring to Fulton Center. That itself may cause subtenants to leave and make new subtenants harder to attract.

**Westfield's Decision to Leave Fulton Center Appears Pretextual**

20. As I noted in my prior declaration, Ms. Grasso informed me that the Lease no longer worked for Westfield in a telephone conversation we had in early January 2024. In a letter dated February 12, 2024, ten years before the expiration of the Lease, Westfield notified the MTA that it intended to "surrender" Fulton Center, noting that "the current situation is financially unsustainable," and stressing "unsafe conditions." (ECF 1-2 at 2.)

21. I understand from publicly available information and Westfield's audited financial statements for the Center that Westfield experienced poor performance in the U.S. following the COVID-19 pandemic. (**Exhibit C** is Westfield's audited 2019-2022 statements of participation rent.) Westfield disclosed that, in May 2020, it "saw a reduction" in revenue at Fulton Center due to the COVID-19 pandemic—not because of any "security" concerns resulting from alleged

NYCTA conduct. (Ex. C at 4.) In 2021 and 2022, Westfield offered COVID-19-related concessions to its subtenants. (*Id*. at 7 and 11.)

22. In fact, Westfield has also disclosed that as a result of the pandemic, its overall commercial revenues at the Center dropped significantly, from nearly $9 million in 2019 to around $2.3 million and $3.5 million in 2021 and 2022, respectively. (*Id.* at 6, 10 and 13.) None of Westfield's audited financial statements for the fiscal years 2019 to 2022 mention "security" issues.

23. My understanding is that Westfield's troubles are in no way limited to the Center. (**Exhibit D** is transcripts from recent investor calls organized by Westfield's parent company.) In fact, to "drive" the "return of our . . . group EBIDTA to pre-COVID levels," Westfield's parent company embarked on a "radical reduction of [its] financial exposure to the U.S. over the course of 2022 and 2023." (Ex. D at 3.) This was, in the CEO's own words, a "massive arbitrage operation." (*Id*. at 8.)

24. Ms. Grasso also mentions construction disputes with NYCTA as one reason behind the parties' "deteriorated relationship." (ECF No. 38 at 3-4, § III and ¶ 12.) The construction-related dispute has been ongoing for several years and is not a new occurrence. Particularly given that Westfield and NYCTA are partners in a development that is a major transit hub, which cost more $1.4 billion to develop, and that serves millions of customers, it is not atypical that a long-term partnership might give rise to some disagreements from time to time.

25. I otherwise strongly disagree with Ms. Grasso's characterization of NYCTA and Westfield's relationship. (*See*, *e.g.*, ECF No. 38 ¶¶ 12-14.) NYCTA has performed its obligations in good faith and has sought to work with Westfield, including through regular meetings, to resolve challenges as it was made aware of them. Westfield is not "of no importance," (*id.* ¶ 14), but rather

an essential partner to NYCTA.

### Westfield Distorts Its Discussion with NYCTA

26. I have relayed the conversations I had with Ms. Grasso in connection with Westfield's desire to prematurely terminate the Lease in my prior declaration. (*See* ECF No. 11 ¶¶ 4-8.) Ms. Grasso's account of our conversation is inaccurate, including on the question of whether Westfield raised assigning the Lease. (*See* ECF No. 38 ¶¶ 19-23.)

27. I recall that, during a January 3, 2024 call, Ms. Grasso mentioned Westfield's desire to terminate the Lease. I raised Westfield's request to MTA and NYCTA employees. Westfield's proposal to prematurely terminate the Lease was not acceptable because it would have created irremediable issues regarding the operation—or failure thereof—of Fulton Center.

28. I never told Ms. Grasso that NYCTA would accept Westfield's surrender of its obligations under the Lease. Nor could I have done so since that was not my decision to make. I do not have that authority, and I have no doubt that Ms. Grasso understands as much. In fact, I told Ms. Grasso that I would have to relay Westfield's request to prematurely terminate the Lease to NYCTA senior management.

29. Ms. Grasso also says that I "specifically stated that NYCTA would likely bring in CBRE"[2] to replace Westfield. (ECF No. 38 ¶ 21.) This fundamentally distorts our conversation.

30. CBRE is no substitute for Westfield. CBRE is a third-party property manager that, to my knowledge, has no mall-owner/operator experience and does not operate retail facilities like those at Fulton Center. As such, if NYCTA issued an RFP for Fulton Center today, I would not expect CBRE to submit a bid as they are not master lessees.

---

[2] Ms. Grasso states that "CBRE manages several other sites for NYCTA." (ECF No. 38 ¶ 21.) That is not true. CBRE acts as a property manager for some MTA properties but has no agreements with NYCTA at present.

8

31. In any event, I never told Ms. Grasso that CBRE, or anyone else, was prepared to step in. Rather, I indicated to Ms. Grasso that NYCTA *might* consider asking CBRE to manage the Center as an emergency measure *if* Westfield abandoned the Center. In my view, this would be a disastrous outcome for NYCTA and the Center. To the extent Ms. Grasso's declaration gives the impression that the NYCTA was at any point ready to accept Westfield's surrender of the lease, her declaration is misleading, and I categorically reject it.

**NYCTA Must Preserve Operations at Fulton Center**

32. Westfield's abandonment of Fulton Center would impose an undue burden on NYCTA and significantly disrupt services. Even attempting to assume Westfield's responsibilities—something NYCTA is not equipped to do—would detract from NYCTA's primary responsibility: operating New York City's transit system. I expect that Westfield's termination of the Lease would cause significant harm, including the possible departure of some of the subtenants and an important disruption of services in connection with the Lease.

33. Disruption of services at Fulton Center would harm the MTA's ridership, including customers who rely on the amenities provided for by Westfield and its subtenants under the Lease. The subway complex at Fulton Center is a major hub in the system and the Center is the single largest retail center in the NYCTA subway system. Not only are amenities especially important at the Fulton Center given its size and role, disruption of services there may undermine MTA customers' confidence over the services at the MTA's transit hubs more generally and create reputational harm for NYCTA and MTA.

34. Disruption of services would undermine customer safety and security. Fulton Center is a large complex. New Yorkers navigate the Center at all hours of the day, including while transferring subway lines. As with all our station retails, ensuring this space is occupied

helps to create a welcoming and high-quality environment for the MTA's ridership at peak hours.

35. Finally, any disruption of services by Westfield has negative ripple effects. The cessation of a service or departure of a subtenant is likely to decrease foot traffic (of commuters as well as neighboring office workers who patronize the tenants there), rendering Fulton Center less attractive to the remaining subtenants. This, in turn, can cause further disruptions and departures, rendering the Center less attractive to prospective subtenants or master tenants. Continuity of service is critical to the Center's long-term promise as a vibrant transit hub in Lower Manhattan.

36. Exacerbating these difficulties are the practical realities of arranging for a new master tenant. While any major RFP is an expensive, arduous, and time-consuming process, I expect a hypothetical new RFP of Fulton Center may raise particular challenges in addition to what I detailed above. (*See supra* ¶ 18.) For example, Westfield is continuing operations at Westfield WTC, a retail space connected to the Center by the Dey Street Corridor. I expect that prospective master tenants at the Center may balk at leasing space connected so closely to Westfield WTC. (*See supra* ¶ 16.)

37. For the foregoing reasons, among others, NYCTA must ensure continuity of operations at the Center as provided for in the Lease.

Dated: April 10, 2024
       New York, New York

/s/ David Florio
David Florio